**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE COMMITTEE OF 100 ON THE** | ) |
| **FEDERAL CITY** | ) |
| **945 G Street, N.W.** | ) |
| **Washington, DC 20001** | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ANTHONY FOXX, Secretary of** | ) |
| **Transportation,** | ) |
| **1200 New Jersey Ave, SE** | ) |
| **Washington, DC 20590** | ) |
| | ) |
| **VICTOR MENDEZ, Administrator,** | ) |
| **Federal Highway Administration,** | ) |
| **1200 New Jersey Ave, SE** | ) |
| **Washington, DC 20590** | ) |
| | ) |
| **GINA McCARTHY, Administrator, U.S.** | ) |
| **Environmental Protection Agency** | ) |
| **1200 Pennsylvania Ave. NW** | ) |
| **Washington, DC 20460** | ) |
| | ) |
| **GENERAL JAMES F. AMOS,** | ) |
| **Commandant, U.S. Marine Corps.** | ) |
| **1555 S Southgate Rd.** | ) |
| **Arlington, VA 22214** | ) |
| | ) |
| **SALLY JEWELL, Secretary U.S.** | ) |
| **Department of the Interior** | ) |
| **1849 C Street, NW** | ) |
| **Washington DC 20240** | ) |
| | ) |
| **JON JARVIS, Director National Park** | ) |
| **Service** | ) |
| **1849 C Street NW** | ) |
| **Washington, DC 20240** | ) |
| | ) |
| **VINCENT GRAY, Mayor** | ) |
| **1350 Pennsylvania Avenue, NW** | ) |
| **Washington, DC 20004** | ) |
| | ) |
| **MATTHEW   BROWN,   Acting   Director** | ) |

**D.C. Department of Transportation**    )
**55 M Street, SE**    )
**Washington, DC 20003**    )
                      **Defendants**    )
    )

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

This lawsuit pertains to CSX Transportation Inc.'s (CSXT) efforts to enlarge a rail tunnel, currently situated in a public right of way in the District of Columbia, underneath Virginia Avenue in Southeast Washington, D.C. ("Virginia Avenue Tunnel," or "VAT"). Plaintiff, The Committee of 100 on the Federal City ("The Committee"), files this civil action seeking declaratory and injunctive relief prohibiting the Defendants from issuing any federal or District of Columbia approvals and/or permits, including but not limited to construction, use and occupancy, and storm water permits, because the Final Environmental Impact Statement, and the Record of Decision (ROD) endorsing the preferred "build alternative" therein violate the National Environmental Policy Act (NEPA) and the Administrative Procedures Act ("APA").

The Final Environmental Impact Statement and Record of Decision's approval of a "build alternative" as opposed to a "no build" or "alternate routing" option was unlawful, in violation of NEPA and the APA because it was the result of unlawful predetermination.

Additionally, among other things, the ROD and Final Environmental Impact Statement (FEIS): (1) improperly "segment" the impacts from the VAT from other CSXT "Gateway Initiative" projects and/or similar rail construction and upgrade projects; (2) fail to consider the cumulative impacts of other rail construction and improvements in the

District and surrounding States; (3) fail to take a hard look at the alternative of routing CSXT's intermodal freight traffic around Washington, D.C., using an alternate route; (4) fail to consider important and relevant information, such as the potential costs of reasonably foreseeable rail spills or incidents and the lack of any District Agency with jurisdiction for ensuring rail safety or the adverse environmental and consequences that would result from a spill, derailment or other rail safety incident; and (5) fail to consider that the District of Columbia will launch a Rail Plan study in Fiscal Year 2015.

The Environmental Impact Statement (EIS) process was also defective because the Defendants failed to adequately respond to Plaintiff's comments pertaining to alternate routing and relied on dated and inaccurate information in that regard.

The EIS, furthermore, was not conducted sufficiently early in the planning process so that it could serve as an important contribution to the decisionmaking process and would not be used to rationalize or justify decisions already made.

