**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE COMMITTEE OF 100 ON THE FEDERAL CITY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:14-cv-001903-CRC ) |
| ANTHONY FOXX, in his official capacity as Secretary of the Department of Transportation; VICTOR MENDEZ, in his official capacity as Administrator of the Federal Highway Administration; GINA McCARTHY, in her official capacity as Administrator of the U.S. Environmental Protection Agency; GENERAL JOSEPH DUNFORD,[1] in his official capacity as Commandant of the U.S. Marine Corps; S.M.R. JEWELL, in her official capacity as Secretary of the Department of the Interior; and JON JARVIS, in his official capacity as Director of the National Park Service, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Federal Defendants, and | ) ) |
| VINCENT GRAY, in his official capacity as Mayor of Washington, D.C.; MATTHEW BROWN, in his official capacity as Acting Director of the D.C. Department of Transportation, | ) ) ) ) |
| District Defendants, and | ) ) |
| CSX TRANSPORTATION, INC., | ) ) |
| Defendant-Intervenor. | ) |

**FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, General Joseph Dunford, the current Commandant of the Marine Corps, is substituted for General James F. Amos.

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

I.     FACTUAL BACKGROUND ...........................................................................................2

     A.     The 100-Year-Old Virginia Avenue Tunnel Needs Reconstruction........................2

     B.     The Single Track Tunnel Is A Choke Point in Area Rail Traffic ...........................4

     C.     The Tunnel Requires Modernization to Meet Modern Industry Standards .............5

     D.     FHWA's NEPA Analysis Began with the Purpose to Provide Efficient
             Freight Service for the District of Columbia, The Washington, D.C.
             Metropolitan Area, and the Eastern Seaboard While Addressing Deficiencies
             with the Tunnel ......................................................................................................6

     E.     The NEPA Process Involved Significant Public Outreach and Engagement ..........7

     F.     FHWA Developed 12 Concepts for Consideration and Narrowed These to
             Four Alternatives for Detailed Consideration............................................................8

     G.     FHWA's Selected Alternative Is Also the Environmentally Preferred
             Alternative.............................................................................................................12

II.     LEGAL BACKGROUND ...............................................................................................12

III.     STANDARDS OF REVIEW ...........................................................................................13

     A.     Standard for Preliminary Injunction .....................................................................13

     B.     Standard under the Administrative Procedure Act .................................................14

IV.     ARGUMENT.....................................................................................................................15

     A.     Plaintiff Has Shown no Likelihood of Success on the Merits of Its Claims..........15

          1.     Plaintiff's Predetermination Claim Has No Merit .....................................15

2.      Plaintiff's NEPA Segmentation Claim is Meritless ...................................19

3.      Plaintiffs Cumulative Impacts Claim Has No Support in the Record ...............................................................................................22

4.      FHWA analyzed a reasonable range of alternatives .................................25

5.      The EIS properly considers reasonable foreseeable impacts ....................29

6.      The FEIS relies on accurate information ...................................................32

B.      Plaintiff Cannot Demonstrate Irreparable Injury ....................................................33

C.      The Balance of Harms and Public Interest Do Not Favor A Preliminary Injunction ..............................................................................................................39

1.      The Public Interest Does Does Not Favor a Preliminary Injunction .........39

2.      The Balance of Harms Weighs Against Preliminary Injunctive Relief ........................................................................................................41

D.      Should the Court Grant Plaintiff's Motion for Preliminary Injunction, the Court Should Impose a Security Bond as Required by Federal Rule of Civil Procedure 65(c) ........................................................................................42

CONCLUSION .......................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*AT&T Corp. v. FCC,*
349 F.3d 692 (D.C. Cir. 2003) ........................................................ 14, 15

*Abdullah v. Obama,*
753 F.3d 193 (D.C. Cir. 2014) .................................................. 13, 14, 15

*Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA,*
215 F.3d 61 (D.C. Cir. 2000) ................................................................ 15

*Amoco Prod. Co. v. Gambell,*
480 U.S. 531 (1987) ............................................................... 34, 39, 41

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ......................................................... 14, 15

*Citizens Against Rails-To-Trails v. Surface Transp. Bd.,*
267 F.3d 1144 (D.C. Cir. 2001) ........................................................... 13

*Citizens against Burlington, Inc. v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) ................................................... 18, 26, 27

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ............................................................................. 14

*City of Alexandria v. Slater,*
198 F.3d 862 (D.C. Cir. 1999) ....................................................... 26, 27

*City of Grapevine v. Dep't of Transp.,*
17 F.3d 1502 (D.C. Cir. 1994) ............................................................. 27

*Clapper v. Amnesty Int'l USA,*
133 S. Ct. 1138 (2013) ........................................................................ 36

*Coal. for Common Sense in Gov't Procurement v. United States,*
576 F. Supp. 2d 162 (D.D.C. 2008) .................................................... 33

*Coal. on Sensible Transp., Inc. v. Dole,*
826 F.2d 60 (D.C. Cir. 1987) ................................... 13, 19, 21, 22, 23

*Concerned about Trident v. Rumsfeld,*
555 F.2d 817 (D.C. Cir. 1976) (per curiam) ...................................... 31

*Ctr. for Food Safety v. Vilsack,*
636 F.3d 1166 (9th Cir. 2011) ............................................................ 36

*Davis v. Latschar,*
  83 F. Supp. 2d 1 (D.D.C. 1998) ........................................................................... 27

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) .......................................................................... 33

*Del. Dep't of Natural Res. & Envtl. Control v. U.S. Army Corps of Eng'rs,*
  685 F.3d 259 (3d Cir. 2012) ............................................................................... 17

*Del. Riverkeeper Network v. FERC,*
  753 F.3d 1304 (D.C. Cir. 2014) ...........................................................19, 20, 21, 23

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ........................................................................... 12, 13, 31

*Flaherty v. Bryson,*
  850 F. Supp. 2d 38 (D.D.C. 2012) ................................................................. 16, 17

*Forest Guardians v. U.S. Fish & Wildlife Serv.,*
  611 F.3d 692 (10th Cir. 2010) ...................................................................... 16, 17, 18

*Fund For Animals v. Hall,*
  448 F. Supp. 2d 127 (D.D.C. 2006) .................................................................... 13

*Fund for Animals v. Norton,*
  281 F. Supp. 2d 209 (D.D.C. 2003) .................................................................... 16

*Glass Packaging Inst. v. Regan,*
  737 F.2d 1083 (D.C. Cir. 1984) .......................................................................... 31

*Grand Canyon Trust v. F.A.A.,*
  290 F.3d 339 (D.C. Cir. 2002) ............................................................................ 23

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
  607 F.3d 453 (7th Cir. 2010) ............................................................................. 42

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ............................................................................. 41

*Los Alamos Study Grp. v. Dep't of Energy,*
  794 F. Supp. 2d 1216 (D.N.M. 2011) .................................................................. 17

*Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ........................................................................................... 36

*Malcom v. Reno,*
  129 F. Supp. 2d 1 (D.D.C. 2000) ........................................................................ 42

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ................................................................................... 14, 39

*McGregor Printing Corp. v. Kemp*,
    No. 91-3255 (GHR), 1992 WL 118794 (D.D.C. May 14, 1992) .......................... 42

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983) ....................................................................................... 31

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) .......................................................................... 31

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .................................................................................. 14, 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................... 14

*N.J. Dep't of Envtl. Prot. v. U.S. NRC*,
    561 F.3d 132 (3d Cir. 2009) ........................................................................... 31

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
    489 F.3d 1221 (D.C. Cir. 2007) ...................................................................... 14

*New York v. U.S. Dep't of Transp.*,
    715 F.2d 732 (2d Cir. 1983) ........................................................................... 31

*No Gwen Alliance, Inc. v. Aldridge*,
    855 F.2d 1380 (9th Cir. 1988) ........................................................................ 31

*Reinders Bros. v. Rain Bird E. Sales Corp.*,
    627 F.2d 44 (7th Cir. 1980) ............................................................................ 42

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ..................................................................................13, 31

*S. Utah Wilderness Alliance v. Norton*,
    237 F. Supp. 2d 48 (D.D.C. 2002) .................................................................. 27

*San Luis Obispo Mothers for Peace v. NRC*,
    449 F.3d 1016 (9th Cir. 2006) ................................................................... 31, 32

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ........................................................................ 42

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ........................................................ 15, 33, 36

*Taxpayers Watchdog, Inc. v. Stanley*,
    819 F.2d 294 (D.C. Cir. 1987) ........................................................................ 19

*Tenn. Envtl. Council v. Tenn. Valley Auth.*,
    3:13-CV-374-TAV-HBG, 2014 WL 3810740 (E.D. Tenn. Aug. 1, 2014) ......................... 17

*Theodore Roosevelt Conserv. P'ship v. Salazar,*
    661 F.3d 66 (D.C. Cir. 2011) ...................................................................... 26, 27

*Theodore Roosevelt Conserv. P'ship v. Salazar,*
    616 F.3d 497 (D.C. Cir. 2010) ...................................................................... 12, 13

*Theodore Roosevelt Conserv. P'ship v. Salazar,*
    605 F. Supp. 2d 263 (D.D.C. 2009) .............................................................. 13, 31

*Tongass Conserv. Soc. v. Cheney,*
    924 F.2d 1137 (D.C. Cir. 1991) .......................................................................... 25

*Transmission Access Policy Study Group v. Ferc,*
    225 F.3d 667 (D.C. Cir. 2000) ........................................................................... 14

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
    Nos. 01-4216, 01-4220, 2001 WL 1739458 (10th Cir. Nov. 16, 2001) ................ 42

*Va. Petrol. Jobbers Asso. v. Fed. Power Com.,*
    259 F.2d 921 (D.C. Cir. 1958) (per curiam) ........................................................ 37

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,*
    435 U.S. 519 (1978) ........................................................................................... 12

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ....................................................................................... 39, 41

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008) ............................................................................ 13, 14, 15, 33, 39

*Wis. Gas Co. v. Fed. Energy Regulatory Com.,*
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) .................................................... 36, 39

*Wis. Valley Improvement Co. v. FERC,*
    236 F.3d 738 (D.C. Cir. 2001) ........................................................................... 14

*Yakus v. United States,*
    321 U.S. 414 (1944) ........................................................................................... 40

**Statutes**

5 U.S.C. § 701 .................................................................................................... 1, 14

5 U.S.C. § 706(2)(A) ................................................................................................ 14

42 U.S.C. § 4332(C) ................................................................................................. 12

42 U.S.C. § 4332(2)(C) ....................................................................................... 13, 25

49 U.S.C. § 11101(a) ............................................................................................... 40

**Rules**

Fed. R. Civ. P. 65(b)(1)(A) ...................................................................................... 33

Fed. R. Civ. P. 65(c) ................................................................................................... 42

**Regulations**

23 C.F.R. § 771.111 ....................................................................................................19

40 C.F.R. § 1502.2(f) .................................................................................................. 16

