# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| The Committee of 100 on the Federal City | ) |
| Plaintiff, | ) |
| v. | ) |
| Anthony Foxx, Secretary of Transportation, et al., | ) Case No. 1:14-cv-1903-CRC |
| Defendants, and | ) |
| CSX Transportation, Inc. | ) |
| Defendant-Intervenor. | ) |

## CSXT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

Peter R. Steenland, Jr.
(D.C. Bar No. 79236)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8532


Peter J. Shudtz
(D.C. Bar No. 188243)
CSX TRANSPORTATION, INC.
1331 Pennsylvania Avenue, N.W.
Suite 560
Washington, DC 20004
(202) 783-8124

Thomas H. Dupree, Jr.
(D.C. Bar No. 467195)
Michael K. Murphy
(D.C. Bar No. 468907)
David A. Schnitzer
(D.C. Bar No. 1022420)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 6

    A.    Congress Authorized The Construction And Use Of The Virginia Avenue Tunnel ................................................................. 6

    B.    There Is A Demonstrated Need To Modernize The Virginia Avenue Tunnel ............................................................................. 7

    C.    The Federal Highway Administration And The District Of Columbia Department Of Transportation Begin The NEPA Process ................................................................................... 10

    D.    FHWA And DDOT Issue A Draft EIS Identifying Three Build Alternatives And A No-Build Option ............................. 14

    E.    The Final EIS Selects A Preferred Build Alternative That Satisfies The Project's Purpose And Need While Minimizing Environmental Impacts .......................................... 15

    F.    FHWA's Record Of Decision Selects The Preferred Alternative .................................................................................... 16

ARGUMENT ................................................................................................... 16

    I.    The Committee Has Failed To Demonstrate Irreparable Injury And The Balance Of Harms Tips In Defendants' Favor In Any Event......................... 18

        A.    The Committee Has Failed To Demonstrate Irreparable Injury...................................................................................... 18

        B.    CSXT Will Suffer Irreparable Harm If The Project Is Enjoined ................................................................................. 23

        C.    The Public Interest Weighs Strongly Against An Injunction .................. 25

    II.    The Committee Has Failed To Establish A Likelihood Of Success On The Merits ................................................................................... 27

        A.    The Alternatives Analysis Was Not "Predetermined"............................. 28

            1.    Predetermination Requires An "Irreversible And Irretrievable" Commitment To A Plan Of Action ....................... 29

**TABLE OF CONTENTS**
(continued)

Page

2.    Neither The Federal Government Nor The District Of Columbia Predetermined The Outcome ................................... 31

B.    There Was No Unlawful "Segmentation"................................... 36

C.    The FEIS Properly Considered Cumulative Impact ................................ 38

D.    The FEIS Properly Considered Reasonably Foreseeable Impacts ...................................................................................... 38

E.    The FEIS Adequately Addressed Alternatives ......................................... 41

F.    The FEIS Did Not Rely On "Flawed Information" ................................. 43

G.    There Was No Violation Of D.C. Law .................................................... 43

1.    There Was No Violation Of The D.C. Environmental Protection Act........................................................ 43

2.    There Was No Violation Of Other D.C. Statutes.......................... 44

CONCLUSION.................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) ........................................................................ 16

*Am. Bus. Ass'n v. Slater*,
    1999 U.S. Dist. LEXIS 20936 (D.D.C. Sept. 10, 1999), *rev'd on other
    grounds*, 231 F.3d 1 (D.C. Cir. 2000) .......................................................... 39, 40

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
    126 F.3d 1158 (9th Cir. 1997) ........................................................................ 31

*Balt. Gas & Elec. Co. v. Natural Res. Defense Council, Inc.*,
    462 U.S. 87 (1983) .......................................................................................... 27

*Bhd. of Ry. & Steamship Clerks v. Fla. E. Coast Ry.*,
    384 U.S. 238 (1966) .......................................................................................... 5

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 18

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) ........................................................................ 42

*City of Alexandria v. Slater*,
    198 F.3d 862 (D.C. Cir. 1999) .................................................................... 41, 42

*Coal. on Sensible Trans. v. Dole*,
    826 F. 2d 60 (D.C. Cir. 1987) .......................................................................... 4

*Ctr. for Food Safety v. Vilsack*,
    636 F.3d 1166 (9th Cir. 2011) ........................................................................ 21

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ...................................................................... 17

*Del. Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) ...................................................................... 37

*Forest Guardians v. U.S. Fish and Wildlife Serv.*,
    611 F.3d 692 (10th Cir. 2010) .................................................................... 30, 33

*Fund for Animals v. Norton*,
    281 F. Supp. 2d 209 (D.D.C. 2003) ............................................................ 29, 32

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Glass Packaging Inst. v. Regan,*
  737 F.2d 1083 (D.C. Cir. 1984) ...................................................................... 39, 40

*Jackson Cnty. v. FERC,*
  589 F.3d 1284 (D.C. Cir. 2009) .......................................................................... 36

*Jones v. D.C. Redevelopment Land Agency,*
  499 F.2d 502 (D.C. Cir. 1974) ............................................................................ 26

*Lee v. U.S. Air Force,*
  354 F.3d 1229 (10th Cir. 2004) .......................................................................... 30

*Macht v. Skinner,*
  715 F. Supp. 1131 (D.D.C.)
  *aff'd,* 889 F.2d 291 (D.C. Cir 1989) .................................................................. 21

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ........................................................................................ 5, 17

*Metcalf v. Daley,*
  214 F.3d 1135 (9th Cir. 2000) ........................................................................ 30, 32

*Mid States Coal. for Progress v. Surface Transp. Bd.,*
  345 F.3d 520 (8th Cir. 2003) .............................................................................. 40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................................. 28

*N.J. Dep't of Envtl. Prot. v. NRC,*
  561 F.3d 132 (3d Cir. 2009) ................................................................................ 40

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................................ 17

*\*Pub. Utils. Comm'n v. FERC,*
  900 F.2d 269 (D.C. Cir. 1990) ........................................................................ 30, 34

*Quince Orchard Valley Citizens Ass'n v. Hodel,*
  872 F.2d 75 (4th Cir. 1989) ................................................................................ 23

*Rufer v. F.E.C.,*
  2014 WL 4076053 (D.D.C. Aug. 19, 2014) .................................................... 16, 18

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ............................................................................ 17

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Sierra Club v. Fed. Highway Admin.*,
   435 F. App'x 368 (5th Cir. 2011) .................................................................. 31

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   990 F. Supp. 2d 9 (D.D.C. 2013) ............................................................. 21, 22

*TD Bank, N.A. v. Pearl*,
   891 F. Supp. 2d 103 (D.D.C. 2012) ............................................................. 18

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   661 F.3d 66 (D.C. Cir. 2011) ....................................................................... 27

*Va. Sunshine Alliance v. Hendrie*,
   477 F. Supp. 68 (D.D.C. 1979) .................................................................... 22

*Village of Logan v. U.S. Dep't of Interior*,
   577 F. App'x 760 (10th Cir. 2014) ............................................................... 21

*W. Ala. Quality of Life v. U. S. Fed. Hwy. Admin.*,
   302 F. Supp. 2d 672 (S.D. Tex. 2004) .......................................................... 20

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ...................................................................................... 25

*Wildearth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ..................................................................... 27

*Winter v. Natural Res. Defense Council, Inc.*,
   555 U.S. 7 (2008) ................................................................... 4, 16, 17, 18

*Wisc. Gas v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ..................................................................... 18

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) ....................................................................... 29

*Wyoming v. U.S. Dep't of Agric.*,
   661 F.3d 1209 (10th Cir. 2011) ............................................... 28, 29, 30, 31, 32

**Statutes**

14 Stat. 387 (Feb. 5, 1867) .................................................................................. 6

16 Stat. 2 (Mar. 18, 1869) ................................................................................... 6

16 Stat. 161 (June 21, 1870) ............................................................................... 6

## TABLE OF AUTHORITIES
(continued)

Page(s)

31 Stat. 767 (Feb. 12, 1901) ............................................................................. 7, 35

5 U.S.C. § 706(2)(A) ............................................................................................ 28

National Environmental Policy Act of 1969 (NEPA),
    42 U.S.C. §§ 4321 *et seq*. .............................................................................. 27

    42 U.S.C. § 4332(2)(C) .................................................................................. 27

    42 U.S.C. § 4332(2)(C)(i)-(iii) ...................................................................... 27

D.C. Code § 8-109.01 .......................................................................................... 44

D.C. Code § 8-109.06 .......................................................................................... 44

D.C. Code § 9-201.01 ..................................................................................... 44, 45

D.C. Code § 10-801 ....................................................................................... 44, 45

**Regulation**
40 C.F.R. § 1502.14(e) ........................................................................................ 31

**Other Authorities**
34 Cong. Rec. 397 (1901) ................................................................................. 6, 7

77 Fed. Reg. 25781 (May 1, 2012) ..................................................................... 11

78 Fed. Reg. 41927 (July 12, 2013) .................................................................... 14

C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1 (3d
    ed. 2014) ......................................................................................................... 18

I-95 Corridor Coal., *Mid-Atlantic Rail Operations Phase II Study: Final Report*
    (2009) ........................................................................................................ 2, 24

Mandelker, Daniel R., et al., *NEPA Law and Litigation* § 10-46 (2013) .................................... 30

Metro. Washington Council of Gov'ts, *2013 Transportation Highlighted Projects* ..................... 3

Metro. Washington Council of Govt's, *Transportation Improvement Program for
    the Metropolitan Washington Region: FY 2013-2018* (2012) ........................................... 2, 24

Nat'l Capital Planning Comm'n, *Freight Railroad Realignment Feasibility Study*
    (2007) ............................................................................................................. 41

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Nat'l Econ. Council & President's Council of Econ. Advisers, *An Economic
        Analysis of Transportation Infrastructure Investment* (2014) ................................................ 26

Ne. Corridor Master Plan Working Grp., *2010 Northeast Corridor Master Plan* ........................ 3

Defendant-Intervenor CSX Transportation, Inc. (CSXT) respectfully submits this brief in opposition to the application for a preliminary injunction filed by Plaintiff The Committee of 100 on the Federal City (the "Committee").

## INTRODUCTION

The Committee asks this Court to enjoin a project to rebuild a key piece of the region's transportation infrastructure—the Virginia Avenue Tunnel, which was built more than a century ago, and has now become a bottleneck to freight and passenger trains moving through Washington, D.C.  The Federal Highway Administration (FHWA) and the District of Columbia Department of Transportation (DDOT), among many other government entities, have recognized the urgent need for this project as part of the larger effort to restore our nation's aging infrastructure and transportation systems.  The region's passenger-rail operators, including Amtrak and Virginia Railway Express, are also strong supporters of the project.