The EIS, moreover, contains material misstatements, including an exaggerated account of the degree to which the VAT, standing alone, impedes freight rail on the eastern seaboard, which resulted in an inadequate assessment of the "no build" alternative.   Similarly, while the EIS relies on cost estimates included in the 2007 Railroad Realignment Feasibility Study, produced by the National Capital Planning Commission, to support the decision to give no further consideration to the alternative routing around Washington, D.C., the EIS and ROD fail to acknowledge that the same study concluded that the benefits of re-routing around Washington, D.C. far outweighed those costs – even without considering the costs associated with a rail spill or other incident, such as a terrorist attack.

As a result of the failure to abide by NEPA's standards and requirements, the EIS analysis of alternatives, and the EIS and ROD endorsement of the preferred Build Alternative is unlawful, and no Federal or District action should be permitted to proceed until a new Environmental Impact Statement is completed.

## I.   JURISDICTION AND VENUE

1)    This action arises under, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq.

2)    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

3)    With respect to the claims premised on the District of Columbia Environmental Policy Act of 1989 (D.C. Code § 8-109.01 et seq.), this Court has supplemental jurisdiction in accordance with 28 U.S.C. § 1367.

4)    This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202, and may grant relief pursuant to the APA, 5 U.S.C. §706.

5)    Venue is properly vested in this judicial district under 28 U.S.C. § 1391 (b) & (e), where the Defendants are either agencies of the District of Columbia or officers

or employees of the United States and reside in this district, and a substantial part of the events and omissions which gave rise to this action occurred in this district.

## II.   PARTIES

6)     Plaintiff, The Committee of 100 on the Federal (Committee of 100), is a nonprofit, tax-exempt organization incorporated under the laws of the District of Columbia.  The Committee of 100 is the District's oldest community based planning and advocacy organization. Its mission is to safeguard and advance city and transportation planning, with a goal for preserving the environment and enhancing the District's beauty and overall livability as a city. The Committee has approximately 110 members, including members who live, work, commute, and enjoy recreation activities in the immediate vicinity of the Virginia Avenue Tunnel.  Plaintiff and its members will be adversely affected and injured by the actions of the federal defendants in issuing the permits and approvals referenced in this complaint as a result of the environmental impacts to water and air quality; the increased freight traffic through a residential neighborhood, disruptions to streets and sidewalks, the risk of accidents and spills, and the deleterious and preemptive effect expanding freight rail through the expanded Virginia Avenue Tunnel will have on rail planning in the District of Columbia, and specifically the upcoming D.C. Rail Plan, which will be a long term planning tool to assess and address the District's passenger and freight rail needs into the future.

7)     Maureen Cohen Harrington is a member of the Committee of 100 whose property is immediately adjacent to the current Virginia Avenue Tunnel, and who will directly suffer from the negative environmental impacts associated with the construction of the expanded tunnels, as well as the operation of the tunnels, once construction is

completed.   The Committee of 100 brings suit, on its own behalf, as well as in furtherance of the interests of Ms. Harrington.

8)      Defendant Anthony Foxx is the U.S. Secretary of Transportation, and the Federal Highway Administration is under the jurisdiction of the Department of Transportation.

9)      Defendant Victor Mendez is the Administrator of the Federal Highway Administration, which is a sub-agency of the U.S. Department of Transportation (DOT). FHWA was the co-lead agency for the Environmental Impact Statement, and FHWA and DOT are responsible for issuing the Record of Decision on the Final Environmental Impact Statement. CSX Transportation Inc. will also require permits from DOT and FHWA in order to enlarge the Virginia Avenue Tunnel.

10)     Defendant Gina McCarthy is the Administrator of the U.S. Environmental Protection Agency. CSX Transportation Inc. will require a National Pollutant Discharge Elimination System (NPDES) Stormwater Permit for Construction Activities in order to enlarge the Virginia Avenue Tunnel.