40 C.F.R. § 1502.14(a)................................................................................................ 25

40 C.F.R. § 1502.14(d) ............................................................................................. 9, 26

40 C.F.R. § 1502.14(e)................................................................................................ 17

40 C.F.R. § 1506.1(a).................................................................................................. 16

40 C.F.R. § 1506.1(d) ................................................................................................. 16

40 C.F.R. § 1508.7 ...................................................................................................... 23

40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c) ..................................................................... 23

40 C.F.R. § 1508.9(a)(1)............................................................................................. 21

43 C.F.R. § 46.420(a)(2).............................................................................................. 26

77 Fed. Reg. 25,781 (May 1, 2012) ............................................................................. 7

**TABLE OF EXHIBITS**

1. Declaration of Michael Hicks

**Record of Decision**
2. Record of Decision
3. Record of Decision Appendices A-C
4. Record of Decision Exhibits A-B

**Final Environmental Impact Statement**
(FEIS Volume 1)
5. Section 4(f) Evaluation, Table of Contents, Executive Summary
6. Chapters 1-3
7. Chapter 4
8. Chapters 5-11

(FEIS Volume 2)
9. Appendix A, part one
10. Appendix A, part two
11. Appendix A, part three

(FEIS Volume 3)
12. Appendix B-C
13. Appendix D-E
14. Appendix F
15. Appendix G-H
16. Appendix I, part one
17. Appendix I, part two
18. Appendix J
19. Appendix K, part one
20. Appendix K, part two

(FEIS Volume 4)
21. Appendix L, part one

22. Appendix L, part two

(FEIS Volume 5)
23. Appendix M, part one
24. Appendix M, part two
25. Appendix M, part three
26. Appendix M, part four
27. Appendix M, part five

# INTRODUCTION

Plaintiff has challenged the Federal Highway Administration's ("FHWA") approval of a proposal for the long-overdue reconstruction of the Virginia Avenue Tunnel (the "Tunnel") in the Capitol Hill neighborhood of Washington, D.C.  Plaintiff claims that the FHWA's Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") fail to satisfy the requirements of the National Environmental Policy Act ("NEPA").[2]  While Plaintiff makes various arguments regarding the sufficiency of the NEPA analysis, Plaintiff's arguments all seem to be focused on the belief that the scope of the FEIS should have been expanded to consider freight rail operations from the ports in the mid-Atlantic region to destinations in the Midwest, *see* Plaintiff's Complaint ¶¶ 30-33, and should have given greater consideration to "reroute" alternatives that would have removed all or most freight rail transportation from the District of Columbia.  *Id.* ¶ 70(k).  However, NEPA does not require the expansive analysis for which Plaintiff advocates here.  Rather, the FEIS adequately analyzed and disclosed the environmental impacts of a reasonable range of alternatives for the Tunnel reconstruction project ("Project").  Moreover, it adequately supports FHWA's decision in the ROD to authorize CSX Transportation, Inc. ("CSX"), which owns the Tunnel, to temporarily close two ramps on Interstate 695 ("I-695") for approximately one week during construction, and to occupy a portion of the 11th Street Bridge right-of-way (which supports I-695).

---

[2] This Memorandum only addresses Plaintiff's claims that relate to federal law, specifically NEPA and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*  Plaintiff's claims that relate to the District of Columbia Environmental Policy Act ("DCEPA") or other District of Columbia law will be addressed by other defendants in this case.

On the basis of its NEPA allegations, Plaintiff has moved for a preliminary injunction, asking the Court to halt the Virginia Avenue Tunnel Project until the Court issues a decision on the merits of Plaintiff's claims.  The Court should deny the Motion because Plaintiff has failed to carry its heavy burden to demonstrate any of the four factors required to obtain injunctive relief: (1) a likelihood of success on the merits; (2) that Plaintiff will suffer imminent irreparable injury; (3) that the balance of harms tips in Plaintiff's favor; and (4) that the public interest favors injunctive relief.  Plaintiff's NEPA claims find no support in the record or in the case law, and Plaintiff has presented no substantial evidence of imminent irreparable harm.  Plaintiff's sole evidence of irreparable harm is contained in the declaration of Maureen Cohen Harrington, a resident living near the construction site, who is concerned about noise, vibrations, air pollutants, traffic, and parking problems caused by the Virginia Avenue Tunnel reconstruction.  Even so, the temporary annoyance caused by construction impacts does not constitute imminent irreparable harm sufficient to support an injunction, particularly in the context of an urban environment adjacent to a major interstate highway.

Finally, Plaintiff has failed to demonstrate that the equities tip in its favor or that the public interest supports halting this important public works Project.

For all these reasons, Plaintiff's motion for a preliminary injunction should be denied.

## I.  FACTUAL BACKGROUND

### A.  The 100-Year-Old Virginia Avenue Tunnel Needs Reconstruction

The Virginia Avenue Tunnel in Washington, D.C. runs under Virginia Avenue, Southeast and Virginia Avenue Park, from just west of 2nd Street Southeast to just east of 11th Street

Southeast.  FEIS 1-1[3].  It runs parallel to, and directly south of, I-695 (formerly I-295), a major highway running east to west across the southern portion of the District.  *Id*.  The reconstruction of the Tunnel will require the short-term closure of two ramps serving I-695 (for approximately one week or less) and the use of the Interstate Highway right-of-way, both of which require FHWA approval.  These approvals are the federal action necessitating FHWA's preparation of an FEIS and ROD in this case.  FEIS 1-1; ROD 1 to 2.  FHWA is not funding the Tunnel reconstruction.  ROD 1.

The Tunnel was constructed by the Baltimore and Potomac Railroad Company in two phases between 1872 and 1904, pursuant to Congressional authorization.  FEIS 1-3; Act of Mar. 18, 1869, ch. 2, 16 Stat. 1; Act of Feb. 12, 1901, ch. 353, 31 Stat. 767.  The Tunnel is of masonry construction, with rails on crushed stone ballast atop a soil floor.  FEIS 2-3 to 2-4.

In 1985, a large section of the Tunnel's roof collapsed and required emergency repairs. The Tunnel was closed for months, disrupting both freight traffic and street traffic above the Tunnel.  FEIS 1-4.  Though structurally sound after repairs made in 1985-86, there is visible cracking in the masonry, active water infiltration, spalling (i.e. flaking) of brick, and deterioration of mortar in joints.  FEIS 2-3.  The Tunnel's drainage is poor, leading to increased water in the Tunnel and deterioration of the soil beneath the ballast.  FEIS 2-4 to 2-5.  The speed of trains has been reduced to 15 miles per hour through the Tunnel to maintain safe train passage. *Id*.  Maintenance demands for the Tunnel are extensive.  *Id*.

---

[3] The record citations in this brief for the FEIS and ROD refer to the page number in the document.  Thus, "FEIS 1-3" refers to the first chapter, third page, in the FEIS.

### B.  The Single Track Tunnel Is A Choke Point in Area Rail Traffic

The Tunnel and the rails passing through it are now owned by CSX, and they are part of the CSX freight rail corridor that runs along the east coast, and between the east coast and West Virginia, Pennsylvania, Ohio, Indiana, and Illinois.  FEIS 1-5 and 1-6, Figure 1-2.  An average of 20 freight trains pass through the Tunnel daily.  FEIS 2-5.  CSX shares some of its rail lines in and around the District with passenger carriers including the National Railroad Passenger Corporation ("AMTRAK"), Virginia Railway Express ("VRE"), and the Maryland Area Regional Commuter ("MARC") service.[4]  FEIS 1-5.  Approximately 90 AMTRAK and commuter trains run on CSX tracks in the District daily.  *Id*.  Sharing the rails between freight and passenger trains limits the number of trains that can use the rails, slows train speeds, and limits the number of passengers and freight that can move through the area at a time.  *Id*.

When originally constructed, the Tunnel contained two sets of tracks.[5]  31 Stat. 767. Dual tracks remain to the east and west of the Tunnel today, though only a single set of tracks travels through the Tunnel. The width of the Tunnel no longer accommodates two tracks as a result of the modernization and enlargement of train equipment in the 20th Century.  FEIS 1-4. When trains are delayed in passing through the Tunnel, or prevented from using the Tunnel due to flooding, train traffic backs up to the south and north of the District; even those passenger

---

[4]  VRE and MARC provide commuter rail service to residents in West Virginia, Maryland, and Virginia, some of whom are employed in the District.  FEIS 1-5.

[5]  The statute provided: "That the Baltimore and Potomac Railroad Company be, and it is hereby, empowered, authorized, and required to revise, change, and improve the alignment and grade of its railroad, and to relocate parts thereof within the city of Washington, in the District of Columbia, as hereinafter provided, to wit:  Beginning at a point in its present tunnel under Virginia avenue near the intersection of Eleventh street southeast, and extending thence by a continuation of said tunnel, with a width sufficient for not less than two nor more than four tracks, along and under Virginia avenue to the west side of Second street southeast . . . ." 31 Stat. 767 (Feb. 12, 1901).

trains that do not intend to travel through the Tunnel are delayed reaching their destination. FEIS 2-2.  Thus, ironically, while the Tunnel is barely visible to the casual observer, it has become a significant choke point in the movement of freight and passengers as a result of the single track through the Tunnel and its condition.  FEIS 2-1 to 2-2 (Mid Atlantic Rail Operations Phase II Study commissioned by Departments of Transportation from Delaware, New Jersey, Pennsylvania, Maryland, and Virginia identified the Tunnel as a primary bottleneck); FEIS 5-1 ("Upon completion, the portals will remain viewable from very few vantage points (i.e. only at [a] few location[s] at the west and east portals as they are today)."

### C.  The Tunnel Requires Modernization to Meet Modern Industry Standards

A significant and growing portion of the freight carried on these rail lines is now transported in "intermodal containers" because they can be transferred from ship to rail to truck. FEIS 1-5, 2-5.  Although the freight rail industry standard is rapidly moving toward stacking of these intermodal containers two high – "double stacking" – to accommodate more freight on each train (and presumably to reduce costs to shippers of goods), the Tunnel height cannot accommodate double stack trains.  For trains that must go through the Tunnel, CSX may only use single-stack containers.  CSX therefore must use two single-stacked trains to accommodate the same amount of freight that could be pulled on one double-stacked train.  FEIS 2-3.  Double stacking would permit an increase in freight hauling without necessarily increasing the number of trains.  *Id.*

According to FHWA's 2011 Freight Analysis Framework, which forecasts freight movement throughout the country through the year 2040[6], overall freight tonnage throughout the country is expected increase by 50 percent over 2010 levels by the year 2040.  FEIS 2-5.

---

[6]  See http://www.ops.fhwa.dot.gov/freight/freight_analysis/faf/ (last visited Dec. 15, 2014).