The Virginia Avenue Tunnel is a critical part of the rail network that serves citizens and businesses in the mid-Atlantic and midwestern United States.  The tunnel is owned by CSXT and is located on Capitol Hill.  It lies beneath approximately nine city blocks with exit portals just west of 2nd Street S.E. and just east of 11th Street S.E.  CSXT seeks to modernize this aging tunnel—largely at its own expense—to ensure that this vital rail line can continue to carry and deliver the nation's freight.  The rebuilding plan includes adding a second track and providing additional vertical clearance to accommodate modern double-stacked shipping containers.

The project will take between 30 and 42 months to complete.  During construction, trains will operate through a tunnel that is fully enclosed, other than a 230-foot segment that is far away from any residence.  Once the construction is complete, the entire area will be fully restored.  In fact, it will be better than before, in that there will be additional green space, a new dog park, and a section of Virginia Avenue itself will be straightened to conform to the original L'Enfant Plan.

Any impact from construction activities will be temporary and no different than ordinary construction in an urban area.  The unchallenged studies accompanying the environmental review confirm that there will be no meaningful impact on air quality, as any emissions will not exceed *de minimis* emission thresholds.  Nor will there be any vibration beyond that ordinarily produced by typical construction projects.  And once the project is completed, the trains will operate in a new tunnel with reinforced concrete walls and a concrete floor, and the neighborhood will return to its normal (indeed improved) state.

The existing tunnel is an aging piece of infrastructure.  CSXT must devote increasing amounts of time and resources to inspection, preventive maintenance and repair to ensure continued safe operations.  Because the tunnel is so narrow, this work often means that train traffic through the tunnel must be halted, sometimes with short notice.  Stopping rail traffic in an abrupt way can have enormous impacts on traffic throughout the region, much as a disabled subway train can cause massive backups that take hours to dissipate.  As five state departments of transportation explained in a joint study, the tunnel creates a "notable capacity limitation[]" and is a "primary congestion point[]" for the region's rail system.  *See* I-95 Corridor Coal., *Mid-Atlantic Rail Operations Phase II Study: Final Report* 4-7 (2009).  The Metropolitan Washington Council of Governments similarly noted that the tunnel "has long been identified as one of the most significant freight bottlenecks on the East Coast."  *Transportation Improvement Program for the Metropolitan Washington Region: FY 2013-2018*, at D-1 (2012).

The plan to rebuild the Virginia Avenue Tunnel was five years in the making, and was a team effort that incorporates the ideas of a universe of federal, state and local officials, project planners and engineers, regional transit agencies, environmental experts, community groups, local residents and businesses, and many other interested people and organizations.  The

project's potential environmental effects are exhaustively documented in the multivolume Final

Environmental Impact Statement (FEIS) that provided the basis for the Record of Decision

(ROD) selecting the preferred alternative.

The need to fix the tunnel has been recognized by many other stakeholders:

- Virginia Railway Express, which provides passenger rail service into the District, has endorsed the Virginia Avenue Tunnel project as "greatly improv[ing] fluidity on the part of the railroad" used by its commuter trains, and emphasized that it "will help VRE's current service as well as support our expansion plans."  ROD at C-14.

- Amtrak joined in producing the *2010 Northeast Corridor Infrastructure Master Plan*, which explained that the tunnel creates a "significant bottleneck[ ]" to passenger operations, and advocated a "second track through the Virginia Avenue tunnel."  *Id*. at 47, *available at* http://bit.ly/1sZRYWE.

- The Metropolitan Washington Council of Governments put the need to fix the tunnel on its Transportation Planning Board Top 10 list.  *See* www.mwcog.org/uploads/committee-documents/a11aXFZf20130912133457.pdf, at 7.

- Advisory Neighborhood Commission 6B stated:  "We are generally supportive of the . . . the Preferred Alternative," and "recognize that a 100-year old tunnel is likely to need comprehensive repairs in the near future."  ROD at C-16; FEIS at L-41.

- The Washington, DC chapter of the National Railway Historical Society stated that "[w]e see the [No Build Alternative] as simply postponing a problem that must be dealt with (an aging 100+ year old tunnel) and as an economically unsound decision in the long-run for the Washington, D.C. metropolitan region."  FEIS at L-150.

None of the Committee's arguments is likely to succeed on the merits.  Its claim that ordinary urban planning agreements—agreements that were expressly made dependent on NEPA approval—constitute unlawful "predetermination" is not the law, and no court, in the more than 40 years since NEPA was enacted, has ever interpreted NEPA the way the Committee does.  Nor is the Committee correct in claiming that an EIS addressing the Virginia Avenue Tunnel is *per se* unlawful on the theory that any railroad-related EIS must address all potential "impediments" along the eastern seaboard.  The Committee's remaining arguments—concerning re-routing, derailment risks and the importance of the project—all amount to policy disagreements rather than genuine NEPA claims.  As the D.C. Circuit has explained, "[t]he NEPA process involves an almost endless series of judgment calls . . . .  It is of course always possible to explore a subject more deeply and to discuss it more thoroughly.  The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."  *Coal. on Sensible Transp. v. Dole,* 826 F.2d 60, 66 (D.C. Cir. 1987).

The Committee fares no better with its arguments under D.C. law.  These arguments are largely derivative of the Committee's NEPA claims and fail for the same reasons.  To the extent that the Committee has a distinct state-law claim, it fails because DDOT fully complied with the D.C. Environmental Protection Act and because DDOT did not violate the statute concerning permanent conveyances of property by granting a revocable use permit.

But this Court need not reach the merits in order to deny the Committee's application.  That is because the Committee has failed to demonstrate that it will suffer irreparable injury in the absence of an injunction.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (declining to assess the plaintiff's likelihood of success on the merits because the balance of harms tipped decisively in the defendants' favor).  The entirety of the Committee's attempt to

establish that it will suffer irreparable injury consists of (1) a claim that *the Government* will be harmed because it supposedly will lose its ability to control the construction project and train operations; and (2) a declaration from one of the Committee's members that she believes she will suffer from "noise, vibrations, air pollutants, and other environmental impacts, not to mention [ ] traffic and parking problems."  Plaintiff's Application for a Preliminary Injunction ("Application") at 41.  The first argument is irrelevant; the second is speculative, unsupported by any evidence, and does not amount to "irreparable harm" as a matter of law in any event.

Even if the Committee *had* established it will suffer irreparable harm—which it plainly has not—any such harm would be outweighed by the harm to Defendants (including the substantial daily costs CSXT incurs from an outdated tunnel that slows freight traffic throughout the region), and the harm to the public interest (including the costs to commuters who suffer delays as well as the safety and economic risks presented by the antiquated tunnel).  Rebuilding the Virginia Avenue Tunnel is vital to ensuring that CSXT can continue to fulfill its common carrier obligation, serving the businesses and consumers of the mid-Atlantic region and throughout the United States.  *See Bh'd. of Ry. & Steamship Clerks v. Fla. E. Coast Ry.*, 384 U.S. 238, 245 (1966) (common carrier's duty "runs not to shippers alone but to the public").

This is a classic example of a project that is in the public interest:  rebuilding the nation's aging infrastructure to serve the needs of the twenty-first century.  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and citation omitted).  The Committee has not carried that burden here, and its application for a preliminary injunction should be denied.

## STATEMENT OF FACTS

**A.     Congress Authorized The Construction And Use Of The Virginia Avenue Tunnel.**

1.      In 1867, Congress authorized the Baltimore and Potomac Railroad Company (a predecessor to CSXT) to operate in Washington, D.C.  14 Stat. 387 (Feb. 5, 1867).

2.      Two years later, Congress determined that the Railroad "may enter [the District] within the limits of [the] city on and by whichever one of the two routes herein designated [it] may elect and determine."  16 Stat. 2, 3 (Mar. 18, 1869).  The Railroad selected the second route, which started at the Potomac between L and M streets, SE, and then continued "westwardly . . . to the intersection of Virginia Avenue with South L and East Twelfth streets; thence along said Virginia Avenue northwestwardly to South K Street; thence along said South K Street westwardly to South Fourth Street; thence . . . along the said bank of the canal northwestwardly to Virginia Avenue; then along Virginia Avenue northwestwardly to the intersection of South C and West Ninth streets."  *Id.*

3.      Congress later "authorized and empowered" the Railroad to extend further west into the District, across Maryland Avenue and across the Potomac River on the Long Bridge (adjacent to the 14th Street vehicular bridge).  16 Stat. 161 (June 21, 1870).

4.      In the early 1870s, the Railroad laid tracks along these corridors, including across Virginia Avenue, K Street, and Canal Street, SE.  It also constructed a short tunnel from just east of 11st Street, SE, to 8th Street, SE under Virginia Avenue.  *See* Final Environmental Impact Statement & Section 4(f) Evaluation, Virginia Avenue Tunnel Reconstruction (June 5, 2014) ("FEIS") at 1-3.

5.      In 1901, Congress passed legislation to open up the City and develop areas around the Capitol in a manner consistent with the L'Enfant Plan.  *See* 34 Cong. Rec. 397 (1901).  The

1901 Act stated that its purpose was "that the said railroad shall be located under Sixth street southeast, Fifth street southeast, Fourth street southeast, Third street southeast, and Second street southeast in a tunnel as aforesaid; . . . ."  31 Stat. 767 (Feb. 12, 1901).

6.      The Act granted the Railroad the right to operate "at a point in its present tunnel under Virginia avenue near the intersection of Eleventh street southeast, and extending thence by a continuation of said tunnel, with a width sufficient for not less than two nor more than four tracks, along and under Virginia avenue to the west side of Second street southeast; thence in the open, with a width sufficient for four main tracks, along what would be Virginia avenue if extended through reservation seventeen, now called Garfield Park, to another section of Virginia avenue as now opened at South Capitol street; thence along said last mentioned section of Virginia avenue to a connection with its present four main tracks and right of way near Delaware avenue."  *Id.*

7.      The Baltimore and Potomac Railroad Company completed the Virginia Avenue Tunnel in 1905 at its own expense.  The tunnel was originally constructed using a "cut-and-cover" construction with a depth of 30 feet, two tracks, and a width of 45 feet (28 feet of interior horizontal clearance).  The tunnel extended generally beneath Virginia Avenue from just west of 2nd Street S.E. and just east of 11th Street S.E..  *See* FEIS at 1-4.

**B.      There Is A Demonstrated Need To Modernize The Virginia Avenue Tunnel.**

8.      CSX Transportation, Inc. owns the Virginia Avenue Tunnel, as well as the freight lines first established by Congress in the late nineteenth century for the Baltimore and Potomac Railroad, one of CSXT's several predecessor railroads.  *See* FEIS at 1-3.