11)     Defendant General James F. Amos is the Commandant of the United States Marine Corps. CSX Transportation Inc. will require the Marine Corps' approval to stage equipment and materials and to relocate utilities that currently exist within an adjacent Marine Corps Recreational Facility in order to enlarge the Virginia Avenue Tunnel.

12)     Defendant Sally Jewell is the Secretary of the U.S. Department of the Interior, which has jurisdiction over the National Park Service, and CSX Transportation Inc. will require the National Park Service's approval to stage equipment and materials

and to relocate utilities that currently exist within National Park Service property in order to enlarge the Virginia Avenue Tunnel.

13)     Defendant Jon Jarvis is the Director of the National Park Service. CSX Transportation Inc. will require National Park Service approval to stage equipment and materials and to relocate utilities that currently exist within National Park Service property in order to enlarge the Virginia Avenue Tunnel.

14)     Defendant Vincent Gray is the Mayor of the District of Columbia, with jurisdiction over the District of Columbia Department of Transportation. CSX Transportation Inc. will require permits from District of Columbia agencies in order to enlarge the Virginia Avenue Tunnel.

15)     Defendant Matthew Brown is the Acting Director D.C. Department of Transportation ("DDOT"), which acted as co-lead Agency responsible for completing the Environmental Impact Statement at issue in this civil action.  CSX Transportation Inc. will require permits from DDOT in order to enlarge the Virginia Avenue Tunnel.  DDOT, furthermore, has already issued certain permits to CSXT in association with the Virginia Avenue Tunnel expansion project.

### III.     NATIONAL ENVIRONMENTAL POLICY ACT

16)     Congress enacted the National Environmental Policy Act ("NEPA") to "promote efforts which will prevent or eliminate damages to the environment".  42 U.S.C. § 4321.  To achieve this goal, NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action. See id. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.

17)     The National Environmental Policy Act. NEPA has twin aims. First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 551 (1978). Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

18)     NEPA's requirements are procedural, calling upon "agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 68 (D.D.C. 2012). In the course of preparing an Environmental Impact Statement, the agency must "take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas & Elec. Co.*, 462 U.S. at 97.

19)     Agencies' evaluation of environmental consequences must be based on scientific information that is both "[a]ccurate" and of "high quality." 40 C.F.R. § 1500.1(b).  In addition, federal agencies must notify the public of proposed projects and allow the public the chance to comment on the environmental impacts of their actions. *See id*. § 1506.6.

20)     NEPA requires federal agencies to produce an Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  The EIS must provide a "full and fair discussion of significant environmental impacts and ... inform decision makers

and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

21)     The NEPA process must be integrated with agency planning "at the earliest possible time." 40 C.F.R. § 1501.2.

22)     In an EIS, the federal agency must identify the direct, indirect, and cumulative impacts of the proposed action, and consider alternative actions and their impacts. See 42 U.S.C. § 4332(C).

23)     Agencies must consider "[c]onnected actions," "[c]umulative actions," and "[s]imilar actions" together in one environmental impact statement.   40 C.F.R. § 1508.25(a)(1) - (3).   Actions are "connected actions" if they: a. "[a]utomatically trigger other actions which may require environmental impact statements," b. "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or c. "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id*. § 1508.25(a)(1)(i)-(iii).

24)     NEPA requires agencies to consider "alternatives to the proposed action."   42 U.S.C. § 4332(2)(C)(iii) and (E).   The discussion of alternatives is the "heart" of the NEPA process and is intended to "provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.   The alternatives analysis should "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." *Id*. § 1502.2(g).

25)     For FHWA projects, "[i]n order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are

9

fully evaluated, the action evaluated ... shall (1) connect logical termini and be of sufficient length to address environmental matters on a broad scope; (2) have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and (3) not restrict consideration of alternatives for other reasonably foreseeable transportation improvements." 23 C.F.R. § 771.111(f).  Similarly, even in non-FHWA projects, courts consider "such factors as whether the proposed segment (1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 439 (5th Cir.1981)

26)     Agencies are not permitted to predetermine the outcome of the EIS. 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.").