Moreover, intermodal container freight traffic is anticipated to grow from 18 percent of all freight transportation in 2007 to nearly 27 percent by 2040. FEIS 2-5. FHWA predicts that a large share of that growth in intermodal freight will occur in rail because of limitations in growth of highway construction, highway congestion, fuel efficiency of rail, and greenhouse gas emission efficiencies. FEIS 2-5 to 2-6. Moreover, the Panama Canal expansion (projected completion 2015), will soon allow passage by ships capable of carrying 12,000 intermodal containers each. FEIS 2-6. The expanded canal will allow freight transporters from Asia access to east coast ports, and "ports along the east coast, such as in Savannah, GA and Charleston, SC, are investing hundreds of millions of dollars to upgrade their facilities to accommodate the larger intermodal vessels and capture a greater market share." FEIS 2-6.

As the largest freight railroad on the east coast, CSX anticipates greater demand for intermodal freight transportation along its eastern corridor and between east coast ports and the Midwest. *Id*. CSX's existing rail network would accommodate anticipated growth if it had dual tracks throughout the network that could accommodate double-stack freight trains. *Id*. CSX's National Gateway Initiative is engaging in an effort to improve the flow of freight traffic throughout the nation by accommodating double stack trains along the east coast and Midwest. *Id*. Given the Tunnel's location along the CSX east coast corridor, and its single-track tunnel through which double stack freight trains cannot pass, it is a constraint to more efficient freight transportation throughout the network. *Id*.

**D. FHWA's NEPA Analysis Began with the Purpose to Provide Efficient Freight Service for the District of Columbia, the Washington, D.C. Metropolitan Area, and the Eastern Seaboard While Addressing Deficiencies with the Tunnel**

FHWA assumed lead responsibility for NEPA compliance related to the Tunnel reconstruction Project NEPA analysis on May 9, 2011, because the Tunnel will require short-

term closure of ramps on I-695 and occupancy of a portion of the 11th Street Bridge right-of-way.[7]  FEIS 1-8; ROD 1 to 2.  The purpose of the Project is to "preserve, over the long-term, the continued ability to provide efficient freight transportation services in the District of Columbia, the Washington Metropolitan area, and the eastern seaboard."  FEIS S-3.  The needs for the Project include addressing the structural and operational deficiencies in the current Tunnel, accommodating increases in freight transportation that are anticipated as a result of the Panama Canal expansion, and ensuring that freight transportation services remain uninterrupted while the old Tunnel is replaced with a new facility.  *Id.*

In developing alternatives for consideration in meeting the purpose and needs, FHWA sought input not only from CSX, which owns the Tunnel, but also from Federal and District of Columbia agencies, interested parties, and the public.[8]  FEIS App. A, August 2, 2011 Scoping Letter and Responses.  The District of Columbia Department of Transportation ("DDOT") is a joint lead agency on the FEIS, as CSX is also seeking permits and approvals from DDOT related to the Project.  ROD 2.

### E.  The NEPA Process Involved Significant Public Outreach and Engagement

The Project's NEPA process began with a scoping letter dated August 2, 2011, notifying interested parties that FHWA and DDOT were beginning a NEPA process regarding the Project.[9]

---

[7]  The District of Columbia Department of Transportation ("DDOT") is a co-lead agency and the U.S. Marine Corps, the National Park Service, the National Capitol Planning Commission, and the Federal Railroad Administration are cooperating agencies.  FEIS S-1.

[8]  At page 3 of Plaintiff's brief, it erroneously asserts that Parsons Corp. prepared studies underpinning the FEIS and is also contracted to perform construction on the tunnel.  As Plaintiff was informed by FHWA in the ROD's response to comments, *Parsons Brinckerhoff* was the lead NEPA consultant, not Parsons Corp.   The two companies are separate entities and not affiliated. ROD, App. C, at C-97 (response to comment 14-5).

[9]  Initially the FHWA and DDOT proposed to prepare an environmental assessment.  However, on May 1, 2012, the FHWA published notice in the Federal Register that it intended to prepare a draft environmental impact statement.  FEIS App. A; 77 Fed. Reg. 25781-02 (May 1, 2012).

Federal Defendants' Opposition to
Plaintiff's Application for a Preliminary Injunction                                                    7

FEIS App. A, scoping letters.  Even before NEPA scoping began, CSX had initiated community

outreach and made numerous presentations to a range of community groups regarding its

proposal for reconstruction of the Tunnel and the concepts under consideration.  FEIS 7-7 to 7-9.

The FHWA hosted four public meetings to solicit further feedback from the community on the

Project and to involve the community in the development of alternatives for the Draft EIS

("DEIS").  FEIS 7-9 to 7-11; *see also* FEIS App. K, public meeting advertising (end of volume).

A Project website was developed and became available in August 2011, and contained

information on scheduled upcoming Project activities, public meeting materials, public

comments, responses to frequently asked questions, and sign-up for inclusion on the Project

mailing list.  FEIS 7-11.  A Project newsletter began in May 2012, with seven newsletters

published between May 2012 and January 2013, during the alternatives development period.

FEIS 7-12.

**F. FHWA Developed 12 Concepts for Consideration and Narrowed These to Four Alternatives for Detailed Consideration**

FHWA developed the following eight criteria for screening concepts for consideration:

1. The concept, upon completion, will address the deficiencies of the Virginia Avenue Tunnel.

2. The concept, upon completion, will provide the necessary improvements for operating double-stack intermodal containers and have two railroad tracks for the efficient flow of commercial rail freight through the Washington Metropolitan Area.

3. The concept will avoid major impacts to the structures, traffic or access to or from I-695.

4. The concept must allow for the maintenance of traffic across Virginia Avenue and along adjacent streets throughout the duration of construction.

5. The concept will maintain interstate rail commerce without a substantial negative impact to the level of service during construction.

6.  The concept will be implemented in a time frame that accommodates the near term anticipated increase in freight traffic.

7.  The concept has a comparatively reasonable duration of construction in the vicinity of the existing tunnel.

8.  The concept has a comparatively low cost.

FEIS 3-42.

The Draft EIS was issued on July 12, 2013, beginning a 45-day public comment period (that was extended for an additional 30 days, resulting in a 75 day comment period).  FEIS 7-12. The DEIS was available for download from the Project website, and hard copies were mailed to interested Federal and District agencies, and copies were available for use at public libraries in Southeast and Southwest, DDOT and FHWA offices, and the CSX community office close to the Tunnel.  *Id.*   A two and one half hour public hearing was held July 31, 2013, at the Capitol Skyline Hilton Hotel.  *Id.*

Based on input during scoping, as well as engineering and physical constraints, the FHWA developed 12 concepts for consideration in the DEIS which were screened for consistency with the eight criteria.[10]  FEIS 3-42 to 3-66. Concept 1 is the No Build alternative that is required under NEPA, 40 C.F.R. § 1502.14(d).[11]  Concepts 2 through 7 are build alternatives that propose rebuilding or reconfiguring the Tunnel.  Concept 2 would rebuild and expand the current Tunnel for two tracks and double-stack trains and would build and use a temporary "runaround" track to the south side of the Tunnel during construction in a protected, but open, trench.  FEIS 3-45.  Concept 3 is similar to Concept 2, except that the temporary runaround track would be to the north of the existing Tunnel.  FEIS 3-46.  Concept 3A, which is

---

[10]  The Agency originally developed 11 concepts but the addition of Concept 3A based on public comments brought the original 11 concepts up to 12.
[11] The "No Build" alternative here is the "No Action" alternative required by NEPA.  FEIS 3-1.

based on public comment, would involve construction of two single track, double-stack tunnels, with the second tunnel built to the north of the existing Tunnel.  FEIS 3-47.  Concept 4 is similar to Concept 2, except that the temporary runaround track and trench would serpentine both to the north and to the south sides of the Tunnel.  FEIS 3-49.  Concept 5 would involve construction of two single track, double-stack side-by-side tunnels with one in the location of the current Tunnel and one to the south of the current Tunnel.  FEIS 3-50.  Concept 6 is similar to Concept 2, 3, and 4 in that it would result in one double-track, double-stack tunnel in the location of the current Tunnel, but it differs in that the runaround track and trench would not be required and half the new tunnel would be used for continuous train traffic throughout construction.  FEIS 3-51. Concept 7 would involve tunnel construction similar to Concepts 2 through 6 but would reroute train traffic away from the rail line serving the Tunnel during construction and close the Tunnel completely until construction was completed.  *Id.*

Concepts 8 through 11 involve permanently rerouting the CSX main rail line outside of Virginia Avenue, but the tunnel would remain to service Washington Metropolitan Area regional customers of CSX.  FEIS 3-55 to 3-60.  Concept 8 involves building a nine-mile long tunnel far beneath the existing Tunnel, which would avoid construction at street level but carry an extremely high financial cost.  FEIS 3-55 to 3-56.  Concept 9 is taken from the 2007 study prepared by the National Capital Planning Commission entitled "Railroad Realignment Feasibility Study," and would divert freight rail traffic off the main line north of Arkendale, Virginia, around the east side of the District through Virginia and Maryland along a new 2.5 mile, two track bridge that would have to be built over the Potomac River.  FEIS 3-56 to 3-58. This concept would use and expand existing single track lines in Charles County and Prince George's County, Maryland – including Indian Head Branch and Pope's Creek Branch – and

join up with the main rail line near Jessup, Maryland.   FEIS 3-58.  Concept 10 is also taken from the National Capital Planning Commission 2007 study and would also reroute freight rail traffic around the east side of the District in Maryland and Virginia along an alternative alignment that would depart from the main line south of Fredericksburg, Virginia and rejoin the main line near Jessup, Maryland.  FEIS 3-60.  Concept 11 is similar to Concept 7 but involved permanently rerouting freight trains outside of the District.  FEIS 3-60.

Each of the twelve concepts was discussed in the DEIS and FEIS, and the reasons for the elimination of concepts are summarized. FEIS 3-62 through 3-66.  The reroute options (Concepts 8-11) were eliminated from detailed consideration because of impacts to communities, natural resource impacts, complex multi-jurisdictional planning demands, and extremely high cost estimates ($2 billion to $4.7 billion, compared to a range of $175 to $208 million for the alternatives considered in detail).  FEIS 3-65.  The FHWA studied four alternatives in detail, the No Build alternative (Alternative 1) and three Build alternatives (Alternatives 2, 3, and 4).[12] FEIS 3-66.

The FHWA responded to comments on the DEIS in the May 2014 FEIS.  FEIS 7-13. Further public comments were received after the FEIS was issued, and the agency responded to those comments in the ROD.  ROD, App. C.  FHWA's ROD selecting Alternative 3 was signed on November 4, 2014.  ROD 45.

---

[12] Alternative 2 was originally Concept 2, Alternative 3 was originally Concept 5, and Alternative 4 was originally Concept 6.  FEIS S-5 to S-7.  Concept 3A was dropped from detailed consideration because it would cause major disruptions to I-695 during construction. FEIS 3-65.