9.      Washington, D.C. is centrally located on routes between east coast ports, such as Norfolk, VA, Charleston, SC, Savannah, GA, Jacksonville, FL, and markets in nearly two dozen states east of the Mississippi River.  A large percentage of freight carried through this network consists of intermodal containers—containers that can be transported by ship, truck, or train, and have become one of the most common ways to move goods worldwide.  *See* FEIS at 1-5; Declaration of Louis E. Renjel, Jr. ("Renjel Decl.," attached hereto) at ¶¶ 4-5.  Other types of freight traffic pass through Washington, D.C. and the Virginia Avenue Tunnel, including merchandise, coal and equipment trains.  *See* FEIS at 1-7.

10.     Approximately 20 freight trains pass through the Virginia Avenue Tunnel daily. *See* Renjel Decl. at ¶ 6.

11.     The last several decades have witnessed a steady growth in the demand for freight transportation due to population growth and the increasing globalization of commerce.  This demand will grow substantially in the years ahead.  The United States Government has forecast that overall freight tonnage will increase by 50 percent in 2040 from 2010 levels, and that 27 percent of that increase will involve the use of intermodal containers.  *See* FEIS at 2-5, 2-6.

12.     For a mainline freight rail line, the current industry standard is at least two railroad tracks (to allow for simultaneous two-way traffic) with a minimum operating speed of 40 mph.  Although the Virginia Avenue Tunnel was originally constructed with two tracks, modernization of rail equipment during the twentieth century forced the conversion of the tunnel to a single railroad track several decades ago.  So while the rail lines immediately on the east and west ends of the tunnel still contain two tracks, trains must "single-track" through the tunnel. *See* FEIS at 2-1, 2-2; Renjel Decl. at ¶ 7.

13.     The single-track Virginia Avenue Tunnel is widely regarded as a chokepoint for freight traffic traveling the mid-Atlantic corridor.  The *Mid-Atlantic Rail Operations Phase II Study* (December 2009), prepared at the behest of Departments of Transportation from Delaware, New Jersey, Pennsylvania, Maryland and Virginia, identified the Virginia Avenue Tunnel as a primary congestion point and major bottleneck for freight and passenger traffic alike.  *See* FEIS at 2-1, 2-2; Renjel Decl. at ¶ 7.

14.     The height of the tunnel limits the movement of freight traffic along the eastern seaboard.  Constructed over a century ago, the tunnel was not built to accommodate common, modern freight rail configurations, which include the double-stacking of intermodal containers. Renjel Decl. at ¶¶ 5, 8.

15.     A minimum vertical clearance of 21 feet is necessary to operate intermodal double-stacked freight trains through a tunnel.  The existing vertical clearance within the Virginia Avenue Tunnel is approximately 18 feet, which prevents double-stacked trains from traveling through Washington, D.C.  *See* FEIS at 2-2; Renjel Decl. at ¶ 8.

16.     In 1985, a 350-foot section of the tunnel crown collapsed.  During the emergency repair work, the tunnel was shut down for several months, disrupting freight rail operations and street level traffic.  *See* FEIS at 1-4; Renjel Decl. at ¶ 9.  Even with CSXT's current active maintenance and inspection program, a major structural problem could occur over the next few decades as the tunnel reaches the end of its useful life.  *See* FEIS at 2-5; Renjel Decl. at ¶ 9.

**C.     The Federal Highway Administration And The District Of Columbia Department Of Transportation Begin The NEPA Process.**

17.     CSXT decided to rebuild and enlarge the Virginia Avenue Tunnel to address the problems caused by the tunnel's width and height constraints.  These problems would continue to worsen in light of the projected increase in the demand for freight rail, and because of maintenance and safety concerns caused by the tunnel's age.  Renjel Decl. at ¶ 11.

18.     CSXT met with federal agencies, the District of Columbia government, regional agencies and organizations, and a variety of elected officials from 2008 through 2010 to discuss the need to rebuild the Virginia Avenue Tunnel.  Based on these discussions, government officials determined that the reconstruction of the tunnel would require the short-term closure of I-695 ramps for one week or less—a federal action that triggers NEPA review.  *See* FEIS at S-1, 7-1, 7-2.  The project would also require approval by DDOT because portions of Virginia Avenue would need to be closed during construction.

19.     On August 23, 2010, CSXT and the District of Columbia, acting through the Office of the Deputy Mayor and DDOT, entered into a Memorandum of Agreement regarding

10

several different transportation projects, one of which was the Virginia Avenue Tunnel.  *See*

FEIS Appendix A (Pl. Ex. 13).  The Memorandum recognized that the Virginia Avenue Tunnel

project was subject to NEPA review.  It specifically provided that DDOT would contact the

federal government to request "expedient assistance on the National Environmental Policy Act

requirements for the Virginia Avenue Tunnel Expansion Project."  *Id*.  The District also agreed

to "coordinate with CSXT and to expedite approvals of the required public space permits for the

Virginia Avenue Tunnel Expansion Project."  *Id.*

20.     FHWA assumed lead agency status for NEPA compliance on May 9, 2011, and

invited DDOT to participate as the joint lead agency.  FHWA also invited the National Capital

Planning Commission, the National Park Service and the U.S. Marine Corps to be cooperating

agencies under NEPA.  In addition, the Federal Railroad Administration (FRA) was invited to be

a cooperating agency due to its special expertise in railroad safety.  CSXT, the owner of Virginia

Avenue Tunnel, was designated as the project sponsor.  *See* FEIS at 1-1.

21.     The project website went live on August 16, 2011.  The website contained a

schedule of activities, public meeting materials, public comments, "frequently asked questions"

and a webpage on the National Historical Protection Act Section 106.  Website visitors could

submit comments or sign up to be on the project email list.  *See* FEIS at 7-11;

www.virginiaavenuetunnel.com.

22.     FHWA initially classified the project for a "Class III" NEPA review, meaning

that it would prepare an initial assessment to determine whether the project would have a

significant impact.  FHWA later elevated the NEPA classification to a "Class I" and on May 1,

2012, FHWA released a Notice of Intent to prepare a Draft Environmental Impact Statement in

the Federal Register.  *See* FEIS at 7-3, Appendix A; 77 Fed. Reg. 25781 (May 1, 2012).

23.     On August 2, 2012, DDOT sent "scoping" letters to seven federal agencies, twelve District of Columbia government agencies, and three regional agencies asking whether they were aware of any environmental or social issues associated with the project, or if they had any other concerns.  Comments were received from several of those agencies, including the National Capital Planning Commission, the U.S. Environmental Protection Agency, the Department of Housing and Community Development, and the State Historic Preservation Office.  *See* FEIS at Appendix A.

24.     FHWA completed the consultations required under Section 106 of the National Historic Preservation Act.  A final Section 106 Memorandum of Agreement was developed in consultation with the District of Columbia State Historic Preservation Office, the FHWA, the Marine Corps, the National Park Service, DDOT, and the District Department of Parks and Recreation.  *See* FEIS at 7-5, 7-6, Appendix A.

25.     FHWA and DDOT also consulted as required by Section 7 of the Endangered Species Act.  The U.S. Fish and Wildlife Service, the District Department of Environment, and the National Park Service provided their views on sensitive, threatened, or endangered species in the project area.  *See* FEIS at 7-5, Appendix A.

26.     FHWA and DDOT also met with other agencies throughout the scoping process, including the Federal Railroad Administration and the District Urban Forestry Administration. *See* FEIS at 7-7.

27.     FHWA and DDOT officials, along with project planners, engaged in active community and public outreach during the scoping process.  They briefed numerous community and civic organizations, businesses and individuals, including the local Advisory Neighborhood

Commissions, the Capitol Quarter Residents and Home Owners Association, and the Garfield

Park Association.  *See* FEIS at 7-7 through 7-9.

28.     FHWA and DDOT officials teamed with project planners in hosting four public

meetings prior to the publication of the Draft EIS.  *See* FEIS at 7-10, 7-11.

29.     During this stage, a total of twelve broad concepts for the project were

considered, including the no-action scenario, seven "build" scenarios, and four "rerouting"

scenarios, in which freight would be rerouted around the tunnel either during construction or

permanently.  *See* FEIS at S-27, 3-42 through 3-45.

30.     On December 21, 2012, DDOT and CSXT signed an agreement whereby DDOT

agreed to issue a Temporary Construction Public Space Permit for the Virginia Avenue Tunnel

project.  The scope of the permit was expressly conditioned on the build alternative, if any,

ultimately selected by the ROD—and the agreement provided that if the no-build alternative was

selected, the permit would be null and void.  *See* FEIS at Appendix A (Pl. Ex. 19).  The

agreement further stated that DDOT would give CSXT the permit only *after* the issuance of the

ROD.  *See id.*

31.     In a separate agreement, also dated December 21, 2012, DDOT confirmed

CSXT's "right to occupy and use exclusively the Virginia Avenue Tunnel Right of Way . . . for

the Virginia Avenue Tunnel Reconstruction Improvements for railroad purposes."  This

agreement is consistent with the right granted to CSXT's predecessor railroad in the Act of 1901

to use and operate the Virginia Avenue Tunnel.  *See* FEIS at Appendix A (Pl. Ex. 15).

32.     The scope of the Public Right of Way Permit was contingent upon completion of

the NEPA process.  It stated:  "As of the date hereof, Exhibit A generally identifies the Virginia

Avenue Tunnel ROW as the area covered by all three build alternatives identified in the [Draft

EIS].  CSXT shall only be allowed to construct the Virginia Avenue Tunnel Reconstruction

Improvements in the location identified in the Record of Decision, if any.  Therefore, upon

completion of the Virginia Avenue Tunnel Reconstruction Improvements in accordance with the

Record of Decision, this Permit shall be automatically and without further action amended to

reduce the Virginia Avenue Tunnel ROW shown on Exhibit A to reflect the as-built location of

the Virginia Avenue Tunnel Reconstruction Improvements." *See id.*

> **D.     FHWA And DDOT Issue A Draft EIS Identifying Three Build Alternatives And A No-Build Option.**

33.     The Draft EIS was announced in the Federal Register on July 12, 2013.  *See* 78

Fed. Reg. 41927.  FHWA initially provided for a 45-day comment period, but later extended the

deadline by 30 days—to September 25, 2013—in response to public requests.  *See* FEIS at 7-12.

34.     The Draft EIS identified three build alternatives and a no-build option.  The build

alternatives set forth different conceptual designs for a rebuilt tunnel containing two tracks that

would accommodate double-stacked intermodal container freight trains.  *See* FEIS at 3-1 through

3-3.