27)     The APA confers a right of judicial review on any person adversely affected by agency action.  5 U.S.C. § 702.  The APA provides that the reviewing court "shall … hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and shall "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(2)(A).

## IV.    DISTRICT OF COLUMBIA ENVIRONMENTAL POLICY ACT

28)     The District of Columbia enacted its own Environmental Policy Act in 1989 (DCEPA). The DCEPA is similar to NEPA in many respects and is intended to require "that the environmental impact of proposed District government and privately initiated actions be examined before implementation and to require the Mayor, board, commission, or authority to substitute or require an applicant to substitute an alternative action or mitigating measures for a proposed action, if the alternative action or mitigating measures will accomplish the same purposes as the proposed action with minimized or no adverse environmental effects." D.C. Code § 8-109.01

29)     Of importance to this case, the DCEPA requires: "Whenever the Mayor or a board, commission, authority, or person proposes or approves a major action that is likely to have substantial negative impact on the environment, if implemented, the Mayor, board, commission, authority, or person shall prepare or cause to be prepared, and transmit … a detailed EIS at least 60 days prior to implementation of the proposed major action, unless the Mayor determines that the proposed major action has been or is subject to the functional equivalent of an EIS." D.C. Code § 8-109.03

## V.     FACTS

30)     CSX Transportation (CSXT) launched what it dubbed the "National Gateway" on May 1, 2008.  The stated goal of the initiative was "to create a highly efficient freight transportation link between the Mid-Atlantic ports and the Midwest."

31)     As explained in a June 26, 2009 letter from CSXT to the National Capital Region Transportation Planning Board of the Metropolitan Washington Council of Governments, CSXT's National Gateway, was intended to "remove obstructions that prevent running double-stack intermodal trains throughout the Washington area." The

National Gateway Initiative involves upgrading tracks, equipment and facilities and to provide clearance for double stack intermodal trains.

32)     According to a June 2010 CSXT presentation, the National Gateway Initiative required 38 clearance projects across the eastern seaboard.

33)     CSXT's National Gateway Initiative involved 13 projects that were necessary for CSXT to be able to run double-stack cars in the Washington Metropolitan Region.   These included replacing two bridges in Montgomery County, Maryland and one in Prince William County, Virginia; renovating two tunnels in Frederick Maryland; lowering track at two points in Prince George's County and 4 points in the District of Columbia; modifying one bridge in the District of Columbia; and replacing and enlarging the Virginia Avenue Tunnel, in Washington, D.C.

34)     This lawsuit focuses on the Virginia Avenue Tunnel expansion project.

35)     The Virginia Avenue Tunnel is located in the Capitol Hill neighborhood of the District of Columbia (DC or District) beneath Virginia Avenue SE from 2nd Street SE to 9th Street SE; Virginia Avenue Park between 9th and 11th Streets; and the 11th Street Bridge right-of-way. The tunnel is also aligned on the south side of Interstate 695 (I-695) previously known as Interstate 295 (I-295). The tunnel portals are located a short distance west of 2nd Street SE and a short distance east of 11th Street SE. The tunnel and rail lines running through the District are part of CSX's eastern seaboard freight rail corridor, which connects Mid-Atlantic and Midwest states.

36)     The Virginia Avenue Tunnel is four blocks away from the U.S. Capitol Building.

37)     According to the Final EIS, "the tunnel has just a single railroad track, which limits the flow of freight train traffic. Virginia Avenue Tunnel was identified as a bottleneck on the east coast. Furthermore, the tunnel does not have sufficient vertical clearance to accommodate rail cars that are loaded with two intermodal containers set one on top of the other, which is called 'double-stacking.'"