### G.  FHWA's Selected Alternative Is Also the Environmentally Preferred Alternative

Alternative 3 was selected as the preferred alternative because it best met the purpose and need for the Project, minimized impacts, and addressed community concerns.  FEIS S-4.  The selected alternative reduces the duration of the construction period as much as possible, and the center wall and dual tunnel, single-track, double-stack design provides enhanced safety and railroad operational efficiency.  ROD 8.  It also reduces the use of an open trench for temporary rail operations during construction as much as possible, limiting the trench to a 230-foot area at the west end of the tunnel, away from adjacent residences.  *Id*.  The selected design will incorporate features, such as new track ballast and bed, and new concrete flooring, that will reduce noise and vibration felt in the area when trains are passing through the tunnel compared to the current Tunnel.  *Id*.  It is also the environmentally preferred alternative.  *Id*.  The direct and cumulative impacts from the Project will occur during the construction period.  ROD 9.  After construction, there will be no significant additional adverse environmental impacts from the Project, with the exception that some mature trees will be replaced with younger trees: the streetscape will be improved and freight operations will return to pre-construction levels (but with improved service and efficiency).[13]  ROD 9.

### II.      LEGAL BACKGROUND

Under NEPA, federal agencies prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  NEPA is a procedural statute designed to inform agency decision-making and the public regarding environmental impacts.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir.

---

[13]  The Tunnel is immediately adjacent to I-695 – indeed only a few feet away.  FEIS S-1, 4-1, 4-3 (map).  This highway provides constant high levels of background noise now that will remain during and after construction.  FEIS 4-42.

2010) ("It is an 'essentially procedural' statute, meant to ensure 'a fully informed and well-considered decision, not necessarily' the best decision") *quoting Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989); *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001); *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F.Supp.2d 263, 271 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010).   An EIS should take a "hard look" at the environmental impacts of the proposed action and compare the proposal to other reasonable alternatives.  *Theodore Roosevelt Conservation*, 616 F.3d at 503; 42 U.S.C. § 4332(2)(C)).

A court's review of an agency's NEPA compliance is limited. *Theodore Roosevelt Conservation*, 605 F. Supp. 2d at 271. Its role is to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Id.* (citation omitted). "The Court must not substitute its judgment for that of the agency, as 'NEPA merely prohibits uninformed—rather than unwise—agency action.'"  *Id.* at 271-72 (*quoting Robertson,* 490 U.S. at 351).

"Because the NEPA process 'involves an almost endless series of judgment calls ... [t]he line-drawing decisions ... are vested in the agencies, not the courts."  *Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 132 (D.D.C. 2006) (*quoting Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)).

### III.      STANDARDS OF REVIEW

### A.  Standard for Preliminary Injunction

It is well-established that the entry of a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such

relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).   To obtain preliminary

injunctive relief, a moving party must "establish that [it] is likely to succeed on the merits, that

[it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in [its] favor, and that an injunction is in the public interest." *Id*. at 20; *see also*

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Plaintiff

must satisfy all four factors, *Abdullah v. Obama,* 753 F.3d 193, 197 (D.C. Cir. 2014).  A plaintiff

must make a clear showing based on substantial proof that it has suffered or will imminently

suffer an irreparable injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57

(2010) (citation omitted); *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968,

972 (1997) (per curiam) (requiring a "clear showing" of "substantial proof")); *Chaplaincy*, 454

F.3d at 297.

## B.  Standard under the Administrative Procedure Act

Plaintiff's claim is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §

701, *et seq.*, and is subject to the "highly deferential" standard of review set out in the APA.

*Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).  Under this

standard, a court may invalidate a final agency decision only where it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope

of review under this standard is narrow, and a court may not substitute its judgment for that of

the agency. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43

(1983); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), abrogated on

other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

"A party seeking to have a court declare an agency action to be arbitrary and capricious

carries 'a heavy burden indeed.' " *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 745 (D.C.

Cir. 2001) (quoting *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C.

Cir. 2000)).  "The arbitrary and capricious standard is '[h]ighly deferential,' and it 'presumes the

validity of agency action.'"  *Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1228 (quoting *AT&T*

*Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003)).  The district court must uphold the agency's

action where it "has considered the relevant factors and articulated a rational connection between

the facts found and the choice made."  *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61,

68 (D.C. Cir. 2000) (internal quotation and citation omitted).

## IV.    ARGUMENT

To support its motion for a preliminary injunction, Plaintiff must prove by substantial

evidence a likelihood of success on the merits, that it will suffer irreparable harm without

preliminary injunctive relief, that the balance of equities tips in its favor, and that an injunction is

in the public interest.  *Winter*, 555 U.S. at 20; *Chaplaincy*, 454 F.3d at 297; *Sierra Club v. U.S.*

*Army Corps of Engrs.,* 990 F. Supp.2d 9, 24 (D.D.C. 2013).  Plaintiff must satisfy all four

factors, *Abdullah,* 753 F.3d at 197, and here Plaintiff has not satisfied any of them.  None of its

claims are supported by the relevant facts or law.  Moreover, Plaintiff has brought forth no

evidence of irreparable harm and has not demonstrated that the equities favor injunctive relief

here or that the public interest would be served by halting this important infrastructure project.

Plaintiff's motion should be denied.

### A.  Plaintiff Has Shown No Likelihood of Success on the Merits of Its Claims

1.  Plaintiff's Predetermination Claim Has No Merit

Plaintiff claims that three agreements reached between CSX and DDOT outside of the

NEPA process provide evidence of unlawful predetermination of the outcome of the NEPA

process.  Pl.'s Br. at 13-19 (ECF No. 3).  Plaintiff points to: an August 13, 2010 Memorandum of

Agreement regarding various transportation projects in the District, including the Virginia

Avenue Tunnel reconstruction; a December 21, 2012 Term Sheet Agreement, regarding permits

that CSX would need if the Tunnel reconstruction were approved; and an October 29, 2013

amendment to the Term Sheet agreement granting DDOT an option to purchase a separate right-

of-way (Shepherd's Branch) owned by CSX in Southeast D.C. if the Tunnel reconstruction is

approved.[14]  This claim has no merit because FHWA was not a party to any of these agreements.

Furthermore, FHWA was a joint lead agency in the NEPA process, and the ROD challenged in

this case is FHWA's decision, not DDOT's or CSX's decision.  Finally, FHWA has expressly

confirmed it *did not* consider the agreements between DDOT and CSX in making its decision.

ROD 1, 3 ("FHWA did not consider occupancy permits issued by DDOT and agreement

memoranda between DDOT and CSX in reaching this decision"); ROD 44 (FHWA decision

selecting Alternative 3 is based on its own independent review of the FEIS and supporting

technical documents); *see also* ROD App. C, responses to comments 12-7 (C-52), 12-19, 12-20

(C-62 to C-64).  Plaintiff is not likely to succeed on this claim.

NEPA regulations require that "agencies shall not commit resources prejudicing selection

of alternatives before making a final decision."  40 C.F.R. § 1502.2(f); *see also* 40 C.F.R. §

1506.1(a).[15]  The weight of case authority has concluded that "predetermination occurs only

when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent

---

[14] The three agreements are found in Appendix A to the FEIS.  The ROD explained that the 2010 Memorandum of Agreement was intended to resolve potential conflicts and improve coordination between DDOT and CSX regarding various transportation projects in the District. ROD App. C, responses 12-19 and 12-20 (C-62 to C-64); FEIS S-35, Question 27.  The 2012 Term Sheet Agreement is expressly conditioned on the selection of a building alternative in the NEPA process.  FEIS App. A, Term Sheet Agreement ¶ 4.b.

[15] 40 C.F.R. § 1506.1(d) explains that "[t]his section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance."

upon the NEPA environmental analysis producing a certain outcome." *Flaherty v. Bryson*, 850

F. Supp. 2d 38, 70 (D.D.C. 2012) (emphasis in original), quoting *Forest Guardians v. U.S. Fish

and Wildlife Serv.*, 611 F. 3d 692, 714 (10th Cir. 2010); *see also Fund for Animals v. Norton*,

281 F. Supp. 2d 209, 229 (D.D.C. 2003).  The evidentiary standard to prove predetermination is

high.  *See Forest Guardians*, 611 F.3d at 714; *Flaherty*, 850 F. Supp. 2d at 70; *see also Tenn.*

*Envtl. Council v. Tenn. Valley Auth.*, -- F. Supp. 2d --, 3:13-CV-374-TAV-HBG, 2014 WL

3810740, *5-8 (E.D. Tenn. Aug. 1, 2014); *Del. Dep't of Natural Res. v. Army Corps of Eng'rs*,

685 F. 3d 259, 275 n.16 (3d Cir. 2012); *Los Alamos Study Grp. v. Dep't of Energy*, 794 F. Supp.

2d 1216, 1228-30 (D N.M. 2011) , *aff'd*, 692 F.3d 1057 (10th Cir. 2012).

FHWA did not commit itself to an outcome independent of the NEPA process and

Plaintiff never argues that it did.  Pl.'s Br. at 13-19.  Instead, Plaintiff argues that DDOT

predetermined the outcome of the NEPA process.  Plaintiff ignores FHWA's role in approving

the FEIS and issuing the ROD.  That is fatal to Plaintiff's predetermination argument here.  Even

if it were not, however, the agreements on which Plaintiff bases its predetermination argument

fail to establish irreversible and irrevocable commitments to a particular NEPA outcome, even

by DDOT.  The agreements may suggest that DDOT had a preference for a build alternative that

replaces the 100-year-old Tunnel over a No Build or reroute alternative.  That, however, is not a

violation of NEPA.

There is nothing unlawful in an agency having a preference among the alternatives in a

NEPA process; in fact, the NEPA regulations require identification of a preferred alternative.  40

C.F.R. § 1502.14(e).  Nor does NEPA require "subjective impartiality" of an agency undertaking

a NEPA analysis.  *Forest Guardians*, 611 F.3d at 712 ("An agency can have a preferred

alternative in mind when it conducts a NEPA analysis").  Consequently, it is not unlawful for an

agency to anticipate the possible outcome of the NEPA process.  *Id.* at 715 ("We would not hold

. . . that predetermination was present simply because the agency's planning, or internal or

external negotiations, seriously contemplated, or took into account, the *possibility* that a

particular environmental outcome would be the result of its NEPA review of environmental

effects.") (emphasis in original).

      Furthermore, in these circumstances, where CSX has submitted a reasonable proposal to

reconstruct the Tunnel, it was appropriate for DDOT and FHWA to consider CSX's goals.

*Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C. Cir. 1991) (agency should

take into account the needs and goals of the parties involved in a permit application).  "An

agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate

alternative ways of achieving *its* goals, shaped by the application at issue and by the function that

the agency plays in the decisional process."  *Id.* at 199.  So long as the agency develops its

NEPA analysis and evaluates the reasonable alternatives in objective good faith, with the "hard

look" that is the hallmark of NEPA, the statute is satisfied.  *See Forest Guardians*, 611 F.3d at

712.