35.     Planners held a public hearing on July 31, 2013 at the Capitol Skyline Hotel in

Washington, D.C., in which they presented the Draft EIS and fielded questions from the

community.  In addition to the comments at the hearing, more than 100 agencies, organizations

and individuals provided written comments by letter or email.  *See* FEIS at 7-13, Appendix L.

36.     Planners also attended three additional public meetings in the period between the

Draft EIS and the FEIS.  Two were organized by Congresswoman Eleanor Holmes Norton:  one

on November 23, 2013 at the Capper Senior Apartments, and a second on January 25, 2014 at an

office building at 200 I Street S.E.  The third meeting during this period, hosted by the

community on January 16, 2014, was also held at 200 I Street.  *See* FEIS at 7-12.

**E.    The Final EIS Selects A Preferred Build Alternative That Satisfies The Project's Purpose And Need While Minimizing Environmental Impacts.**

37.    The Final Environmental Impact Statement was signed on June 5, 2014, by FHWA and DDOT, and was publicly issued on June 13, 2014.  The FEIS analyzed the impacts arising from a no-build alternative (Alternative 1) and three build alternatives (Alternatives 2, 3 and 4).  The FEIS identified Alternative 3 as the preferred alternative.  *See* FEIS at 3-1 through 3-4.

38.    The preferred alternative replaces the existing Virginia Avenue Tunnel with two new permanent tunnels.  Each new tunnel will have a single railroad track with enough vertical clearance to allow double-stack intermodal container freight trains.  The two tunnels will be separated by a center wall for most of their length.  A new parallel south side tunnel will be built first as trains continue operating in the existing Virginia Avenue Tunnel.  After the south-side tunnel is completed, train operations will switch over to the new tunnel and the existing Virginia Avenue Tunnel will be demolished and rebuilt.  Trains will operate in enclosed tunnels throughout the construction period, with the exception of approximately 230 feet immediately east of the 2nd Street portal, where they will operate in a protected open trench.  *See* FEIS at S-5.

39.    Although NEPA does not require a federal agency to provide any opportunity for public comment after the Draft EIS comment period, FHWA opened the FEIS for comment.  During the comment period—which was extended from 30 to 60 days in response to public requests—government officials and project planners held two more public meetings on July 1 and July 31, 2014, at the Capitol Skyline Hotel.

40.    In sum, the three-year NEPA process leading to the Record of Decision included more than a dozen meetings and briefings with a wide range of government agencies and community groups (*see* FEIS at 7-4 through 7-9); ten public meetings and hearings; three

15

opportunities for formal written comments; a 1,615-page DEIS (including 11 appendices); and a

2,639-page FEIS (including 13 appendices and specific responses to 133 agencies, organizations

and individuals who submitted comments).

###### F.   FHWA's Record Of Decision Selects The Preferred Alternative.

41.     FHWA issued its Record of Decision on November 4, 2014.  The ROD chose the

Preferred Alternative as the Selected Alternative.

42.     FHWA explained that "[t]he Selected Alternative satisfies the Purpose and Need

for the Project to a higher degree than the other two Build Alternatives while minimizing

environmental impacts and addressing community concerns."  ROD at 8.  The agency further

explained that the Selected Alternative "reduces the construction duration for the Project to the

greatest extent possible," and emphasized that the Selected Alternative was also "the

environmentally preferred alternative" that would have the least impact on the environment.  *Id*.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.

Natural Res. Defense Council, Inc*., 555 U.S. 7, 20 (2008); *see also Abdullah v. Obama*, 753 F.3d

193, 197 (D.C. Cir. 2014) (identifying four factors necessary to obtain a preliminary injunction).

"Granting a preliminary injunction is 'an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief.'"  *Rufer v. F.E.C.*, 2014 WL 4076053,

at *6 (D.D.C. Aug. 19, 2014) (quoting *Winter*, 555 U.S. at 22).

"When seeking a preliminary injunction, the movant has the burden to show that *all four

factors*, taken together, weigh in favor of the injunction."  *Abdullah*, 753 F.3d at 197 (emphasis

added and quotation omitted).  Accordingly, if this Court were to conclude that the balance of the

harms tips against the Committee, there is no need even to consider likelihood of success on the merits. That is what happened in *Winter*, where the Supreme Court denied a preliminary injunction on the ground that any irreparable injury to the plaintiff was outweighed by the public interest and the harm to the defendant. The Court concluded that "[a] proper consideration of these factors alone requires denial of the requested injunctive relief," and thus there was no need to "address the lower courts' holding that plaintiffs have also established a likelihood of success on the merits." 555 U.S. at 23–24.[1]

In this case, *none* of the four factors cut in the Committee's favor. Its request for the "extraordinary" and "drastic" relief of a preliminary injunction, *Mazurek*, 520 U.S. at 972, must be denied.

---

[1] The Committee urges the Court to look at these factors as sort of a sliding scale, under which the Committee may overcome deficiencies on one factor with the purported strength of others. Application at 39-40. But this argument ignores multiple recent D.C. Circuit opinions expressing doubt that a "sliding-scale" approach is permissible under *Winter*. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring, joined by Henderson, J.) ("[T]he *Winter* Court rejected the idea that a strong likelihood of success on the merits could make up for showing only a possibility (rather than a likelihood) of irreparable harm"); *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (agreeing with the *Davis* concurrence that, under *Winter*, the four factors are independent requirements). The D.C. Circuit has not yet conclusively resolved this question. *See Sherley*, 644 F.3d at 393. But given the force of Judge Kavanaugh's reasoning in *Davis*, this Court should not follow the outdated, pre-*Winter* approach that the Committee demands. *See also Nken v. Holder*, 556 U.S. 418, 438 (2009) (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other").

I.     **The Committee Has Failed To Demonstrate Irreparable Injury And The Balance Of Harms Tips In Defendants' Favor In Any Event.**

      A.     **The Committee Has Failed To Demonstrate Irreparable Injury.**

The Committee does not come close to making the necessary showing of irreparable injury.  A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely*"—not just possible—in the absence of an injunction.  *Winter,* 555 U.S. at 22.  "The D.C. Circuit 'has set a high standard for irreparable injury,' underscoring that 'the injury must be both certain and great.'"  *Rufer*, 2014 WL 4076053, at *7 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  Because a showing of the prospect of irreparable harm is "a sine qua non" for injunctive relief, *TD Bank, N.A. v. Pearl*, 891 F. Supp. 2d 103, 112 (D.D.C. 2012), "a movant's failure to show any irreparable harm is [ ] grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  *Chaplaincy*, 454 F.3d at 297.

As the D.C. Circuit has explained, the "key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."  *Wisc. Gas v. FERC,* 758 F.2d 669 (D.C. Cir. 1985) (emphasis omitted).  Moreover, claims of future injury cannot be speculative and must be based on *actual evidence* of likely harm.  "A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury."  11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2014).  "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."  *Id*.

The Committee offers only two examples of alleged "irreparable injury."  The first is that "once the Defendants issue their approvals and permits, they will lose their ability to control CSXT's operations, both with respect to the construction and the actual operation of the newly

expanded tunnel." Application at 40. But the claim that *Defendants* will lose their ability to control CSXT's operations does not establish actual harm *to the Plaintiff*. The Committee cannot rely on alleged harm to the Government in order to obtain an injunction against the Government. Moreover, the claim is simply wrong. Of course the Government will not "lose the ability" to supervise the reconstruction of the tunnel or the operation of CSXT trains once the tunnel is completed. Reconstruction of the tunnel will not alter, much less eliminate, the Government's regulatory authority. The District of Columbia will retain supervisory authority over construction work performed in the District, and the federal Government will retain authority over the operation of freight rail services and the routing and transportation of hazardous materials. In addition, CSXT will remain bound to the many mitigation and other commitments reflected in the FEIS and the ROD.

The Committee's only other claim to "irreparable injury" consists of various harms that one of its members, Maureen Cohen Harrington, claims she might suffer. Application at 41. But these alleged harms are entirely speculative—and none of them constitutes irreparable or permanent injury. To the contrary, they are all *temporary* annoyances no different than any person experiences when living in a dense urban area where noisy construction projects are constantly ongoing.

First, Ms. Harrington's claim that she "will suffer from noise, vibrations, air pollutants, and other environmental impacts" is speculation. Neither Ms. Harrington nor the Committee has introduced any *evidence* that she will suffer injury—let alone irreparable injury—from these supposed impacts. The Committee introduced no study, no data, no modeling results—nothing beyond a single conclusory paragraph in Ms. Harrington's declaration that reads:

> As a front row resident, I will be directly affected by the noise, vibrations, air
> pollutants, traffic and parking problems, utility disruptions, and other

environmental impacts and "inconveniences" from the construction to enlarge

the Virginia Avenue Tunnel into two new, larger freight rail tunnels.

Pl. Ex. 16 at ¶ 5.  Even if a conclusory assertion like this suffices to confer standing, it is

obviously not *evidence* that she will suffer the harms she claims.

In fact, the evidence that *is* in the record negates these claims.  The FEIS analyzed the

noise, vibration and air pollution the project may cause and determined that all three were *de

minimis* or nonexistent—no different from the dozens of ordinary construction projects that may

be ongoing at any given time in an urban area:

- Noise.  Noise modeling determined that construction noise "will be a nuisance or

  annoyance," but that it will not exceed a small increase in what is "already an urban

  environment with high ambient noise levels," and that noise would be confined to

  daytime hours and can be reduced through mitigation.  FEIS at 5-27 through 5-28.

- Vibration.  The FEIS predicts no vibration damage to any buildings as a result of

  construction activities, and that vibration from construction activities will cause at

  most occasional and temporary annoyance to a small number of nearby residents.

  FEIS at 5-39.

- Air pollutants.  Air emissions are not expected to exceed the *de minimis* emission

  thresholds in EPA's General Conformity Rule.  "The impacts of criteria pollutants

  from construction activities are not considered to be a concern."  FEIS at 5-22.

Moreover, all of these effects are temporary and will only last for the 30 to 42 months in

which construction is ongoing.  *See W. Ala. Quality of Life Coal. v. U. S. Fed. Hwy. Admin.,* 302

F. Supp. 2d 672, 684 (S.D. Tex. 2004) (temporary effects "such as inconvenience, increased

traffic, and increased noise and air pollution" due to some 33 months of highway project

construction are not an irreparable injury).  In fact, the court in *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 40 (D.D.C. 2013), denied a preliminary injunction in a NEPA case precisely because it found that the construction-related disruptions were temporary and thus could not constitute irreparable injury.