38)     Washington, DC is located on the route between east coast ports, such as Norfolk, Virginia; Baltimore, Maryland; Charleston, South Carolina; and Savannah, Georgia; and markets in West Virginia, Pennsylvania, Ohio, Indiana and Illinois.

39)     Among the federal agencies involved, the FHWA assumed lead agency status for NEPA compliance on May 9, 2011, and DDOT acted as the joint lead agency.

40)     The NEPA process began as an Environmental Assessment, which commenced in the summer of 2011.  In the spring of 2012, the project was reclassified as one that would require an Environmental Impact Statement.

41)     The Notice of Intent to issue an Environmental Impact Statement was published in the Federal Register on May 1, 2012. *See* 77 Fed. Reg. 25781.

42)     The Draft EIS ("DEIS") was issued on July 12, 2013, and the public comment period extended through September 25, 2013.

43)     The Committee of 100 submitted comments on the Draft EIS and Final EIS, during the public comment period, and Plaintiff's members also testified in public hearings and public meetings associated with the NEPA process.

44)     The Final Environmental Impact Statement endorsed one of the so-called "Build Options," which entails shifting the existing Virginia Avenue Tunnel from its

current location, building a new tunnel adjacent to the existing one, and building the two new tunnels to a height that will accommodate double-stack freight.

45)     The Final Environmental Impact Statement rejected, and failed to give legally adequate consideration to the "no build" option and the "alternate route" options.

46)     The Final Environmental Impact Statement includes material misrepresentations that ensured that the "no build option" would be rejected, including the statement that "[t]he single railroad track within Virginia Avenue Tunnel represents the single greatest constraint on rail headway … on CSX's mainline freight rail network. It is a bottleneck to the eastern seaboard freight rail corridor because only a single freight train can pass through the tunnel at any one time." *See* FEIS, Section 2.1.1 at 2-2; *See also* FEIS Section 2.1.2, at 2-3 ("this inadequate vertical clearance of Virginia Avenue Tunnel effectively prevents CSX from operating double-stack intermodal container freight trains along its eastern seaboard freight rail corridor.").

47)     Similarly, while the EIS relies on cost estimates included in the 2007 Railroad Realignment Feasibility Study, produced by the National Capital Planning Commission, to support the decision to give no further consideration to the alternative routing around Washington, D.C., the EIS and ROD fail to acknowledge that the same study concluded that the benefits of re-routing around Washington, D.C. far outweighed those costs – even without considering the costs associated with a rail spill or other incident, such as a terrorist attack.

48)     Parsons and Clark Construction, two large engineering and construction companies, separately and in collaboration, prepared numerous studies underpinning the EIS and drafted numerous portions of the Draft and Final EIS, and – on information and

belief – CSXT has contracted with both Parsons and Clark to perform the construction of the tunnel.

49)     The Final Environmental Impact Statement did not assess the cumulative impacts of all of CSXT's National Gateway Initiative projects.

50)     The Final Environmental Impact Statement limited its analysis of impacts to the impacts associated with constructing and expanding the Virginia Avenue Tunnel, neglecting the environmental and other relevant impacts on the human environment associated with running double stack freight cars on two tracks at increased speeds through the District of Columbia.

51)     The Final Environmental Impact Statement did not take into consideration the fact that, unlike Maryland and Virginia, the District of Columbia has no Agency with jurisdiction for ensuring rail safety.

52)     The Final Environmental Impact Statement did not take into consideration the reasonably foreseeable increased likelihood of a spill, derailment or other rail safety incident, and adverse the environmental consequences that would result.

53)     The Final Environmental Impact Statement did not take into consideration that the District of Columbia will launch a Rail Plan study in Fiscal Year 2015.