      Here, the FEIS presents FHWA's and DDOT's robust, comprehensive, and detailed

analysis of the potential environmental impacts of the Tunnel reconstruction, as well as

alternatives.  The ROD provides FHWA's well-reasoned, rational decision based on the FEIS

and supporting technical documents to approve the temporary ramp closures on I-695 and the

occupancy of a portion of the 11th Street Bridge right-of-way.  The ROD was FHWA's decision,

not DDOT's decision, and any agreements between DDOT and CSX were not considered in

reaching it.  ROD 1, 3.  For these reasons, Plaintiff is not likely to succeed on the merits of its

predetermination claim, and that claim does not support entry of a preliminary injunction.

2.      Plaintiff's NEPA Segmentation Claim is Meritless

FHWA also established an appropriate scope for its NEPA analysis, and Plaintiff's claim

that FHWA improperly segmented the environmental analysis is equally unavailing.  Plaintiff

misapplies the relevant law, confuses the facts, and is unlikely to succeed on this claim.  Pl.'s Br.

at 19-23.

> FHWA's NEPA regulations require that
>
> to ensure meaningful evaluation of alternatives and to avoid commitments to
> transportation improvements before they are fully evaluated, the action evaluated
> in each EIS . . . shall: 1) [c]onnect logical termini and be of sufficient length to
> address environmental matters on a broad scope; 2) [h]ave independent utility or
> independent significance, i.e., be usable and be a reasonable expenditure even if no
> additional transportation improvements in the area are made; and 3) [n]ot restrict
> consideration of alternatives for other reasonably foreseeable transportation
> improvements.

23 C. F. R § 771.111.  "Agencies may not evade their responsibilities under NEPA by artificially

dividing a major federal action into smaller components, each without 'significant' impact."

*Coal. on Sensible Transp. v. Dole,* 826 F.2d 60, 68 (D.C. Cir. 1987) (quoting *Taxpayers*

*Watchdog. Inc. v. Stanley,* 819 F.2d 294, 298 (D.C. Cir. 1987); *see also Del. Riverkeeper*

*Network v. FERC,* 753 F.3d 1304, 1315 (D.C. Cir. 2014).  Courts in this Circuit have

acknowledged, however, that the rule against segmentation "is not required to be applied in

every situation."  *Del. Riverkeeper*, 753 F.3d at 1315 (quoting *Taxpayers Watchdog*, 819 F.2d at

298).  Moreover, in the context of a transportation project like this one – entirely within an urban

area rather than linking two cities – the logical termini criterion is "unusually elusive," and

worthy of only "modest weight."  *Coal. On Sensible Transp.*, 826 F.2d at 69.  Instead, more

focus is placed on "independent utility."  *Id.*

Here, the Tunnel Project has logical termini as well as independent utility.  Dual tracks

currently exist to the east and west of the Tunnel on the rail line that serves the Tunnel, but not in

the Tunnel itself because it is not wide enough to accommodate dual tracks.  Thus, the length of

single track through the Tunnel provides logical termini for the Project.  Similarly, there is

independent utility in replacing the single track through the Tunnel with a dual track, to alleviate

the bottleneck causing delays for freight moving through the Tunnel and sometimes causing

delays for passenger trains south of the District that are headed for Union Station.  The Tunnel

does not lose its independent utility simply because it also helps alleviate systemic congestion as

part of CSX's National Gateway Initiative.

The Tunnel itself also provides its own logical termini for the Project, given its condition,

maintenance requirements, and operational demands.  Reconstructing the Tunnel to improve its

structure, drainage, stability, and security would reduce maintenance delays and provide more

efficient access to CSX's customers in the District.  Thus, the Tunnel would have independent

utility even if no other rail improvements were undertaken.

Plaintiff's argument that the Tunnel Project was improperly segmented is based on the

false premise that the main reason for the Project is to allow double stack trains carrying

intermodal containers to use the Tunnel.  Although that is one of the purposes of the Project, it is

not the only purpose or even the primary purpose.  *See* FEIS 2-1 (Purpose and Need) (Purpose is

to preserve, over the long-term, the ability to provide efficient freight transportation services in

the District, region, and eastern seaboard, and the Project needs include addressing structural and

operational deficiencies of the Tunnel, accommodate increases in freight transportation, and

ensure that during construction freight transportation services remain uninterrupted).

Plaintiff's argument also relies heavily on their erroneous assertion that this case is

similar to *Delaware Riverkeeper Network v. FERC.*  In that case, the D.C. Circuit invalidated the

agency's environmental assessment on one segment of natural gas pipeline, because there were

three other segments along the same pipeline then proposed or under consideration before the same agency and all the segments had similar environmental impacts and were interdependent. 753 F.3d at 1315-18.  This case is factually distinguishable from *Delaware Riverkeeper*.  Here, unlike *Delaware Riverkeeper*, the Tunnel itself (due to its maintenance needs) and the single track through the Tunnel, serve as logical termini and establish the independent utility of the Project.  Furthermore, here the FHWA prepared an EIS, whereas in *Delaware Riverkeeper* the agency had prepared a more limited environmental assessment.[16]

Plaintiff also cannot make out a credible claim that the FHWA segmented the Tunnel reconstruction to evade a robust environmental review because it has not identified any larger project with potentially significant environmental impacts that the FHWA has allegedly divided up into smaller segments that have insignificant environmental impacts for NEPA review.  *Coal. On Sensible Transp.*, 826 F.2d at 69.  Plaintiff suggests in passing that the impacts of reconstructing the Tunnel should have been considered in conjunction with CSX's National Gateway Initiative, addressing 60 other impediments along CSX's rail corridor to double stack trains.  Pl.'s Br. at 21-22.  However, Plaintiff provides no evidence that FHWA had a proposal before it for decision related to CSX's National Gateway Initiative, that the 60 other impediments require federal approval to be corrected, or even where the 60 other impediments are and whether they have already been corrected by CSX.[17]

---

[16] An environmental assessment is a "concise public document" that serves to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).

[17] The FEIS reported that other locations on CSX's rail lines in the District with inadequate vertical clearance for double stack trains would require only minor modifications to the rail line. FEIS 2-3.

Federal Defendants' Opposition to
Plaintiff's Application for a Preliminary Injunction                                                    21

Plaintiff's argument is based on the logic that because the CSX rail lines are interconnected, the Tunnel cannot have independent utility. Pl.'s Br. at 22 ("A tunnel – standing alone has no independent utility because – standing alone -- [it] comes from nowhere and leads to nowhere"). The D.C. Circuit has flatly rejected that logic as the basis for a segmentation claim in the context of a highway improvement in *Coalition for Sensible Transportation*, 826 F.2d at 69, and this Court should reject it here as well. "The proper question is whether one project will serve a significant purpose even if a second related project is not built." *Id.*, 826 F.2d at 69. Here, the reconstructed Tunnel will certainly serve a significant purpose in helping improve the efficiency of rail transportation in the District. For that reason, Plaintiff's segmentation argument is unlikely to succeed on the merits and cannot support injunctive relief now.

3.   Plaintiffs Cumulative Impacts Claim Has No Support in the Record

Despite a robust analysis in the FEIS, Plaintiff next argues that the FHWA failed to adequately discuss the cumulative impacts associated with the operation of the Tunnel Project after it is completed.[18] Pl.'s Br. at 23-25. Plaintiff's argument is unavailing for three reasons. First, the FEIS appropriately considered cumulative impacts. *See* FEIS 5-100 to 5-105. Second, Plaintiff is incorrect in asserting that the FEIS did not adequately consider and analyze post-construction impacts due to the potential impact of increased freight movement through the

---

[18]  It appears Plaintiff has misunderstood the distinction between cumulative impacts and direct impacts. Plaintiff's chief complaint pertains to the alleged inadequacy of the FEIS analysis of post-construction impacts from trains operating in the reconstructed Tunnel. Pl.'s Br. at 25 ("It was arbitrary and capricious to limit the cumulative impacts analysis to only the construction phase of the Project and to ignore the environmental impact of transporting up to four times the volume of freight rail, including hazardous materials, at increased speeds through the heart of the capitol."). Post-construction impacts from train operations in the Tunnel are direct impacts, not cumulative impacts.

Tunnel.  FEIS 5-10 and 5-11, 5-81 and 5-82.  Third, Plaintiff has failed to identify any other

actions with impacts that are "cumulative" with the Tunnel reconstruction's impacts that the

FHWA should have considered in the FEIS that were not considered.  Pl.'s Br. at 23-25.  Thus,

Plaintiff's cumulative impacts claim has a small likelihood of success on the merits and does not

support injunctive relief.

        An EIS should discuss the direct, indirect, and cumulative impacts of a proposed project.

40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c).  Cumulative impacts refer to "the impact on the

environment which results from the incremental impact of the action when added to other past,

present, and reasonably foreseeable future actions regardless of what agency (Federal or non-

federal) or person undertakes such other actions.  Cumulative impacts can result from

individually minor but collectively significant actions taking place over a period of time."  *Del.*

*Riverkeeper Network*¸ 753 F.3d at 1319; 40 C.F.R. § 1508.7.  An adequate cumulative impacts

analysis identifies the geographical and temporal boundaries of analysis, the impacts of the

project proposal, identifies other past, present, and reasonably foreseeable future projects

proposed for the same geographic area and within the same temporal boundaries, discusses the

impacts from those projects, and then considers the overall impacts from all the projects

cumulatively.  *Del. Riverkeeper*, 753 F.3d at 1319; *see also Coal. On Sensible Transp.*, 826 F.2d

at 436-37.

        The cumulative impacts analysis in the FEIS explains that the "vast majority of [the]

impacts" from the build alternatives would occur during the construction period, and therefore

the cumulative impacts analysis primarily focuses on the construction period.  FEIS 5-100.  The

FEIS analysis of post-construction impacts adequately supports this conclusion through studies

and modeling, *see, e.g.* FEIS S-10 through S-25, Table S-1, Summary of Environmental Impact

Studies and Proposed Mitigation, and Plaintiff does not challenge these analyses or provide a persuasive rebuttal.[19]   Accordingly, the Court should reject Plaintiff's assertion that the cumulative impacts analysis was inadequate because it focused largely on the construction period.

Even if the Court were to consider Plaintiff's cumulative impacts claim as an inartfully pled challenge to the FEIS analysis of post-construction impacts from increased freight movement through the Tunnel, the Court should reject it.  Plaintiff's claim that the FEIS "ignore[d] the environmental impact of transporting up to four times the volume of freight rail, including hazardous materials, at increased speeds through the heart of the capitol" misstates the facts and misrepresents the FEIS.  Pl.'s Br. at 25.  Plaintiff provides no evidence from the record to support the contention that freight volume through the Tunnel will increase four-fold, and there is no such evidence.  Instead, post-construction the FEIS notes "the Build Alternatives will allow CSX to move the same amount of freight with fewer trains."  FEIS 5-82.