Once the construction is completed, there will be no measurable impacts.  *See* FEIS at 5-42 ("[H]uman annoyance impacts due to train operations are not predicted under any of the Build alternatives").  Indeed, freight trains have used the Virginia Avenue Tunnel for more than 100 years.  *See Macht v. Skinner*, 715 F. Supp. 1131, 1137 (D.D.C.) (proposed construction of light rail would not cause "irreparable harm to plaintiffs because the portion of the line under review is currently an operating freight line"), *aff'd*, 889 F.2d 291 (D.C. Cir 1989).

The Committee does not challenge the modeling in the FEIS that found that there will be no measurable noise, vibration or air quality impacts.  Nor did it offer during the NEPA process any study, report or analysis of its own that presented a contrary view.  The declaration of Ms. Harrington herself is conclusory in the extreme; it simply *asserts* that she may suffer these harms.  The Committee offers this Court no evidentiary basis to find that these are likely injuries, let alone that they would be so severe as to constitute irreparable injury.  *See, e.g.*, *Village of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 767 (10th Cir. 2014) (affirming denial of a preliminary injunction in a NEPA case because the plaintiff "ma[de] no attempt to apprise the court of any evidence showing what aesthetic damage will occur, where it will occur, how it will occur, or when it will occur—[plaintiff] merely posits that such harm will result"); *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011) (reversing preliminary injunction in NEPA case based on alleged harm to plaintiffs' crops because "[t]he undisputed evidence indicates that the [plants at issue] pose a negligible risk of genetic contamination"); *Va. Sunshine*

21

*Alliance v. Hendrie*, 477 F. Supp. 68, 70 (D.D.C. 1979) (denying preliminary injunction in a NEPA case and stating that plaintiff's claim that it will suffer harm "is based upon speculation, speculation about dangers which have been considered by the agency and rejected as being an extremely remote possibility").

Second, Ms. Harrington's claim that she will suffer "traffic and parking problems" and occasional "utility disruptions" during the construction is insufficient, as a matter of law, to constitute irreparable injury.  These alleged harms amount to annoyances that most people endure on a regular basis, particularly in urban areas where traffic is congested and parking is difficult to find.  Likewise, her claim that "[s]he will suffer diminution in the value of her home" is wholly speculative and does not amount to irreparable injury in any event, as such diminution could be fully compensated through money damages.  A purported—and temporary—diminution in property value is not a legally sufficient ground for a preliminary injunction.

Third, Ms. Harrington's claim that "in the event of a rail spill, [her] life and property would be at risk" is a classic example of speculative harm.  The only "evidence" the Committee cites to support this claim are paragraphs 7-9 of Ms. Harrington's declaration, which simply *assert* that she would be at greater risk.  An unsupported assertion cannot establish the irreparable injury necessary for a preliminary injunction.  "[I]t is bedrock law that injunctions will not issue to prevent injuries neither extant nor presently threatened, but only merely feared." *Sierra Club*, 990 F. Supp. 2d at 41 (citation omitted).  There is no evidence that a modernized Virginia Avenue Tunnel will change the nature of the freight currently traveling on this line. Before, during, and after tunnel reconstruction, CSXT will follow the federal safety regulations issued by the Federal Railroad Administration, the Department of Homeland Security, and other federal agencies in transporting freight through a safer, new, double-track tunnel.

**B.      CSXT Will Suffer Irreparable Harm If The Project Is Enjoined.**

CSXT would suffer serious and irreparable injury from a preliminary injunction.  CSXT is poised to begin work on the Virginia Avenue Tunnel and will be irreparably harmed if this critical piece of aging infrastructure on one of its most important routes is not upgraded promptly.  The tunnel stands as an obstacle that limits the railroad's ability to move traffic efficiently and expeditiously as its shippers demand.  *See* Renjel Decl. at ¶ 13.

If an injunction were granted, CSXT would suffer significant harm in the form of the substantial daily business costs arising from an outdated tunnel that cannot accommodate double-stacked containers and is a bottleneck that slows CSXT's freight traffic throughout the region. *See id*.  CSXT's ability to safely ship goods in a short amount of time is critical to its ability to compete in the marketplace, not just against other rail carriers but against intermodal trucking companies.  *Id*.  It is also part of its responsibility as a common carrier.  Rebuilding the tunnel promptly is essential to ensure that CSXT can accommodate the increasing demand for intermodal freight shipping—a demand that will dramatically increase when the upgraded Panama Canal opens in 2016.  *Id*.  Enjoining—even temporarily—this critical public works project would prevent CSXT from handling this imminent increase in traffic, costing the company significant lost revenue, placing it at a severe competitive disadvantage, and harming the many businesses and consumers that depend on freight rail for timely deliveries.  *Id*.

CSXT would also suffer harm through significantly increased construction costs (*see* Renjel Decl. at ¶ 13)—a type of harm that courts have held can warrant the denial of a preliminary injunction in NEPA cases.  For example, in *Quince Orchard Valley Citizens Association v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1989), the Fourth Circuit affirmed the denial of a preliminary injunction where the defendants had already invested millions of dollars in a construction project and faced increased costs from a delay.

23

All of the harm CSXT would suffer from an injunction would be irreparable because the Committee is incapable of posting a bond that would make CSXT whole for the harm that would arise from an injunction that is later lifted.

The Committee makes the blithe—and demonstrably false—claim that CSXT will "not suffer any harm as a result of the grant of the preliminary injunction." Application at 42. The Committee states that CSXT could still "move freight through the Virginia Avenue Tunnel at the same rate and volume." *Id*. at 42. But that ignores the increased costs necessary to maintain an aging tunnel, the heightened risk of an event like the partial collapse of 1985, as well as the significant business costs that would arise from an inability to carry modern double-stacked freight containers. The Committee also argues that CSXT must obtain permits before building the tunnel—a point that has no relevance to whether CSXT would be harmed by an injunction. Equally meritless is the Committee's suggestion that CSXT will suffer no harm because there are other "obstacles" to moving double-stacked containers up the eastern seaboard. Application at 43. This argument—which would justify enjoining virtually *any* large-scale public works project—is misplaced because it is indisputable that the Virginia Avenue Tunnel is a critical chokepoint on CSXT's line, a fact that has been recognized repeatedly over the last decade by numerous state governments and planning authorities. *See, e.g.*, I-95 Corridor Coal., *Mid-Atlantic Rail Operations Phase II Study: Final Report* 4-7 (2009); *Transportation Improvement Program for the Metropolitan Washington Region: FY 2013-2018*, at D-1 (2012).

Finally, the Committee seriously mischaracterizes the testimony of CSXT Vice President Louis Renjel, who correctly observed that *more* District residents would be inconvenienced if the project were delayed, given the population growth in the neighborhood. Application at 43. Indeed, there are many construction projects ongoing in the area, including the development of

new apartment homes that will likely produce a surge in population in a few years.  Delaying this project until those construction projects are completed and the new residents have moved in would subject thousands more District residents to the annoyance of construction.

        **C.**      **The Public Interest Weighs Strongly Against An Injunction.**

Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Here, an injunction would impose significant and harmful public consequences on freight rail, passenger rail, and the regional economy as whole.

The backlog of trains through the single-track Virginia Avenue Tunnel burdens not just CSXT, but the entire regional rail network.  Because the tunnel can accommodate only a single train at a time, trains must halt on an active track and sit idle while a train proceeding in the opposite direction passes through.  This, in turn, backs up rail traffic behind the idling train, and does so far enough down the line that passenger trains also end up unable to proceed, causing delays in service and inconvenience for citizens.  Commuters on Virginia Railway Express trains attempting to enter or exit the District are particularly burdened.  Moreover, because the region's rail system is networked, delays at the Virginia Avenue bottleneck have a ripple effect that can cause delays hundreds of miles away, just as weather-related delays at a hub airport can trigger delays and cancellations across the country.  *See* FEIS at 2-6.

Modernizing the tunnel will serve the public interest in other ways.  The current tunnel's dirt floor causes severe problems when the tunnel floods with water, as often happens.  Rail traffic through the tunnel must be halted before the water can be removed.  The dirt floor also presents a health hazard by allowing seeping sewage from nearby pipes.  These problems will be eliminated by installing a concrete floor in the new tunnel.  In addition, the tunnel walls will be upgraded with reinforced concrete to diminish noise and vibration.  *See* FEIS at S-4, 5-41.

The public will further benefit from the economic growth fostered by a new Virginia Avenue Tunnel.  Locally, the project will immediately provide construction jobs.  More broadly, CSXT's improved ability to move freight in this corridor will have significant economic benefits throughout the nation.  More than $1.8 trillion worth of goods and services move by freight rail every year in the United States, and the Department of Transportation expects that tonnage to increase 62 percent by 2040.  *See* Nat'l Econ. Council & President's Council of Econ. Advisers, *An Economic Analysis of Transportation Infrastructure Investment* 21 (2014).  "Improving America's freight transportation supports economic growth and international competitiveness.  Transportation improvements lower logistics costs, making it more cost-effective for manufacturers to keep production in or move production to the United States and increase the range of possible locations for manufacturing plants and distribution facilities."  *Id.*  For all these reasons, a preliminary injunction would be contrary to the public interest.

The Committee makes no effort to demonstrate that an injunction would be in the public interest, aside from its claim that enjoining a NEPA violation is inherently in the public interest.  Application at 44.  But district courts have the discretion to deny a preliminary injunction even in cases—unlike this one—where there *is* a NEPA violation.  *Jones v. D.C. Redevelopment Land Agency*, 499 F.2d 502, 513-14 (D.C. Cir. 1974).  The Committee misreads the FEIS in claiming it suggests that freight rail will not be affected by the tunnel project.  Application at 44-45.  The FEIS says nothing of the sort.  Quite the contrary, both the FEIS and ROD make clear that the project is necessary "to preserve, over the long-term, the continued ability to provide efficient freight transportation services in the District of Columbia, the Washington Metropolitan Area and the eastern seaboard."  ROD at 2.  Because CSXT is a common carrier, this project is infused with a strong public interest that would be threatened by an injunction.

II.    **The Committee Has Failed To Establish A Likelihood Of Success
On The Merits.**

The Committee brings a host of challenges under federal and District of Columbia law.

None is likely to succeed on the merits.

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq.*, "is

an essentially procedural statute intended to ensure fully informed and well-considered

decisionmaking." *Wildearth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013) (quotation

omitted).  "NEPA has twin aims.  First, it places upon an agency the obligation to consider every

significant aspect of the environmental impact of a proposed action.  Second, it ensures that the

agency will inform the public that it has indeed considered environmental concerns in the

decisionmaking process." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quotation

omitted).  To meet these aims, "NEPA requires an agency to prepare, and solicit public comment

on, an environmental impact statement (EIS) whenever it proposes a 'major Federal action[ ]

significantly affecting the quality of the human environment.'"  *Wildearth Guardians*, 738 F.3d

at 303 (quoting 42 U.S.C. § 4332(2)(C)).  The EIS must consider, among other things, "the

environmental impact of the proposed action"; "any adverse environmental effects which cannot

be avoided"; and any "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(i)-(iii).