54)     On August 23, 2010, prior to the time that the Environmental Assessment process was underway, and long before the notice to issue an Environmental Impact Statement was issued, CSXT and DDOT entered into a Memorandum of Agreement in which DDOT and CSXT agreed that:

  a)  The VAT Expansion Project was "critical" to rail transportation and agreed to "work together" to effectuate the project, including submitting grant applications for the project;

b) DDOT would provide support for CSXT's National Gateway Initiative, which included the VAT expansion project, including submitting a letter of support to U.S. DOT and supporting lobbying efforts to secure federal funding;

c) DDOT would submit a TIGER II grant application for a grant that includes the Virginia Avenue Tunnel expansion project;

d) DDOT would "expedite approvals of the required public space permits for the Virginia Avenue Tunnel Expansion Project;"

e) CSXT would pay DDOT $4,171,044 for design and construction costs associated with adjustments to a different project (the 11th Street Bridge Project[1]) (Exhibit 1, Art. IV (C)), which DDOT agreed to credit to CSXT (the CSXT Credit) toward repairing and resurfacing Virginia Avenue following the tunnel expansion (Exhibit 1, Art. III (B)). Under the agreement DDOT was required to pay for the CSXT Credit from federal funds; and

f) In reliance on DDOT's obligations in the MOA, CSXT would agree to negotiate with DDOT over DDOT's use and development of CSXT's Shepherd's Branch Property.

55)     The August 2010 Memorandum Agreement was not included or disclosed in the Draft Environmental Impact Statement.

56)     Defendant FHWA and the other Federal Defendants were aware of the August 23, 2010 agreement between DDOT and CSXT because, *inter alia*, the agreement was included in the appendix materials to the Final Environmental Impact Statement.

57)     On December 21, 2012, CSXT and DDOT signed another agreement, by and through which:

a) DDOT agreed to issue the required public space permit that CSXT would require in the event that the FHWA Record of Decision (ROD) endorsed one of the "build alternatives;"

b) DDOT agreed to "continue to provide oversight of the EIS process for the VAT as co-lead agency with FHWA" and to "partner" with CSXT to "manage the EIS process;" and

---

[1] These adjustments consisted of redesigning and reconstructing one of the access ramps of the 11th Street bridge to accommodate CSXT's plans for the two-tunnel alternative that was ultimately selected in the FEIS as the preferred alternative. FHWA was the lead agency involved in the 11th Street Bridge construction project.

c) DDOT granted CSXT a permanent right of way for the space occupied by the expanded Virginia Avenue Tunnel.

58)     This agreement was not included or disclosed in the Draft Environmental Impact Statement.

59)     Defendant FHWA and the other Federal Defendants were aware of the December 21, 2012 agreement between DDOT and CSXT because, *inter alia*, the agreement was included in the appendix materials to the Final Environmental Impact Statement.

60)     On October 29, 2013 CSXT and DDOT agreed to amend the December 21, 2012 agreement, such that CSXT gave DDOT an option to acquire the Shepherd's Branch right of way, but on condition that "CSXT shall have obtained from the District of Columbia the necessary permits and approvals needed from any agency of the District of Columbia to commence and construct the VAT Project in accordance with the build alternative …"(underlining in the original).

61)     Defendant FHWA and the other Federal Defendants were aware of the October 29, 2013 agreement between DDOT and CSXT because, *inter alia*, the agreement was included in the appendix materials to the Final Environmental Impact Statement.

62)     On March 30, 2014 DDOT issued a revised Public Right of Way Occupancy Permit, modifying the terms of the 2012 Occupancy Permit and permanent right of way to expand the territory of the right of way that DDOT issued to CSXT.

63)     Defendant FHWA and the other Federal Defendants were aware of the March 30, 2014 Right of Way modification because, *inter alia*, the agreement was included in the appendix materials to the Final Environmental Impact Statement.

64)     The ROD, issued by FHWA on November 4, 2014, set forth the basis for the FHWA decision as specified in 40 C.F.R. § 1505.2, summarized mitigation measures that will be incorporated into the Project, and references documents required Section 4(f) approval in accordance with 23 C.F.R. § 774 et seq.