While the FEIS acknowledges that total volume of U.S. freight is expected to grow 50 percent *over the next 30 years*, not all of that volume will be traveling through the Virginia Avenue Tunnel, either now or 30 years from now.  While the east coast is expected to experience substantial growth in freight volume during the next 30 years as a result of the expansion of the Panama Canal, the FEIS analysis also explains that the reconstruction of the Tunnel to accommodate dual tracks and double stack trains will allow the same number of trains currently using the Tunnel to handle growth in freight of up to 100 percent in comparison to existing conditions.  FEIS 5-82.  Moreover, the dual tracks will reduce time that trains spend idling,

---

[19] Detailed discussion of the studies and modeling of environmental impacts is presented in Chapter 5 of the FEIS.

waiting to get through the Tunnel.  *Id.*  Furthermore, with respect to safety, the FEIS explains

that "[t]rain derailments will be less likely to occur in the new tunnel compared to the existing

tunnel, despite a higher operating speed than current conditions.  The new tunnel will have a

more reliable concrete tunnel floor and track ballast."[20]  FEIS 5-11.

For these reasons, the FHWA's cumulative impacts (and direct impacts) analysis of post-

construction freight impacts was sufficient and Plaintiff is unlikely to prevail on this claim.

Accordingly, it affords no support for Plaintiff's motion for a preliminary injunction.

4.  FHWA analyzed a reasonable range of alternatives

FHWA identified 12 alternatives in its preliminary study and analyzed four alternatives in

detail in the DEIS and FEIS.  The alternatives encompassed a range of options, from the No

Build alternative to 11 various build alternatives.  Plaintiff argues that FHWA violated NEPA

because it failed to consider any options that re-routed freight outside of the District of

Columbia.  Pl.'s Br. at 28.  The FEIS establishes that FHWA conducted a thorough alternatives

analysis and eliminated certain alternatives (or "concepts") from detailed study because they did

not meet the purpose and need of the Project.  As to the eliminated alternatives, FHWA was

obligated to "'*briefly* discuss the reasons for their having been eliminated.'"  *Tongass*

*Conservation Soc'y v. Cheney*, 924 F.2d 1137, 1140-41 (D.C. Cir. 1991) (quoting 40 C.F.R. §

1502.14(a)) (emphasis in original).  The record clearly shows that the FHWA met this standard

by explaining why these concepts were unreasonable given the objectives of the Project.

---

[20] Moreover, the FEIS reports that "CSX trains do not transport explosive, toxic by inhalation (TIH), or poisonous by inhalation (PIH) materials through the District due to a voluntary agreement with the Government of the District of Columbia."  FEIS S-34, Question 21.

NEPA requires that an agency consider "alternatives to the proposed action" in an EIS, including a "no action" alternative and "all reasonable alternatives."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14(a), (d).  A "rule of reason governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'"  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (citation omitted).  The range of alternatives is determined by the project's statement of purpose and need.  *Id.* at 195 ("The goals of an action delimit the universe of the action's reasonable alternatives.").  NEPA regulations specifically call for the agency to "consider the needs and goals of the parties involved in the application or permit as well as the public interest."  43 C.F.R. § 46.420(a)(2).  Courts "generally defer to the agency's reasonable definition of objectives."  *Theodore Roosevelt Conservation*, 661 F.3d at 73 (citations omitted); *City of Alexandria v. Slater,* 198 F.3d 862, 867 (D.C. Cir. 1999) (courts evaluate whether an agency's objectives are reasonable "with considerable deference to the agency's expertise and policy-making role.").  An agency's analysis of alternatives should be upheld "so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  *Busey*, 938 F.2d at 196.

Here the purpose and need for the Tunnel Project is reasonable.  The FEIS identified the purpose of the Project: "to preserve, over the long-term, the continued ability to provide efficient freight transportation services in the District of Columbia, the Washington Metropolitan Area and the eastern seaboard."  FEIS 2-1.  Plaintiff, on the other hand, seems to believe that the purpose of the Project should have been to eliminate all or most freight transportation from the District.  Plaintiff's apparent disagreement with the Tunnel Project's purpose and need, however, is not a basis for finding that the alternatives analysis was insufficient.  "When an agency is asked to sanction a specific plan . . . the agency should take into account the needs and goals of

the parties involved in the application."  *Busey*, 938 F.2d at 196 (citing 43 C.F.R. § 46.420(a)(2),

other citations omitted).  As the Court stated in *Busey*:

> An agency cannot redefine the goals of the proposal that arouses the call for action;
> it must evaluate alternative ways of achieving *its* goals, shaped by the application
> at issue and by the function that the agency plays in the decisional process.
> Congress did expect agencies to consider an applicant's wants when the agency
> formulates the goals of its own proposed action.  Congress did not expect agencies
> to determine for the applicant what the goals of the applicant's proposal should be.

938 F.2d at 199.  This Circuit has consistently upheld purpose and need statements that called for

the purpose of constructing a given project, so long as the agency also considered broader

objectives.  *See Theodore Roosevelt Conservation*, 661 F.3d at 73 (acceptable purpose and need

was "to act upon the Proponents' proposal . . . to expand the level of development by drilling

4,399 new producing wells and to relax seasonal restrictions in certain areas."); *see also S. Utah

Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 53 (D.D.C. 2002); *City of Alexandria,* 198

F.3d at 867-68; *Davis v. Latschar,* 83 F. Supp. 2d 1, 8 (D.D.C. 1998), *aff'd*, 202 F.3d 359 (D.C.

Cir. 2000).

That is exactly what the Agency has done here.  FHWA's purpose and need included

addressing the structural and operational deficiencies of the century-old Tunnel, accommodating

expected increases in freight transportation, and ensuring that during construction, freight

transportation services remain uninterrupted.  FEIS 2-1.  That FHWA identified this purpose and

need within the context of the particular application prompting FHWA action is entirely

reasonable.  *See City of Alexandria*, 198 F.3d at 869 (analysis of alternatives outside jurisdiction

of the action agency "make little sense for a discrete project within the jurisdiction of one federal

agency"); *see also City of Grapevine v. Dep't of Transp.,* 17 F.3d 1502, 1506 (D.C. Cir. 1994)

(an agency's "consideration of alternatives may accord substantial weight to the preferences of

the applicant") (citation omitted).  Plaintiff does not challenge the purpose and need here.

Likewise, the Agency's analysis of alternatives was reasonable.  The FEIS analyzed twelve "concepts" that were preliminarily considered for the Project.  FEIS 3-42 to 3-43. Concept 1 was the no action or "no build" alternative.  FEIS 3-43.  Concepts 2 through 7 and 3A involved the rebuilding or reconfiguration of the Tunnel.  *Id.*  Concepts 8 through 11 involved rerouting freight rail service around Washington D.C.  *Id.*  Four of these concepts were carried forward to be alternatives analyzed in detail.  FEIS 3-1 to 3-3.  FHWA eliminated the remaining concepts from detailed analysis.  To make these determinations, FHWA used eight detailed evaluation criteria and a screening process.  FEIS 3-60 to 3-63.  *See also* Appendix B, Concepts Evaluation Technical Report.  The first four criteria are based on the purpose and need of the Project.  FEIS 3-62.  The second four criteria address issues of technical and economic feasibility, such as impacts on freight traffic and costs, as well as impacts to the community.  *Id.*

FHWA selected Alternative 3 because it best met the purpose and need of the Project while minimizing environmental impacts and addressing community concerns.  ROD 3.  The preferred alternative offers the shortest construction duration possible and accommodates train operations in a closed tunnel.  *Id.*  It also increases the safety of the tunnel and railroad operations, as the center wall separating the two sets of tracks would isolate any derailment within the Tunnel.  *Id.  See also* FEIS 3-3; ROD 5 to 7.

Plaintiff disagrees with this analysis and argues that all of the reroute concepts would meet seven of the evaluation criteria better than expanding the Tunnel.[21]  Pl.'s Br. at 29.  Plaintiff attempts to apply the evaluation criteria to the reroute concepts, but does not offer any scientific evidence or support for this analysis.  For example, Plaintiff argues that rerouting would have avoided the Tunnel entirely, and thus "the tunnel's deficiencies would have been of no further

---

[21] Plaintiff does not challenge FHWA's evaluation criteria or screening process.

consequence to CSX." *Id.* But under all of the reroute concepts, the existing Tunnel would remain in use indefinitely because CSX must service its Washington Metropolitan area customers, even if non-local freight is re-routed. FEIS 3-43. Thus, an important part of the purpose and need of the Project –to address structural deficiencies in the Tunnel—would remain unmet.

FHWA's alternatives analysis was reasonable. Plaintiff simply disagrees with the Agency's decision, but has not demonstrated that this decision was arbitrary and capricious.

     5.  <u>The EIS properly considers reasonably foreseeable impacts</u>

Plaintiff claims that FHWA fails to consider the post-construction impacts from "rail accidents, disasters or terrorist attack involving trains using the newly expanded tunnel." Pl.'s Br. at 25. Plaintiff argues that an accident involving the spill of hazardous materials is "reasonably foreseeable" because more freight will pass through the Tunnel at greater speed. Pl.'s Br. at 26. Plaintiff fails to offer any evidence or scientific studies supporting these allegations, each of which is contradicted by the record.

First, and contrary to Plaintiff's allegations, the composition of freight passing through the District is not anticipated to change as a result of the Tunnel Project. ROD, App. C at 14-6 (C-97); 24-5 (C-128); 37-27 (C-169). The risk of a rail accident, disaster or terrorist attack exists today. Reconstructing the Tunnel to address structural and operational deficiencies would present no greater risk than exists now.

Second, the FEIS does not support Plaintiff's statement that CSX "will be quadrupling the volume of freight that travels through the Tunnel, and that freight will be traveling at substantially faster rates of speed." Pl.'s Br. at 26 (citing FEIS 2-4 to 2-5). There is no statement in the FEIS that trains will travel at "substantially faster" speeds through the Tunnel.

Nor do the FEIS pages Plaintiff cites support the claim that construction of the Tunnel Project will "vastly increase" the volume of freight.  *Id*.  The FEIS discusses an expected increase in freight tonnage in the entire country over the next 30 years.  FEIS 2-5; 5-82.  But this does not necessarily mean a "vast" increase in train traffic through the Tunnel.  In fact, with the increased vertical clearance in the new Tunnels, double-stack intermodal container trains will allow the same amount of freight to be carried in half as many train cars.  FEIS 5-82.

Third, "CSX does not transport explosive, toxic by inhalation (TIH), or poisonous by inhalation (PIH) materials through the District," FEIS S-34 to S-35, nor does it transport crude oil trains through the District.  FEIS S-35.  That is not anticipated to change with the implementation of the Tunnel Project.

Fourth, railroad safety is and will continue to be closely regulated by the Federal Railroad Administration, the Department of Homeland Security, and many other agencies.  *See*, *e.g.*, FEIS 3-34; L-107.  This ensures that all safety requirements will be met after the Project is completed.  "Train derailments will be less likely to occur in the new tunnel compared to the existing tunnel, despite a higher operating speed than current conditions.  The new tunnel will have a more reliable concrete floor and track ballast."  FEIS S-34.  *See also* FEIS 5-11; 3-3 (discussing added safety benefits from new center wall); ROD 8.