NEPA does not "require agencies to elevate environmental concerns over other

appropriate considerations. . . . [I]t require[s] only that the agency take a 'hard look' at the

environmental consequences before taking a major action." *Balt. Gas & Elec.*, 462 U.S. at 97

(citation omitted).  As the D.C. Circuit has explained, NEPA "does not mandate particular

substantive environmental results; rather, it focuses Government and public attention on the

environmental effects of proposed agency action." *Theodore Roosevelt Conservation P'ship v.

Salazar*, 661 F.3d 66, 68 (D.C. Cir. 2011) (quotation omitted).

Because NEPA does not provide a private right of action, courts review NEPA challenges under the Administrative Procedure Act.  Under the APA's deferential standards, a court may not set aside an agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  In applying this standard, a court must "accord agency action a presumption of validity," and "the burden is on the petitioner to demonstrate that the action is arbitrary and capricious."  *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (quotation omitted).

## A.     The Alternatives Analysis Was Not "Predetermined."

The Committee contends that the alternatives analysis was predetermined, relying on three agreements between the District of Columbia and CSXT.  *See* Application at 13-19.  In the Committee's view, these agreements "irrevocably committed" the District of Columbia to the Selected Alternative identified in the Record of Decision.  *Id*. at 18.

The Committee's argument fails at the threshold because a predetermination inquiry focuses on whether *the NEPA decisionmaker* predetermined the outcome, and in this case it was the Federal Highway Administration, not the District of Columbia, that issued the Record of Decision.  Nor was there any "predetermination."  The three documents the Committee relies upon are standard planning agreements.  Before federal officials launch a multi-year EIS process analyzing an infrastructure project within a state or municipality, it makes perfect sense for the

state or municipality to indicate its general support for the project and its willingness to help with the permitting process if the Record of Decision approves a build alternative.  Otherwise, the federal government could end up spending years of its employees' time analyzing the project, studying alternatives, preparing massive Draft and Final Environmental Impact Statements, writing the Record of Decision—only to discover, at the end of this enormous and expensive multi-year process, that the local permitting authorities do not actually support the project and have no intention of issuing the requisite permits.  *See Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999) ("it is not logical that the [federal government] would be required to . . . commit its resources to the preparation of an EIS which might ultimately prove unnecessary").

The agreements the Committee relies upon reflect responsible planning by government officials.  In the four decades since NEPA was enacted, no court has ever held that these types of agreements amount to unlawful predetermination.

### 1.     Predetermination Requires An "Irreversible And Irretrievable" Commitment To A Plan Of Action.

NEPA plaintiffs seeking to overturn agency action based on a predetermination theory must meet a "stringent standard."  *Wyoming*, 661 F.3d at 1264 (quotation omitted). Predetermination occurs only when an agency takes action that "constitute[s] an irreversible and irretrievable commitment of resources" prior to the completion of the NEPA process.  *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 229 (D.D.C. 2003); *see also Wyoming*, 661 F.3d at 1264 ("predetermination occurs only when an agency *irreversibly* and *irrevocably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that analysis") (emphases in original; quotation omitted).  Because "concluding that an agency has predetermined the outcome of its NEPA

analysis is a conclusion that [a court] would not and should not reach lightly," *Wyoming*, 661

F.3d at 1264 (quotation omitted), predetermination challenges rarely succeed.  As one leading

treatise concludes, "[t]he courts have usually rejected claims that an agency is biased or that it

predetermined its environmental analysis."  *NEPA Law and Litigation* § 10-46 (2013).

The D.C. Circuit has held that conditional promises—that is, promises to commit

government resources once the NEPA process has concluded—do not constitute

predetermination.  In *Public Utilities Commission v. FERC*, 900 F.2d 269 (D.C. Cir. 1990), the

court held that the agency did not violate NEPA when it granted a power company a conditional

certificate of use prior to issuing the necessary environmental approvals.  The court explained

that the agency's "non-environmental approval was expressly not to be effective until the

environmental hearing was completed."  *Id*. at 282.  Other circuits take the same approach.  *See*

*Lee v. U.S. Air Force*, 354 F.3d 1229, 1240 (10th Cir. 2004) (finding no predetermination where

agreements would not take effect until NEPA review had concluded); *Metcalf v. Daley*, 214 F.3d

1135, 1145 (9th Cir. 2000) ("[a]lthough it could have, [the agency] did not make its promise . . .

conditional upon a NEPA determination").

Similarly, as long as an agency does not irrevocably *commit* to a particular NEPA

outcome, it remains free to take preparatory actions that *support* that outcome.  For example, in

*Forest Guardians v. U.S. Fish and Wildlife Service*, 611 F.3d 692 (10th Cir. 2010), the court

rejected a predetermination challenge when an agency and the project sponsor signed a grant

agreement that provided funding for a wildlife program that was the subject of an ongoing NEPA

review.  The court held that the agency's agreement to spend money on the program "does not

indicate that there was only one predetermined outcome."  *Id*. at 719.  "An agency may prefer

one alternative from the outset."  *Sierra Club v. Fed. Highway Admin*., 435 F. App'x 368, 374

(5th Cir. 2011), and "can formulate a proposal or even identify a preferred course of action before completing an EIS," *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1185 (9th Cir. 1997). Indeed, a federal agency is entitled to identify a "preferred alternative" at the outset of the NEPA process in a Draft EIS, without concern for tainting the objectivity of the overall analysis. 40 C.F.R. § 1502.14(e).

### 2. Neither The Federal Government Nor The District Of Columbia Predetermined The Outcome.

The Committee fails to satisfy the "stringent standard," *Wyoming*, 661 F.3d at 1264, necessary to prove agency bias and predetermination. None of the three agreements the Committee relies upon suggests that the Record of Decision was preordained.

The three agreements are all between CSXT and the District of Columbia, whereas it was the Federal Highway Administration (FHWA) that issued the Record of Decision—a purely federal document. The Committee identifies no authority for the notion that a federal agency can be deemed to have predetermined the outcome of its Record of Decision based on the actions of a state agency. Even if the District of Columbia had entered into a binding contractual commitment regarding the outcome of the NEPA process—and it plainly did not, as explained below—that could not predetermine the federal agency's review. It is no answer to point to DDOT's role as the co-preparer of the EIS. That is because FHWA *also* prepared the EIS, and the EIS thus reflects the independent judgment of the federal government; there is no basis to conclude that FHWA simply rubber-stamped the analysis. Thus, even if the District of Columbia could somehow be deemed to have locked itself into the outcome of the EIS, the Committee cannot establish predetermination unless it can also show that *the Federal Highway Administration* bound itself in advance to the outcome. And because the only grounds for the

Committee's predetermination challenge are agreements to which the FHWA was not a signatory, the Committee's arguments must fail.

Even if the agreements entered into by the District of Columbia were relevant to a predetermination analysis, nothing in the agreements demonstrates that the outcome was predetermined.  To the contrary, the agreements between the District and CSXT recognize the need for a NEPA analysis before any resources are irrevocably committed; they condition the scope of a permit on the outcome of the NEPA analysis; and they expressly acknowledge and leave open the possibility that a "no build" option would be selected and that the conditional permit would be of "no further force and effect" if that were to happen.

Moreover, even if these documents could somehow reflect a commitment by the District of Columbia to approve a build alternative, it would not be an "irreversible" and "irrevocable" commitment.  *See Wyoming*, 661 F.3d at 1264; *Fund for Animals*, 281 F. Supp. 2d at 229.  That is because the District of Columbia could always decline to issue the permits necessary to allow construction to begin.  In both *Metcalf* and *Fund for Animals*, the courts analyzed whether there was an "irreversible" commitment by looking to whether there was "a surrender of the Government's right to prevent activity in the relevant area."  *See Fund for Animals*, 281 F. Supp. 2d at 230 (quoting *Metcalf*, 214 F.3d at 1144).  In those cases, the courts found predetermination because the Government had already taken the activity in question before completing the NEPA analysis.  Here, in contrast, construction has not begun—and the District of Columbia has not surrendered the permitting authority that ensures it retains the power to prevent construction activity.  The District of Columbia has made no "irreversible" commitment to the project.

The 2010 Memorandum.  The August 23, 2010 Memorandum of Agreement (Pl. Ex. 13) reflects the District of Columbia and CSXT's planning for several projects in the District,

including the Virginia Avenue Tunnel project.  Nothing in this agreement commits the District to a particular outcome in the NEPA process.  The District's general promise to "provide support" and submit a grant request for the National Gateway Initiative (an initiative that involves dozens of projects up and down the eastern seaboard, from Maryland to Florida) does not amount to a commitment to achieve a particular result in the NEPA evaluation of the Virginia Avenue Tunnel project.  Indeed, the agreement to *seek* funding is far less of a commitment than the actual *provision* of funding in *Forest Guardians*, 611 F.3d at 719, that was held insufficient to establish predetermination.  The Committee also notes DDOT's agreement to coordinate with CSXT and to "expedite approvals of the required public space permits" for the project.  Application at 16.  But this does not commit the District to a particular NEPA outcome; rather, this provision simply addresses what DDOT will do in the event a build option is selected.  Indeed, if the "no build" option were selected, there would be *no* "required public space permits."

In alleging predetermination, the Committee fails to bring to the Court's attention provisions in the 2010 Memorandum that specifically recognize that all NEPA requirements must be satisfied *before* any construction work may begin.  For example, Article III.F provides that DDOT will seek assistance from the federal government concerning "the National Environmental Policy Act requirements for the Virginia Avenue Tunnel Expansion Project."  Similarly, in contending that the 2010 Memorandum establishes the District of Columbia's "irreversible" commitment to begin the project, the Committee fails to address the fact that CSXT must still apply for and obtain various permits from the District before beginning work.