65)     In the ROD, FHWA conceded that it was aware of the agreements between CSXT and DDOT.  FHWA explained, "The 2010 Agreement was meant to resolve potential conflicts regarding a number of projects in the District of Columbia between DDOT and CSX." ROD at 186, p. C-95 (response to Comment 14-1, among others).  FHWA claimed, without explanation, that the agreements between CSXT and DDOT did not impact FHWA's decision.  FHWA failed to explain how it insulated its decisionmaking from DDOT's predetermination, where DDOT was co-lead agency and took the lead with respect to the EIS process.

66)     The District of Columbia never prepared and transmitted a DC Environmental Impact Statement in accordance with the requirements of D.C. Code § 8-109.03.

## COUNT I VIOLATION OF NEPA

67)     Plaintiff incorporates each of the foregoing paragraphs by reference here.

68)     The endorsement of the preferred "build" alternative was the result of unlawful predetermination on the part of the DDOT, as co-lead agency for the EIS, including a *quid pro quo* agreement by which DDOT agreed to support the Virginia Avenue Tunnel in exchange for CSXT's grant of an option that would permit DDOT to purchase the Shepherd's Branch property (conditioned on CSXT receiving all permits

and approvals required for a "build option") and require CSXT's cooperation with DDOT on other projects that were important to DDOT.

69)     DDOT's predetermination was the proximate cause of the FEIS and ROD's endorsement of the preferred "build option."  Furthermore, Defendant FHWA and the other Federal Defendants were aware of DDOT's predetermination because, *inter alia*, the agreements between DDOT and CSXT were included in the appendix materials to the Final Environmental Impact Statement.

70)     The Final Environmental Impact Statement violated the National Environmental Policy Act for the reasons discussed above and additionally because:

a)   The EIS unlawfully segments the impacts related to the construction of the Virginia Avenue Tunnel from the impacts of operating up to four times the volume of freight through the enlarged Virginia Avenue Tunnel.

b)   The EIS fails to consider and address the environmental and other impacts of operating up to four times the volume of freight, at the increased speed of 40 mph, through the Virginia Avenue Tunnel.

c)   The EIS fails to consider and address the impacts of a reasonably likely rail spill, crash or other rail incident.

d)   The EIS unlawfully segments or otherwise fails to consider the cumulative impacts of all of CSXT's National Gateway projects;

e)   The EIS mischaracterizes the degree to which the Virginia Avenue Tunnel stands in the way of CSXT's ability to carry double-stack freight along the eastern seaboard.

f)   The studies underpinning the EIS are unreliable because they were performed by companies who were contracted to perform the expansion construction project.

g)   The EIS failed to consider relevant and pertinent information such as the cost benefit analysis performed by the National Capital Planning Commission in its 2007 Railroad Realignment Feasibility Study, the lack of a District Agency with jurisdiction over rail safety, the projected increase in freight traffic, as well as concomitant noise, vibration, and air quality impacts, and increased risks of accidental and other spills, derailment and other rail incidents, and the comprehensive Rail Plan study that the District of Columbia is set to initiate in FY 2015.

h)   Defendants failed to disclose agreements between DDOT and CSXT prior to issuing the Final Environmental Impact Statement.

i)   Defendants have failed to disclose all documents, including documents referenced in the agreements between DDOT and CSXT in which DDOT agreed to support the Virginia Avenue Expansion project in communications to U.S. Department of Transportation and in an application for a Tiger II grant.

j)   The analysis of alternatives was limited to "Build" options that were minor variations of the same tunnel expansion;

k)   Reasonable consideration was not given to the re-routing freight traffic – either outside the monumental core of Washington, D.C. or outside of Washington D.C. altogether.

l)   Defendants relied on information they knew or should have known was outdated when they considered the viability of alternative routes that would have avoided the Virginia Avenue Tunnel.

m) Defendants failed to conduct a supplemental EIS based on significant new information;

n) Defendants failed to adequately respond to comments submitted by Plaintiff and others regarding the above-listed points and the viability of re-routing CSXT freight traffic away from the Virginia Avenue Tunnel.