Finally, the FEIS states that CSX will take all necessary and required precautions to avoid accidental spills, derailments, or attacks, as required by federal regulations.  FEIS, App. L 20-9 (L-107); 33-3 (L-207).  Thus, Plaintiff's concerns about a "rail accident involving a spill of toxic material," Pl.'s Br. at 26, are unfounded.

In any event, NEPA does not require FHWA to undertake analysis of post-construction impacts from "rail accidents, disasters or terrorist attack involving trains using the newly

expanded tunnel," Pl.'s Br. at 25, and Plaintiff fails to cite any authority requiring this type of

analysis.  Instead, NEPA requires consideration of only the "reasonably foreseeable

environmental effects of the action rather than every conceivable possibility."  *Theodore*

*Roosevelt Conservation*, 605 F. Supp. 2d at 274 (internal quotations and citation omitted).  *See*

*also DOT v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *Metro. Edison Co. v. People Against*

*Nuclear Energy*, 460 U.S. 766 (1983); *Concerned about Trident v. Rumsfeld*, 555 F.2d 817, 829

(D.C. Cir. 1977) (per curiam) ("NEPA does not mandate that every conceivable possibility

which someone might dream up must be explored in an EIS.").  "Reasonable foreseeability" does

not include "highly speculative harms" that "distort[] the decisionmaking process" by

emphasizing consequences beyond those of "greatest concern to the public and of greatest

relevance to the agency's decision."  *Robertson*, 490 U.S. at 356.

Moreover, the D.C. Circuit has held that NEPA does not require agencies to analyze the

criminal impacts of third parties.  *Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1091-94 (D.C.

Cir. 1984).  Other circuits have agreed.  *See N.J. Dep't of Envtl. Prot. v. NRC*, 561 F.3d 132, 136

(3d Cir. 2009) ("there simply is no proximate cause link between an NRC licensing action . . .

and any altered risk of terrorist attack") (citation omitted); *Mid States Coal. for Progress v.*

*Surface Transp. Bd.*, 345 F.3d 520, 544 (8th Cir. 2003) (affirming agency's decision not to

analyze potential impacts of increased terrorist threat); *City of New York v. U.S. Dep't of Transp.*,

715 F.2d 732, 750 (2d Cir. 1983) (same); *No GWEN Alliance of Lane County, Inc. v. Aldridge*,

855 F.2d 1380 (9th Cir. 1998) (holding contentions that Air Force radio towers would increase

probability of nuclear war and be a target in a nuclear war too "speculative" to warrant discussion under NEPA).[22]

Federal Defendants adequately analyzed the reasonably foreseeable environmental consequences of the Project.  Plaintiff fails to demonstrate a likelihood of success that the Agency's analysis was arbitrary and capricious.

6.   The FEIS relies on accurate information

Finally, Plaintiff argues that FHWA violated NEPA by providing "flawed information" to the public in the FEIS.  Plaintiff argues that the statements regarding the single-track Tunnel are "inaccurate and misleading because they exaggerate the importance" of the Tunnel in the context of the rest of CSX's rail network because the Tunnel is allegedly "just one bottleneck among numerous other bottlenecks" within CSX's rail network.  Br. at 35.  To the contrary, numerous studies have cited the Tunnel as one of the primary obstructions to modern rail traffic in the northeast corridor.  *See*, *e.g.*, FEIS 2-1 (discussing Mid-Atlantic Rail Operations Phase II Study). Plaintiff's argument also ignores the principal reason the Tunnel is a choke point—the single track one-way traffic in the Tunnel.[23]  FEIS 2-2 ("The single railroad track within the Virginia Avenue Tunnel represents the single greatest constraint on rail headway . . . on CSX's mainline freight rail network.").  *See also* 1-3; 2-1; 2-6.  Plaintiff's argument that the FEIS relies on flawed information is without merit.

FHWA adequately analyzed the past, present and reasonably foreseeable environmental consequences of the Tunnel Project, analyzed a reasonable range of alternatives, and relied on

---

[22] *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016 (9th Cir. 2006), is distinguished from this case because it involved construction of a wholly new facility, *id.* at 1020, rather than the modernization of existing infrastructure like the Tunnel Project.
[23] While the current vertical clearance of the tunnel is a problem, it is not currently the primary cause of train delays and stoppages.

accurate information.  Plaintiff has failed to demonstrate a NEPA violation or that the Agency's decision was arbitrary and capricious.

### B.  Plaintiff Cannot Demonstrate Irreparable Injury

Because Plaintiff's claims are not likely to succeed, the Court may end its inquiry.  *See, e.g.*, *Winter*, 555 U.S. at 22; *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).  Even if Plaintiff could establish a likelihood of success on the merits, however, that alone is not sufficient to warrant injunctive relief.  To succeed on its motion, Plaintiff must show that it is likely to suffer irreparable injury in the absence of preliminary relief.  *Winter*, 555 U.S. at 20.  "The irreparable injury requirement erects a very high bar for a movant."  *Coal. For Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008). "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  *Sierra Club*, 990 F. Supp. 2d at 38 (citation omitted). To constitute irreparable injury, the party seeking injunctive relief must demonstrate that the claimed injury is both certain and great and that the alleged harm is actual and not theoretical. *Id*. at 38-39.  Furthermore, injunctive relief should not be granted against something "merely feared as liable to occur at some indefinite time."  *Id*. at 39 (citation omitted).  Rather, the movant must show that the injury complained of is of "such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."  *Id*. (emphasis in original) (quotation marks and citation omitted).  This requires a plaintiff to demonstrate by specific facts that there is a credible threat of immediate and irreparable harm.  Fed. R. Civ. P. 65(b)(1)(A). Plaintiff fails to demonstrate that there is any imminent harm to its interests that is certain and not theoretical.  Because it fails to establish irreparable injury, Plaintiff's motion must be denied.

Contrary to Plaintiff's assertion, Pl.'s Br. at 39-40, the Supreme Court has rejected a presumption of irreparable injury in environmental cases. *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545-46 (1987).  The gravity of the purported environmental harm is instead incorporated into the hardship balancing test, and thus no presumption of harm is necessary.  *Id*. at 545.

 Plaintiff offers several arguments regarding alleged harm it, or its members, will suffer as a result of the Project.  These allegations are based on unsubstantiated fears or speculation.  None of these alleged harms rise to the level of irreparable injury, nor will they occur before the Court issues a decision on the merits.  Plaintiff has failed to establish any non-speculative, imminent, irreparable injury to its concrete interests.

First, Plaintiff argues it will be harmed by "noise, vibrations, air pollutants, traffic and parking problems, utility disruptions, and other environmental impacts and 'inconveniences' from the construction."  Harrington Decl. ¶ 5.  In its comments during the NEPA process, Plaintiff failed to present any scientific evidence or studies on noise, vibration or air quality issues, nor did they challenge the sufficiency of FHWA's analysis in the FEIS of these issues.

The FEIS thoroughly analyzes noise, air quality and vibration in the current condition, during construction, and post-construction.  As to noise, ambient noise levels in this urban community are currently relatively high due mainly to the close proximity to I-695.  FEIS 4-42.  Noise from construction may be an "annoyance," but will be intermittent and limited to daylight hours.  FEIS 5-28.  Mitigation will be employed to reduce noise impacts, including: solid fencing to dampen noise; use of drilling installation methods for placement of load bearing piles, rather than pile drivers; consideration of noise in selecting and maintaining construction equipment; where feasible, using demolition equipment with crushing or shearing technology, rather than

impact technology; placing stationary noise-generating equipment as far from residences as practical and feasible; combining high noise generating operations to occur at the same time, when feasible; routing heavily loaded delivery and disposal trucks away from residential streets when practical and feasible; establishing a noise monitoring plan and monitoring noise throughout construction; adherence to DDOT construction noise specifications; establishment of a community outreach program to notify residents of upcoming high noise activities; and establishment of a procedure for addressing noise complaints during construction.  FEIS 5-35 to 5-36.

Vibration-related damage to buildings is not predicted.  FEIS 5-39.  Vibration may cause human annoyance in some residences during specific construction periods.  FEIS 5-39.  CSX will utilize mitigation measures such as: properly maintaining equipment to limit vibration; avoiding pile driving near residences where feasible; scheduling construction activities likely to produce vibration reaching human-annoyance levels, where practicable, for weekdays when many residents are away from their homes; avoiding routing heavily-loaded trucks through heavily-concentrated residential streets; paving or smoothing construction haul routes; using demolition methods that do not involve impacts, where feasible; and avoiding the use of vibratory rollers and packers near sensitive areas, if possible.  FEIS 5-47.

"[T]he predicted air emissions during construction are not considered to be significant."  FEIS 5-20.  Air emissions will stay within the *de minimis* emission levels established by EPA.  FEIS 5-21.  Additionally, during construction, CSX will monitor for noise, vibration and air quality impacts.  FEIS 5-46; ROD 43 to 44.

Plaintiff has not presented any authority holding that temporary parking problems, utility disruptions and traffic rise to the level of irreparable harm.  Nor has Plaintiff shown that any

disruption caused by construction could not be addressed if the Court ultimately required such relief.  *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.") (citation omitted) (*aff'd in part*, 770 F.2d 114 (D.C. Cir. 1985)).

Second, Plaintiff fears a rail disaster in the Tunnel.  Harrington Decl. ¶ 8.  Plaintiff's allegations are based wholly on conjecture and apprehension that a rail accident might occur. Plaintiff's vague, unsupported and speculative fears are inadequate to establish irreparable harm.[24]  As this court recently held, "it is bedrock law that injunctions will not issue to prevent injuries neither extant nor presently threatened, but only merely feared."  *Sierra Club*, 990 F. Supp. 2d at 41 (quoting *Comm. in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991).  Plaintiff has not shown that its worries are likely to come to fruition and, therefore, they are not sufficient to satisfy the irreparable harm standard.

Regardless, the possibility of a rail accident currently exists, and exists with the "no action" alternative.  The Tunnel Project will actually decrease the likelihood and severity of such an incident, if one were to occur.  FEIS S-34; 5-11; 3-3; ROD 8.  The current Tunnel reflects engineering practices and construction methods that are over 100 years old.  FEIS 2-5.  The

---

[24] Courts have long held that unfounded fears are insufficient to establish Article III standing, and therefore, are also insufficient to establish irreparable harm.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1151 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm. . . ."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) (plaintiff's "subjective apprehensions" that allegedly unlawful conduct would occur again were not enough to support Article III standing); *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, as our decision illustrates, a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it.").

reconstructed Tunnel will be built with industry standard construction techniques, including concrete foundations, instead of the current soil floor.  *Id.*  The new Tunnel will also have improved security technology.  FEIS S-33.