The Committee also focuses on CSXT's agreement to pay the District $4,171,044 "for design and construction costs associated with adjustments to the 11th Street Bridge Project required by CSXT."  2010 Memorandum, Article IV.C.  The 11th Street Bridge crosses the

CSXT tracks near the eastern entrance to the Virginia Avenue Tunnel.  During the construction

of the bridge, the parties realized that placing span supports in the intended locations could

hamper or even preclude a future reconstruction of the Virginia Avenue Tunnel.  Accordingly,

CSXT asked the District to modify the design—at CSXT's expense—so that all options could be

kept open.  *See* Pl. Ex. 18 (change order).  The Memorandum also provides for a corresponding

credit to CSXT for resurfacing activities.  2010 Memorandum, Article III.A-B.  However, to the

extent that the resurfacing cost exceeds the credit balance, the remaining costs would be borne by

CSXT, not DDOT.  *Id.*  Because DDOT ultimately could not obtain federal aid for the Virginia

Avenue Tunnel resurfacing work, DDOT and CSXT later agreed to apply this credit to other

transportation projects.  *See* Pl. Ex. 20.  None of these provisions in any way suggests that the

Record of Decision was predetermined.

The 2012 Term Sheet Agreement and Occupancy Permit.  The Committee's claim that

these documents reflect predetermination is meritless.  Both are *conditional*—that is to say, they

are expressly dependent on the NEPA process and the selection of a build alternative.  *See Pub.*

*Utils. Comm'n v. FERC*, 900 F.2d at 282 (conditional approvals are not predetermination).

The Term Sheet Agreement (Pl. Ex. 19) provides that work on the Virginia Avenue

Tunnel project could begin *only* if the Record of Decision selected one of the build alternatives.

Section 4.B states:  "CSXT shall commence the reconstruction work after the issuance of a

record of decision . . . issued in accordance with the National Environmental Policy Act . . . but

only if the Record of Decision selects one of three build alternatives currently described in the

[DEIS] . . . in lieu of selecting the 'no build alternative' set forth in the DEIS."

The Occupancy Permit (Pl. Ex. 15) is also conditional.  It provides that "the NEPA

process will conclude with the issuance of a [Record of Decision] which may select one of the

build alternatives, if any, pursuant to which [CSXT] may construct the Virginia Avenue Tunnel Reconstruction Improvements or adopt the 'No Build Alternative' identified in the DEIS." *Id.* at 1.  The Permit further states that the right-of-way will correspond to the alternative selected through the NEPA process:  "[U]pon completion of the Virginia Avenue Tunnel Reconstruction Improvements in accordance with the Record of Decision, this Permit shall be automatically and without further action amended to reduce [the area covered by the permit] to reflect the as-built location of the Virginia Avenue Tunnel Reconstruction Improvements." *Id.*, Art. I.B.  And it provides that "if the Record of Decision . . . selects the 'no build alternative' for the Virginia Avenue Tunnel Reconstruction Improvements, this Permit shall terminate and be of no further force and effect." *Id.*, Art. IV.B.[2]

The 2013 Amendment to the Term Sheet.  This agreement (Pl. Ex. 14) contains a provision giving DDOT an option to acquire from CSXT a right-of-way (Shepherds Branch). The option is subject to several conditions, one of which is that CSXT obtain permits for the Virginia Avenue Tunnel project in the event that the Record of Decision selects a build alternative.  Just as with the Occupancy Permit, this agreement does not establish predetermination because it is expressly made contingent on the outcome of the NEPA process. Furthermore, the agreement does not promise any particular permitting outcomes, and in fact states that "necessary permits and approvals" from the District of Columbia can be obtained "only after submission of appropriate applications and compliance with all applicable ordinances, regulations and statutes associated therewith."  2013 Amendment Art. II.B.7.

---

[2]    Federal statutes enacted around the turn of the twentieth century granted CSXT's predecessor the right to operate in the Virginia Avenue Tunnel at its current location, and stipulated that the tunnel be wide enough for two tracks.  *See* 31 Stat. 767.  The Occupancy Permit is consistent with those rights.  Indeed, the reconstruction project will restore the tunnel to the two-track design that Congress contemplated.  *See* Occupancy Permit, Art. IV.D.

*     *     *     *

The Committee's attempt to portray ordinary planning documents as evidence of NEPA "predetermination" falls short.  Nothing in these three documents suggests that the Record of Decision was preordained.  To the contrary, they recognize the ongoing NEPA process and are made conditional on the selection of a build alternative.  And even if they could be read to establish a commitment, it was not an "irrevocable" commitment because the District of Columbia still retained its permitting authority.  Under D.C. Circuit law—and indeed the law of every federal circuit that has ever addressed the question since NEPA was enacted—these agreements do not constitute predetermination.

### B.      There Was No Unlawful "Segmentation."

The Committee errs in claiming that FHWA improperly "segmented" the NEPA analysis by considering the Virginia Avenue Tunnel project standing alone.  The Committee's claim fails at the threshold because segmentation analysis applies only to cases where a *single* federal action is divided into components and those components are separately reviewed under NEPA.  *See Jackson Cnty. v. FERC*, 589 F.3d 1284, 1290 (D.C. Cir. 2009) (agencies may not "artificially divid[e] a major federal action into smaller components").  Not only does the Committee fail to identify the "federal action" that was supposedly segmented improperly, but it fails to identify *any* federal action other than the Virginia Avenue Tunnel project.  This is not a coherent argument, let alone a cognizable NEPA claim.

Even if the Committee had properly alleged a NEPA claim, it has not demonstrated improper segmentation.  In addressing such claims, the D.C. Circuit considers whether the proposed project "(1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal

36

funds for closely related projects." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1315 (D.C. Cir. 2014) (quotation omitted).

The Virginia Avenue Tunnel Project easily satisfies all four factors.  First, the project has logical termini:  the single-track portion of the line.  This includes the tunnel itself as well as the approach on either end where the double tracks converge into one.  These are well-defined and perfectly logical termini given the project's purpose of eliminating the bottleneck caused by the single track.  Contrast this with the Committee's position that the EIS should have been expanded to encompass "the other 60 impediments" to double-stacked containers throughout the Mid-Atlantic region.  Application at 22.  This is not the law and no court has ever adopted such an aberrant understanding of NEPA.  Indeed, the Committee is unable even to identify what it believes the correct termini should have been.

Second, the Virginia Avenue Tunnel project has substantial independent utility.  The Committee's contrary view rests on its claim that there are other obstacles to moving double-stacked freight up the eastern seaboard.  But this argument overlooks the many other benefits of the project aside from enabling double-stacking.  For example, replacing the single-track configuration with two tracks will eliminate the bottleneck and reduce congestion.  Indeed, the Committee concedes this very point.  *See* Application at 20-21.  The tunnel's independent utility is further confirmed by, among many other studies, the *Mid-Atlantic Rail Operations Phase II Study*, prepared at the behest of Departments of Transportation from Delaware, New Jersey, Pennsylvania, Maryland and Virginia.  It identified the Virginia Avenue Tunnel as a primary congestion point and major bottleneck for freight and passenger traffic alike.  *See* FEIS at 2-1.

In analogous circumstances, the D.C. Circuit has recognized that widening a highway had independent utility because it would "reduce congestion regardless of the fate of" plans to

reconfigure two interchanges on the highway and build a connecting highway.  *Coal. on Sensible Transp.*, 826 F.2d at 69.  There is also independent utility in replacing the dirt floor with a concrete floor—a design that will prevent the flooding in the tunnel that has caused massive delays and backups.  "The proper question is whether one project will serve a significant purpose even if a second related project is not built," *id.*, and there can be no dispute that the Virginia Avenue Tunnel project, standing alone, serves many significant purposes.

Third, the Committee makes no effort to argue that the Virginia Avenue Tunnel project forecloses the opportunity to consider alternatives—and it obviously does not.

Fourth, the project does not irretrievably commit federal funds for closely related projects.  Here too, the Committee simply ignores this factor, which is plainly satisfied.

### C.      The FEIS Properly Considered Cumulative Impact.

The Committee contends that the FEIS focused on "the construction phase" of the project and failed to consider the "cumulative impacts" arising from "the use and operation of the expanded tunnel."  Application at 24-25.  But the FEIS *did* consider the post-construction impacts.  In fact, the FEIS includes twenty different sections entitled "Post-Construction Impacts" that analyze the actual operation of the rail tunnel.  *See* FEIS §§ 5.1.2 (land use); 5.2.2 (farmland); 5.3.2 (social and community conditions); 5.4.2 (economic conditions); 5.5.3 (air quality); 5.6.3 (noise); 5.7.3 (vibration); 5.8.2 (soil contamination); 5.9.2 (water); 5.10.2 (vegetation and wildlife); 5.11.3 (historical resources); 5.12.2 (parks and recreation); 5.13.2 (visual and aesthetic); 5.14.2 (utilities); 5.15.1.2 (freight transportation); 5.15.2.2 (roadways); 5.15.3.2 (traffic); 5.15.4.2 (parking); 5.15.5.2 (pedestrians and bicyclists); 5.15.6.2 (transit).

### D.      The FEIS Properly Considered Reasonably Foreseeable Impacts.

The Committee argues that the FEIS "does not consider reasonably foreseeable impacts resulting from rail accidents, disasters or terrorist attack involving trains using the newly

expanded tunnel." Application at 25.  This argument rests on the mistaken belief that a reconstructed tunnel will enable CSXT to begin moving large volumes of crude oil or hazardous materials through the District.  This is simply not true.  As the FEIS explains, "CSX does not transport explosive, toxic by inhalation (TIH), or poisonous by inhalation (PIH) materials through the District" and that the "composition of freight passing through the District *will not change* as a result of this project."  FEIS at L-107 (emphasis added).  Further, "[a]ny crude oil shipments by CSX through the District of Columbia are individual tank cars, and they are very rare." *Id*. at S-35.

NEPA does not require the types of analyses the Committee demands.  The D.C. Circuit has held that where the potential impact falls squarely within the jurisdiction of federal regulators, there is no need for a NEPA environmental review.  In *Glass Packaging Institute v. Regan*, 737 F.2d 1083, 1092 (D.C. Cir. 1984), the court held that its conclusion that there was *no* need for a NEPA review "is buttressed by the conformity of the proposed federal action to federal regulations governing other aspects of that action's interrelationship with the physical environment."  That is because "NEPA is meant to supplement federal agencies' other nonenvironmental objectives, not to transplant specific regulatory burdens from those expert agencies otherwise authorized to redress specific nonenvironmental problems and pointlessly to reimpose those objectives on other unqualified agencies." *Id*.

Similarly, the court in *American Business Association v. Slater*, 1999 U.S. Dist. LEXIS 20936 (D.D.C. Sept. 10, 1999), relied on *Glass Packaging* in concluding that "'[i]n light of this specific congressionally conferred . . . mandate' to promote and regulate safe motor carrier operations, 'it would be absurd to hold that [wheelchair safety] is an environmental health risk which . . . [the Department of Transportation] and every other agency must consider in making

an environmental assessment.'  Accordingly, the court concludes that DOT identified and

analyzed all relevant areas of environmental concern in its rulemaking."  *Id.* at *85 (quoting

*Glass Packaging*, 737 F.2d at 1092), *rev'd on other grounds*, 231 F.3d 1 (D.C. Cir. 2000).  Here,

the issue of railroad safety—and the transport of hazardous materials—are closely regulated by

the Federal Railroad Administration, the Pipeline and Hazardous Materials Safety

Administration, and many other federal agencies.  Accordingly, the EIS was not required to

analyze the potential "impact" of a derailment involving hazardous materials.