71)    These actions and failures to act by the Defendants are arbitrary and capricious, an abuse of discretion or otherwise not in accordance with the law, and  they violate NEPA and the APA, and are causing irreparable injury to the Plaintiffs for which they have no adequate remedy at law.

### COUNT II VIOLATION OF DISTRICT OF COLUMBIA LAW

72)    Plaintiff incorporates each of the foregoing paragraphs by reference here.

73)    The District of Columbia Defendants (Mayor Gray and Acting Director Brown) violated the DCEPA by failing to prepare and issue a DCEPA in association with DDOT's December 21, 2012 grant of a permanent right of way over the projected footprint of the expanded tunnels.

74)    The District of Columbia Defendants (Mayor Gray and Acting Director Brown) violated the DCEPA by failing to prepare and issue a DCEPA in association with DDOT's March 30, 2014 modification and expansion of the December 21, 2012 permanent right of way over the projected footprint of the expanded tunnels.

75)     The determination that the NEPA EIS sufficed for purposes of the DCEPA was arbitrary and capricious and/or otherwise not in accordance with the law for all of the reasons listed in Count I, and also because the NEPA EIS did not assess the impacts on the environment associated with operating up to four times the volume of freight traffic, at the increased speed of 40 mph, through the Virginia Avenue tunnels and the District of Columbia, in the absence of a District of Columbia agency with jurisdiction over rail safety.  Instead, the EIS only assessed the impacts associated with construction of the expanded tunnels.

76)     DDOT also violated D.C. Code § 9-202.01 *et seq.* and/or D.C. Code 10-801 when it granted the Right of Way referenced in paragraphs 66 and 67, *supra*. D.C. Code 10-801 and/or D.C. Code § 9-202.01 *et seq.* only permit the D.C. Council to dispose of rights of way – after making the findings specified in the statute.

77)     These actions and failures to act by the Defendants are arbitrary and capricious, an abuse of discretion or otherwise not in accordance with the law, and they violate the DC EPA and APA, and are causing irreparable injury to the Plaintiffs for which they have no adequate remedy at law.

**RELIEF REQUESTED**

78)     WHEREFORE, the Plaintiffs respectfully request that this Court enter the following relief:

a)     Declare the NEPA Final Environmental Impact Statement and the FHWA's Record of Decision unlawful and of no effect.

b)     Require Defendants to issue a new NEPA Environmental Impact Statement, consistent with NEPA, in which DDOT's pre-judgment is neutralized

and which gives fair and full consideration to the "no build" alternative, which considers the cumulative impacts associated with CSXT's Gateway Initiative, which considers impacts resulting from freight rail operations as well as construction of the expanded tunnels.

c)       Require the District of Columbia Defendants, Mayor Gray and Acting Director Brown to prepare and issue a DC EIS, consistent with DCEPA.

d)       Temporarily and permanently enjoin the Defendants from issuing any permits, follow-on Records of Decision, or other approvals that depend on the NEPA Final Environmental Impact Statement and the FHWA's Record of Decision.

e)       Reimburse Plaintiff's attorneys fees and costs as permitted by the Equal Access to Justice Act, 28 U.S.C. § 2412.

f)       Maintain jurisdiction over this civil action to ensure Defendants' compliance with the Court's orders.

g)       Any other relief the Court considers appropriate for a full and final judgment with respect to all of the Plaintiff's claims.

Respectfully Submitted,

Leslie D. Alderman III
ALDERMAN, DEVORSETZ & HORA, PLLC
1025 Connecticut Ave., NW
Suite 615
Washington D.C. 20036
Tel. 202-969-8220
Fax 202-969-8224
lalderman@adhlawfirm.com