Third, Plaintiff argues it will be harmed by the operation of trains through the Tunnel. These alleged harms are either based on inaccurate information or will exist whether or not the Tunnel Project proceeds.  For example, citing pages 2-4 and 2-5 of the FEIS, Ms. Harrington states that she will suffer injury associated with the operation of the Tunnel, claiming "vast[]" increases in the volume of freight traveling through the Tunnel at "much greater speeds." Harrington Decl. ¶ 7.  But as discussed *supra* at Section A.5., the FEIS does not support Ms. Harrington's concerns.  Trains will not travel at "much greater speeds" through the Tunnel, nor will construction of the Tunnel Project "vastly increase" the volume of freight.  The FEIS discusses an expected increase in freight tonnage in the entire country over the next 30 years. FEIS 2-5.  But this does not necessarily mean a "vast" increase in train traffic through the Tunnel.  Indeed, with the increased vertical clearance in the new Tunnels, double-stack intermodal container trains will allow the same amount of freight to be carried in half as many train cars.  FEIS 5-82.  In any event, freight traffic will exist in the Tunnel whether or not it is expanded.

Fourth, Plaintiff's allegations regarding lost property values, Pl.'s Br. at 41, lack any nexus to Federal Defendants' actions or to Plaintiff's claims in this case.  It is "well settled that economic loss" usually does not constitute irreparable harm as such losses are compensable by monetary damages.  *Wisc. Gas*, 758 F.2d at 674.  *See also Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam).  The Tunnel has been in operation for over one hundred years, and members of Plaintiff organization purchased their

property near the Tunnel in the recent past.  FEIS App. A, 99 (homes completed in 2010); ROD,

App. C, C-44 (homes completed in 2012).  Plaintiff has not presented any evidence that the

Tunnel Project will alter property values during the time this case can be litigated – or at all.[25]

Even assuming lower property values, this type of alleged injury does not constitute irreparable

harm to an interest within the NEPA zone of protection.

     Fifth, Plaintiff argues that irreparable harm will occur because once "the Defendants

issue their approvals and permits, they will lose their ability to control CSX's operations, both

with respect to the construction and the actual operation of the newly expanded tunnel."  Pl.'s Br.

at 40.  Not so.  Whether the Tunnel is expanded or not, CSX is and will be subject to the same

federal and District of Columbia laws and regulations that currently govern its operations.  ROD

1.  During expansion of the Tunnel, CSX will be subject to all applicable federal and District of

Columbia laws and regulations relating to construction and to the ongoing operation of rail

service in the District of Columbia.  *See*, *e.g.*, ROD 43-44 (explaining that DDOT will provide

oversight and monitoring of CSX's construction activities); FEIS App. I.  CSX will also be

subject to all of the terms and conditions set forth in the permits the District of Columbia

issues.[26]  ROD 1; 43 to 44.

     Finally, Plaintiff claims it suffered procedural harm because of Federal Defendants'

alleged NEPA violations.  Br. at 40.  The Court should not reach this question because Federal

---

[25] CSX has proposed a mitigation plan for residential property owners near the Project site that
will compensate financially those most affected by the construction – the "front row" residences
– at a rate of $500 per month during construction for the inconvenience related to the Project.
FEIS 5-13 and 5-15; App. C.  CSX has also agreed to compensate front row residential property
owners up to $75,000 for economic impacts if they are required to sell the home during
construction for an unforeseen reason and cannot obtain fair market value within a reasonable
marketing period.  FEIS 5-17.
[26] Federal Defendants refer the Court to the District of Columbia and CSX's briefs for full and
complete explanation of those permit terms and conditions.

Defendants fully complied with their NEPA obligations, as explained above. *See Monsanto*, 561 U.S. 157-58 (holding that even in cases where a NEPA violation has been found, "[a]n injunction should issue only if the traditional four-factor test is satisfied.") (quoting *Winter*, 555 U.S. at 32-33).

Plaintiff's speculative concerns about possible future activities fail to "substantiate the claim of irreparable injury" with evidence of irreparable harm. *Wis. Gas Co.*, 758 F.2d at 674. Plaintiff has not met its burden on this requirement. For this reason alone, the Court should deny Plaintiff's motion.

### C. The Balance of Harms and Public Interest Do Not Favor A Preliminary Injunction

The balance of harms and the public interest weigh against entry of a preliminary injunction. A preliminary injunction would be adverse to the public interest in the safe, efficient, and environmentally superior movement of goods throughout the country. These harms to the public also outweigh the speculative injury Plaintiff asserts.

#### 1. The Public Interest Does Not Favor A Preliminary Injunction

The public interest standard is a separate consideration in determining whether to grant equitable relief. *Mazurek*, 520 U.S. at 972 (stating that plaintiffs must carry the burden or persuasion as to each element "by a clear showing.") (emphasis in original omitted); *see also Amoco*, 480 U.S. at 545. A federal court must deny a preliminary injunction, even where irreparable injury to the movant exists, if the injunction is contrary to the public interest. *See Winter*, 555 U.S. at 23 (holding that even though plaintiffs showed a "near certainty" of irreparable injury to marine mammals resulting from the Navy's use of mid-frequency active sonar, that harm was outweighed by the public interest in facilitating effective naval training exercises); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("[W]here an injunction

is asked which will adversely affect a public interest . . . the court may in the public interest withhold relief . . . though the postponement may be burdensome to the plaintiff") (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

The public interest strongly weighs against a preliminary injunction.  The Project will improve the safety and efficiency of freight and passenger rail service in the District.

As discussed above, the Tunnel is currently a single-track line.  Before proceeding through the Tunnel, all freight train traffic must stop outside the Tunnel and wait until it is clear of oncoming traffic.  Freight trains can back up, causing delays in freight transit as well as passenger rail service.  Because the Tunnel drainage system is outdated, it floods, delaying all train traffic—both passenger and freight.  FEIS, 2-4.  The public has an interest in moving the Project forward to reduce the flooding and associated delays in train traffic.

The public also has an interest in rail security and safety.  Part of the Tunnel Project includes installation of new security technology.  S-33.  The reconstructed Tunnel will also decrease the likelihood and severity of a train accident.  The new Tunnel will have 30 to 36-inch thick walls, floors and ceilings, creating a more safe system than the current dirt floor.  FEIS S-34; 2-4; 2-5; ROD C-97.

And the public has an interest in the efficient and safe movement of goods throughout the country.  CSX must meet its Common Carrier Obligation to provide "transportation or service on reasonable request."  FEIS 2-7 (quoting 49 U.S.C. 11101(a)).

Plaintiff argues that the movement of goods can be shifted from trains to truck traffic. Pl.'s Br. at 44-45.  But that would not favor the public interest for several reasons.  Freight rail transportation produces lower emissions and is three times more energy efficient than truck transit.  FEIS 2-5 to 2-6.  Moreover, a substantial shift in the mode of freight transit may result in

worsening already congested road networks, especially those along the I-95 corridor—including I-695, only a few yards from some of Plaintiff's members' homes.  FEIS 2-6-2-7; FEIS App. C; App. M.  There is a public interest in the safe, secure, environmentally-superior and efficient movement of freight in this country that weighs against a preliminary injunction.  *Weinberger*, 456 U.S. at 312-13 (holding that impairment of a public interest, "even temporarily," is grounds for denying an interlocutory injunction).  It is in the public interest for the Tunnel Project to move forward.

2.  The Balance of Harms Weighs Against Preliminary Injunctive Relief

In addition to being adverse to the public interest as described above, any preliminary injunction will harm CSX.  While Federal Defendants defer to CSX to present evidence of its specific harms for an injunction, it is clear that the losses to the company's business interests easily outweigh Plaintiff's speculative and unfounded claims of environmental injury from construction of the Tunnel Project.  *See, e.g.*, *Amoco*, 480 U.S. at 545 (holding that the district court had properly denied a motion for preliminary injunction, because injury to the environment "was not at all probable" and outweighed by the economic investment of third parties relying on the governmental action challenged in the litigation); *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (considering harm to local economy and companies in balancing harms).  As in *Amoco*, Plaintiff has not met the balance of harms requirement for preliminary injunctive relief.  Plaintiff has failed to satisfy any of the equitable considerations required for preliminary injunctive relief, let alone all of them.  Therefore, Plaintiff's motion should be denied.

**D. Should the Court Grant Plaintiff's Motion for Preliminary Injunction, the Court Should Impose a Security Bond as Required by Federal Rule of Civil Procedure 65(c)**

If the Court concludes that Plaintiff is entitled to emergency injunctive relief in the form of a preliminary injunction, the Court should require Plaintiff to post a security bond in accordance with Federal Rule of Civil Procedure 65(c).  This Rule provides, in relevant part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained . . . .

Fed. R. Civ. P. 65(c).  On its face, Rule 65(c) admits no exceptions; in other words, the bond is a condition of the injunction.  Courts have affirmed the ongoing validity of the bond requirement. *See*, *e.g.*, *Malcom v. Reno*, 129 F. Supp. 2d 1, 11 (D.D.C. 2000) ("security is required); *McGregor Printing Corp. v. Kemp*, No. 91-3255 (GHR), 1992 WL 118794 at *7 (D.D.C. May 14, 1992) (discussing "mandatory language of Rule 65(c)).

There is no "public interest exception" to Rule 65(c); non-profit and environmental plaintiffs are not exempt from the bond requirement.  *See*, *e.g.*, *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010) (rejecting plaintiffs' argument that non-profit entities should be exempt from the requirements of Rule 65(c) as "fl[ying] in the face of Rule 65(c)"). *See also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, Nos. 01-4216, 01-4220, 2001 WL 1739458 at *5 (10th Cir. Nov. 16, 2001).  Absent extraordinary circumstances, a court errs in failing to grant a request for a bond.  *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980).

Here, if an interim injunction were to issue, a bond should be required in an amount the Court deems appropriate.

## CONCLUSION

The Court should deny Plaintiff's motion for preliminary injunction because Plaintiff has failed to carry its heavy burden to demonstrate any of the four factors required to obtain injunctive relief.  Plaintiff has not shown a likelihood of success on the merits, has failed to offer any evidence of imminent irreparable harm, and has not demonstrated that the equities favor injunctive relief or that the public interest would be served by halting this important infrastructure project.  The Court should deny Plaintiff's application for a preliminary injunction.

Respectfully submitted this 15th day of December, 2014,

   __/s/ Alison D. Garner
Paul D. Barker, Jr.
D.C. Bar No. 434990
Senior Attorney
Alison D. Garner
D.C. Bar No. 983858
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division, NRS
P.O. Box 7611
Washington, D.C. 20044-7611
Barker: Tele: (202) 305-0434
Garner: Tele: (202) 514-2855
Fax: (202) 305-0506
paul.barker@usdoj.gov
alison.garner@usdoj.gov

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of December, 2014, a copy of this foregoing document was filed electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means as reflected on the Notice of Electronic Filing.


    __/s/Alison D. Garner
    Alison D. Garner