The same is true with regard to terrorist attacks.  The D.C. Circuit has rejected the

suggestion that "NEPA requires consideration of environmental effects caused by" the acts of "a

deranged criminal," even assuming such acts were "reasonably foreseeable."  *Glass Packaging*,

737 F.2d at 1091-92.  Indeed, courts have rejected arguments that NEPA requires an agency to

evaluate the effects of a terrorist attack.  *See N.J. Dep't of Envtl. Prot. v. NRC*, 561 F.3d 132, 136

(3d Cir. 2009); *Mid States Coal. for Progress v. STB*, 345 F.3d 520, 544 (8th Cir. 2003).

Even if an analysis of derailment risk were required, the FEIS addresses this very issue.

For example, under the heading "Post Construction Impacts: Public Facilities, Services and

Safety," the FEIS states that "[t]rain derailments will be less likely to occur in the new tunnel

compared to the existing tunnel, despite a higher operating speed than current conditions.  The

new tunnel will have a more reliable concrete tunnel floor and track ballast."  FEIS at 5-11; *see

also id.* at L-81 (explaining that the "modern infrastructure and new technologies that will be

applied inside the tunnel, including state of the art roadbed, will provide a greater level of safety

for freight rail traffic than the existing tunnel"); *id.* at S-4, 5-15.  And with regard to the

likelihood of a terrorist attack, a study relied upon by the FEIS explained that the project would

actually *reduce* the likelihood of a such an attack because trains would no longer need to idle

40

outside the tunnel awaiting their turns to enter.  *See* Nat'l Capital Planning Comm'n, *Freight Railroad Realignment Feasibility Study* ES-2 (2007); FEIS at 10-7.

> ### E.     The FEIS Adequately Addressed Alternatives.

The Committee argues that the FEIS should have considered more than four alternatives. Specifically, the Committee claims that the FEIS should have considered alternatives "that involved re-routing CSXT's freight traffic around the city," through someone else's backyard. *See, e.g.*, FEIS L-131 (noting Committee's proposal to build bridge across Potomac at site in Virginia that could only be accessed by laying down tracks and running freight trains through Old Town Alexandria).  The Committee's claim that the FEIS should have analyzed more alternatives is misplaced.  The only reason FHWA began the EIS process was because it needed to close two highway ramps for one week so that temporary bridges could be constructed to maintain north-south traffic over the project.  The Committee errs in arguing that NEPA *required* the agency to treat this relatively minuscule federal approval as an opportunity for a federal remapping of the entire region's rail network.

The reasonableness of alternatives is determined by reference to a project's purpose.  *See City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).  Here, the EIS identified the purpose of the Virginia Avenue Tunnel reconstruction project as preserving CSXT's ability to provide long-term, efficient freight transportation in the District of Columbia and the region. FEIS at S-3.  The project is needed to address the structural deficiencies in an aging tunnel, to accommodate expected increases in demand for freight rail, and to ensure continued and uninterrupted freight service during tunnel reconstruction.  *Id*.

Agencies are accorded wide deference in identifying alternatives that will fulfill the project's purpose and need.  In *City of Alexandria*, 198 F.3d 862—the case that involved replacing the aging Wilson Bridge over the Potomac—the D.C. Circuit rejected an argument

very similar to the one the Committee advances here.  In that case, the district court held that the FHWA violated NEPA where it only evaluated 12-lane bridge designs and failed to consider 10-lane designs.  The D.C. Circuit reversed, holding that the district court failed to give sufficient deference to the agency in considering alternatives.  *Id.* at 867.  The deference accorded an agency's choice of alternatives is heightened in cases like this one, involving a project sponsored by a private applicant.  That is because "Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991).  Accordingly an "agency should take into account the needs and goals" of the applicant, and give them "substantial weight."  *Id.* at 196-97.

Here, FHWA carefully studied but ultimately excluded several rerouting options because they would not fulfill the project's purpose and need, and because "[e]ach would involve costs of extraordinary magnitude."  ROD at 22-23; FEIS at 3-51 through 3-60, Appendix B.  Among other things, each would require a new Potomac River Bridge—with potentially severe environmental impacts—or digging a nine-mile tunnel underneath the city and the Potomac River.  Moreover, each of the rerouting options would require either obtaining a new right-of-way or making substantial changes to long stretches of existing rights-of-way in developed areas. Given the heavily-developed nature of the Washington, D.C. metropolitan area, the idea of acquiring sufficient contiguous properties to run a new double-tracked freight rail line through the region is unrealistic, to say the least, just as it would be unrealistic to "reroute" the I-495 Beltway.  *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (an EIS must only examine alternatives that are "objectively feasible").

In the end, the Committee identifies only one particular alternative it claims should have been considered—an alternative that demonstrates the impracticality of rerouting because it

would require laying down new freight rail lines through the middle of heavily-developed Old Town, Alexandria. Indeed, building this line would require "a new structure over the Potomac River and then using another right-of-way that is of critical importance to the DC government for other purposes"—namely, the Blue Plains facility upon which the Washington region depends for sewage and water treatment. FEIS at L-131. The Committee's alternative would also require using several miles of track running through Joint Base Anacostia-Bolling. ROD at C-69.

### F.       The FEIS Did Not Rely On "Flawed Information."

The Committee claims the FEIS contains "misrepresentations" that "exaggerate the importance" of the project. Application at 33-34. But all the Committee points to are *two statements* out of the thousands of pages in the FEIS, the ROD and their many appendices and exhibits. Moreover, both statements are true. The single track leading into and through the tunnel *is* the single greatest constraint on rail headway on CSXT's mainline network. Renjel Decl. at ¶ 7. And the inadequate vertical clearance *does* effectively prevent CSXT from operating double-stack intermodal container freight trains along its eastern seaboard rail corridor. *Id*. at ¶ 8. The Committee's claim that the Virginia Avenue Tunnel is "just one bottleneck" among many, Application at 35, is nonsensical given the many studies that have singled out the tunnel as an especially serious impediment to regional rail traffic.

### G.       There Was No Violation Of D.C. Law.

#### 1.       There Was No Violation Of The D.C. Environmental Protection Act.

Most of the Committee's arguments about purported violations of the D.C. Environmental Protection Act ("DCEPA") are, in the Committee's words, "carry over[s]" from its NEPA arguments. Application at 37. These arguments fail for the reasons discussed above.

To the extent the Committee attempts to claim a distinct violation of the DCEPA, it is meritless.  The Committee contends that "the District was required to conduct an EIS before it granted CSXT the right of way for the two tunnels."  Application at 37.  Not so.  The DCEPA specifically provides that "[n]o EIS shall be required … with respect to an action … [f]or which an EIS has been prepared in accordance with [NEPA]."  D.C. Code § 8-109.06.  Here, of course, an EIS *was* prepared in accordance with NEPA—indeed, DDOT served as a joint lead agency in preparing the EIS—so there was no need for the District to prepare a separate EIS under the DCEPA.  *See* FEIS at 1-8 ("[B]ecause the Project is already subject to the requirements of NEPA, no additional action is needed under DCEPA.)."

Nor is the Committee correct in arguing that the EIS needed to be completed before the right-of-way was granted.  As discussed above in section II(A), the 2012 agreement merely confirmed CSXT's *existing* right-of-way pursuant to the congressional grant.  Moreover, the 2012 agreement was expressly conditioned on the issuance of an EIS and Record of Decision approving a build option.  Thus, the 2012 agreement ensured that the environmental impacts would "be examined before *implementation*" of the contemplated course of action.  D.C. Code § 8-109.01 (emphasis added).

Finally, the Committee claims that the existing EIS was insufficient under District of Columbia law because it "was limited to an analysis of the environmental impacts caused by the construction," whereas the DCEPA demanded an EIS "that analyzed the actual operation of the rail tunnel."  Application at 38.  But as shown above, the EIS contained numerous sections evaluating the actual operation of the rail tunnel.

### 2.    There Was No Violation Of Other D.C. Statutes.

The Committee claims, in cursory fashion, that DDOT violated D.C. Code Sections 10-801 and 9-201.01.  The Committee's argument fails because neither statute requires City

Council approval before an agency grants permission to use a right-of-way or temporarily closes a road while construction is ongoing.

Section 10-801 appears in Title 10, Chapter 8, entitled "*Sale* of Public Lands." (emphasis added). That section governs the power to "dispose of real property, in whole or in part, now or hereafter owned in fee simple by the District." D.C. Code § 10-801. Here, DDOT did not "dispose" of property. *See* Pl. Ex. 19 Art. IV(D) (permit expressly provides that it "shall not … convey title or provide proof of ownership of the public right of way"). Nor, in CSXT's view, did the District own the land in fee simple. ROD at C-156.

Section 9-201.01 governs the *permanent* closure of streets and has no relevance here.

## CONCLUSION

The Committee's application for a preliminary injunction should be denied.


Dated: December 15, 2014                         Respectfully submitted,

                                                  /s/ Thomas H. Dupree, Jr.
Peter R. Steenland, Jr.                          Thomas H. Dupree, Jr.
(D.C. Bar No. 79236)                             (D.C. Bar No. 467195)
SIDLEY AUSTIN LLP                                Michael K. Murphy
1501 K Street, N.W.                              (D.C. Bar No. 468907)
Washington, DC 20005                             David A. Schnitzer
(202) 736-8532                                   (D.C. Bar No. 1022420)
                                                 GIBSON, DUNN & CRUTCHER LLP
Peter J. Shudtz                                  1050 Connecticut Avenue, N.W.
(D.C. Bar No. 188243)                            Washington, DC 20036
CSX TRANSPORTATION, INC.                         (202) 955-8500
1331 Pennsylvania Avenue, N.W.
Suite 560
Washington, DC 20004
(202) 783-8124

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of December, 2014, I caused a copy of the foregoing

Opposition to Plaintiff's Application for a Preliminary Injunction, together with the Declaration

of Louis E. Renjel in support thereto, and the Proposed Order, to be filed through the CM/ECF

system, causing counsel for the Plaintiff and the government Defendants to be served by

electronic means.


 /s/ Thomas H. Dupree, Jr.
Thomas H. Dupree, Jr.
(D.C. Bar No. 467195)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500