**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                                      |     |                          |
| :----------------------------------- | :-- | :----------------------- |
| THE COMMITTEE OF 100 ON              | **:** |                          |
| THE FEDERAL CITY,                    | **:** |                          |
|                                      | **:** |                          |
| **Plaintiff,**                       | **:** |                          |
|                                      | **:** | Case No. 14-CV—1903 (CRC) |
| **v.**                               | **:** |                          |
|                                      | **:** |                          |
| ANTHONY FOXX,  Secretary of          | **:** |                          |
| Transportation. *et al*.,            | **:** |                          |
|                                      | **:** |                          |
| **Defendants.**                      | **:** |                          |

_____

**DEFENDANT MAYOR VINCENT C. GRAY'S AND ACTING DIRECTOR MATTHEW BROWN'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**

Defendants Mayor Vincent C. Gray and District of Columbia Department of Transportation ("DDOT") Acting Director Matthew Brown, sued solely in their respective official capacities (collectively, the "District Defendants"), by their counsel, the Office of the Attorney General for the District of Columbia, respectfully submit this memorandum of points and authorities in opposition to Plaintiff's Application for a Preliminary Injunction ("Pl. App.").

Plaintiff, the Committee of 100 on the Federal City ("the Committee') contends that the District Defendants, along with the Federal Defendants, violated Plaintiff's rights under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq*., and the District of Columbia Environmental Policy Act, D.C. Official Code §§8-109.01, *et. seq*. ("DC EPA"), by failing to prepare an unbiased environmental impact statement required by NEPA and DC EPA to determine whether CSX Transportation, Inc. ("CSXT") should be permitted to reconstruct, modernize, and expand its 100+ year-old, single track tunnel in the District's Central Employment Area. As relief for this alleged NEPA/DC EPA violation pending the disposition of

its claims, the Committee seeks a preliminary injunction prohibiting all Defendants "from issuing any approvals or permits to CSX Transportation, Inc. that would permit CSX Transportation to proceed with enlarging the rail tunnel situated under Virginia Avenue, in Southeast Washington, D.C." Pl. App. Proposed Order.

    As shown below, however, the Committee is unable to make the showing that it is likely to succeed on the merits of its claims, or to show that it will suffer irreparable harm pending disposition of its claims without a preliminary injunction.  In addition, as will be shown below, the District will be injured if such an injunction issues, and this proposed relief is adverse to the public interest.  Accordingly, Plaintiff's Application for a Preliminary Injunction should be denied.

## STATEMENT OF FACTS

**The Federal Highway Administration And The District Of Columbia Department Of Transportation Have Completed An Environmental Impact Statement For The Virginia Avenue Tunnel Project.**

    In May 2008, CSXT proposed improvements to upgrade freight rail infrastructure in the District of Columbia.  http://www.nationalgateway.org/news-resources/press-releases/2008/csx-announces-national-gateway-improve-flow-freight (Copy of press release annexed as DCX-1; email dated August 11, 2009 from W. Troy Neisz to Faisal Hameed, annexed as DCX-2.) In particular, CSXT proposed reconstructing the Virginia Avenue Tunnel by increasing its vertical clearance to accommodate double-stacked intermodal freight containers on trains. (*Id.*) Implementation of the National Gateway initiative contemplated lowering the track beds at four locations within the District of Columbia, modifying the swing span of Long Bridge, and reconstructing the Virginia Avenue Tunnel ("VAT") by increasing its vertical clearance to

accommodate double-stacked intermodal freight cars and expanding it to a double track tunnel from its current single track configuration. (DCX-2).

CSXT decided to rebuild and enlarge the VAT to address the problems caused by the tunnel's width and height constraints.  These problems would continue to worsen in light of the projected increase in the demand for freight rail, and because of maintenance and safety concerns caused by the tunnel's age.  (Declaration of Louis E. Renjel, verified December 15, 2105, a copy of which is annexed as DCX - 3, at ¶¶ 7-12.)

CSXT proposed complete reconstruction of the VAT to "transform the tunnel [from a single-track tunnel] into a two-track configuration and provide the necessary vertical clearance (minimum 21 feet) to allow double-stack intermodal container freight train operations." (FEIS (Final Environmental Impact Statement) Executive Summary, annexed as DCX – 4, at S-1, S-3.)[1]  Because 'the tunnel is also aligned on the south side of Interstate 695 (I-695) . . .[its] reconstruction . . .of the tunnel will require the short-term (approximately a week or less) closure of ramps of an Interstate Highway (I-695)  . . . which require[s] FHWA approval. Both approvals are federal actions. CSXT is also seeking approval from DDOT to allow temporary I-695 ramp closures . . . ."  (DCX-4, FEIS Exec. Summary at S-1.)

"The purpose of the proposed action is to preserve, over the long-term, the continued ability to provide efficient freight transportation services in the District of Columbia, the Washington Metropolitan Area and the eastern seaboard."  (DCX-4, FEIS Exec Summary at S-3.)

CSXT met with representatives of federal agencies, the District of Columbia government, regional agencies and organizations, and a variety of elected officials from 2008 through 2010 to

---

[1]  This exhibit opens with the cover and Table of Contents of the FEIS.  The page numbers referred to in the citations to DCX-4 are the pages numbers of the Executive Summary, printed at the bottoms of the respective pages.

discuss rebuilding the Virginia Avenue Tunnel and the process for completing it.  Based on these discussions, government officials determined that the reconstruction of the Virginia Avenue Tunnel would require the short-term closure of I-695 ramps—a federal action that triggers NEPA review. (*See* FEIS Chapter 1 – Introduction, annexed as DCX 5, at 1-1.) Reconstruction of the VAT would also require DDOT approval because portions of Virginia Avenue would need to be closed during construction. (*Id.*)

On August 23, 2010, CSXT and the District of Columbia, acting through the Office of the Deputy Mayor and DDOT, entered into a Memorandum of Agreement ("MOA") regarding several different transportation projects, one of which was the VAT.  (*See* FEIS at Appendix A (A01 – CSX/DC Government Memoranda of Agreements) at 1-9, annexed as DCX-6.[2])

The MOA recognized that the VAT project was subject to NEPA review.  It specifically provided that DDOT would contact the federal government to request "expedient assistance on the National Environmental Policy Act requirements for the Virginia Avenue Tunnel Expansion Project." (*Id.* at 3, Art, III, ¶ F.) The District also agreed to "coordinate with CSXT and to expedite approvals of the required public space permits for the Virginia Avenue Tunnel Expansion Project." (*Id.* at Art. III, ¶ D.)

By early August 23, 2010, it had become apparent that planned support structures, or "piers" to support the 11th Street Bridge, which passes over the VAT would have to be redesigned to accommodate the contemplated reconstruction of the VAT, if the planned reconstruction were to satisfy NEPA review. (Amendment Solicitation/Modification of Contract, Contract Number DCKA-2005-R-0146, dated February 11, 2011 ("Change Order No. 8"), annexed as DCX-7).

---

[2]  DCX-6 is a compilation of documents, each of which bears its own range of page numbers. This exhibit contains 126 pages.  For this reason, the District has assigned Bates numbers to the lower right hand corners of the pages in this exhibit for the convenience of the Court and counsel.

FHWA assumed lead agency status for NEPA compliance on May 9, 2011 and invited DDOT to participate as the joint lead agency.  FHWA also invited the National Capital Planning Commission, the National Park Service and the U.S. Marine Corps to be cooperating agencies under NEPA.  In addition, the Federal Railroad Administration (FRA) was invited to be a cooperating agency due to its special expertise in railroad safety.  CSXT, the owner of the VAT, was designated as the project sponsor.  (*See* DCX 5, FEIS Ch. 1 - Introduction at 1).

The project website went live on August 16, 2011.  The website contains a schedule of activities, public meeting materials, public comments, "frequently asked questions" and a webpage on the National Historical Protection Act Section 106.  Website visitors could submit comments or sign up to be on the project email list.  (*See* DCX-8, FEIS Ch. 7 – Comments and Coordination, at 7-11).

FHWA initially classified the project for a "Class III" NEPA review, meaning that it would prepare an initial environmental assessment to determine whether the project would have a significant impact.  FHWA later elevated the NEPA classification to a "Class I" and on May 1, 2012, FHWA released a Notice of Intent to prepare a Draft Environmental Impact Statement in the Federal Register.   (*See* DCX-8, FEIS at 7-3; DCX-9, Appendix A (A06 –Federal Notices) at 3; 77 Fed. Reg. 25781 (May 1, 2012).)

On August 2, 2012, DDOT sent "scoping" letters to seven federal agencies, twelve District of Columbia government agencies, and three regional agencies asking whether they were aware of any environmental or social issues associated with the project, or if they had any other concerns.  Comments were received from several federal and District agencies, including the National Capital Planning Commission, the U.S. Environmental Protection Agency, the

Department of Housing and Community Development, and the State Historic Preservation Office.  (*See* DCX – 10, FEIS at Appendix A (A-02 – Agency Scoping Letters)).

FHWA completed the consultations required under Section 106 of the National Historic Preservation Act.  FHWA exchanged consultation letters with the State Historic Preservation Office, the Advisory Council on Historical Preservation, and the Capitol Hill Preservation Society.  (*See* DCX-8 FEIS Ch. 7, at 7-5, 7-6).

FHWA and DDOT also consulted as required by Section 7 of the Endangered Species Act.  The U.S. Fish and Wildlife Service, the District Department of Environment, and the National Park Service provided their views on sensitive, threatened, or endangered species in the project area.  (*See* FEIS Ch. 7, at 7-5.)

A final Section 106 Memorandum of Agreement pursuant to Section 106 of the National Historic Preservation Act of 1966, as amended (16 USC 470f) was developed in consultation with the District of Columbia State Historic Preservation Office, the FHWA, the Marine Corps, the NPS, DDOT, the District Department of Parks and Recreation, and the State Historic Preservation Office to satisfy the requirements of the National Historic Preservation Act, 36 CFR §800.6(b)(1)(iv).  (*See* FEIS at Appendix A (A-05, Section 106 Correspondence, Memorandum of Agreement) at 20-49.)

FHWA and DDOT met with many agencies throughout the scoping process, including the Federal Railroad Administration, the District Department of the Environment, the District Urban Forestry Administration, the District Department of Parks and Recreation, and the National Park Service to discuss the project.  (*See* DCX-8, FEIS Ch, 7 at 7-7.)

FHWA and DDOT officials, along with project planners, engaged in active community and public outreach during the scoping process.  They briefed numerous community and civic

organizations, businesses and individuals, including the local Advisory Neighborhood Commissions, the Capitol Quarter Residents and Home Owners Association, and the Garfield Park Association. (*See id.* at 7-7, 7-8, 7-9.)

FHWA and DDOT officials teamed with project planners in hosting four public meetings prior to the publication of the Draft Environmental Impact Statement. (*See id.* at 7-10, 7-11.) At each meeting, planners presented display boards containing project information, and provided forms for written comments. Except for the less formal first meeting, the planners also arranged for a court reporter to transcribe spoken comments. In addition, they made available on the project website copies of PowerPoint presentations, poster displays, completed comment forms submitted during and after the meeting (with personal information redacted), and meeting transcripts. (*See id.* at 7-9.)

During this stage, a total of twelve broad concepts for the project were considered, including the no-action scenario, seven "build" scenarios, and four "rerouting" scenarios, in which freight would be rerouted around the tunnel either during construction or permanently. (*See* DCX-4, FEIS Exec Summary at S-27; FEIS Ch. 3 – Alternatives, annexed as DCX-12, at 3-42 through 3-45.)

On December 21, 2012, DDOT and CSXT entered into an agreement ("Term Sheet Agreement") whereby DDOT agreed to issue a Temporary Construction Public Space Permit for the Virginia Avenue Tunnel project. (*See* DCX-6, at 14-53). The scope of the permit was expressly conditioned on the build alternative, if any, ultimately selected by the Record of Decision ("ROD"), a copy of which is annexed as DCX-13. Tthe agreement provided that if the no-build alternative was selected, the permit would be null and void. (*See* DCX-6 at 14 (Term

Sheet Agreement ¶ 4.b.,"Temporary Construction Public Space Permit.")  The agreement further stated that DDOT would give CSXT the permit only after the issuance of the ROD. (*See id.* )

On December 21, 2012, DDOT and CSXT also executed an agreement upon Terms and Conditions for the Public Right of Way Occupancy Permit For CSX Transportation, Inc. (*See id*. at 118-126.) Through this agreement, the Public Right of Way Occupancy Permit affords CSXT the "right to occupy and use exclusively the Virginia Avenue Tunnel Right of Way . . . for the Virginia Avenue Tunnel Reconstruction Improvements for railroad purposes." (*See id.* at 120.)

The scope of the Public Right of Way Occupancy Permit was contingent upon completion of the NEPA process.  It stated:  "As of the date hereof, Exhibit A generally identifies the Virginia Avenue Tunnel ROW as the area covered by all three build alternatives identified in the DEIS. CSXT shall only be allowed to construct the Virginia Avenue Tunnel Reconstruction Improvements in the location identified in the Record of Decision, *if any*. Therefore, upon completion of the Virginia Avenue Tunnel Reconstruction Improvements in accordance with the Record of Decision, this Permit shall be automatically and without further action amended to reduce the Virginia Avenue Tunnel ROW shown on Exhibit A to reflect the as-built location of the Virginia Avenue Tunnel Reconstruction Improvements." (*See id.*)

## A. FHWA And DDOT Issued A DEIS Identifying Three Build Alternatives And A No-Build Option.

The DEIS was announced in the Federal Register on July 12, 2013.  *See* 78 Fed. Reg. 41927.  FHWA initially provided for a 45-day comment period, but later extended the deadline by 30 days—to September 25, 2013—in response to public requests. (*See* DCX-8 at  7-12.)

The DEIS identified three build alternatives and a no-build option.  The build alternatives set forth different conceptual designs for a rebuilt tunnel containing two tracks that would accommodate double-stacked intermodal container freight trains.

Planners held a public hearing on July 31, 2013 at the Capitol Skyline Hotel in Washington, D.C., in which they presented the DEIS and fielded questions and comments from the community.  In addition to the comments provided at the public hearing, more than 100 agencies, organizations and individuals provided written comments by letter or email.  (*See id.* at 7-13.)

Planners attended two additional public meetings at the request of Congresswoman Eleanor Holmes Norton.  The first meeting was held on November 23, 2013 at the Capper Senior Apartments, and the second meeting was held on January 25, 2014 an office building at 200 I Street SE (a DC office building).   A third public meeting was held in the same location on January 16, 2014. (*See id.* at 7-12.)

**B.  The FEIS Selected A Preferred Build Alternative That Satisfies The Project's Purpose And Need While Minimizing Environmental Impacts.**

The FEIS was signed on June 5, 2014, by FHWA and DDOT, and was issued to the public on June 13, 2014.   The FEIS analyzed the reconstruction of the tunnel, including converting the tunnel's single-track to a two-track configuration, and providing vertical clearance for double-stack intermodal container freight trains.

The FEIS analyzed the impacts arising from a no-build alternative (Alternative 1) and three build alternatives (Alternatives 2, 3 and 4).  The FEIS identified Alternative 3 as the preferred alternative.   The preferred alternative replaces the existing VAT with two new permanent tunnels.  Each new tunnel will have a single railroad track with enough vertical clearance to allow double-stack intermodal container freight trains.  A new parallel south side tunnel will be built first as trains continue operating in the existing VAT. After the south side tunnel is completed, train operations will switch over to the new tunnel and the existing VAT will be demolished and rebuilt. With the exception of operating in a protected open trench for

approximately 230 feet immediately east of the 2nd Street portal, trains will operate in enclosed tunnels throughout the construction period.  The two tunnels will be separated by a center wall for most of their length.

The FEIS included responses to all comments received at the public hearing or in written comments.  Some of the comments received led to changes to the FEIS.  DDOT and FHWA considered all comments received in identifying the Preferred Alternative.  *See* FEIS at Appendix L.

Following issuance of the FEIS, DDOT and FHWA announced a 30-day comment period prior to issuing a ROD.  Government officials and project planners held another public meeting on July 1, 2014, at the Capitol Skyline Hotel.  The meeting included a formal presentation, followed by a question-and-answer period.

Again, in response to public requests, FHWA extended the comment period from 30 to 60 days, and held another public meeting at the Capitol Skyline Hotel on July 31, 2014.

**C. FHWA's Record Of Decision Selected The Preferred Alternative.**

FHWA issued its ROD on November 4, 2014.  The ROD chose the Preferred Alternative as the Selected Alternative.

FHWA explained that "[t]he Selected Alternative satisfies the Purpose and Need for the Project to a higher degree than the other two Build Alternatives while minimizing environmental impacts and addressing community concerns."  (DCX- 13, ROD, at 8.)  The agency further explained that the Selected Alternative "reduces the construction duration for the Project to the greatest extent possible," and emphasized that the Selected Alternative "was developed in direct response to community concerns about trains temporarily operating in an open trench during construction near neighborhoods."  *Id*.  FHWA noted that the Selected Alternative was also "the

environmentally preferred alternative" that would have the least impact on the environment.  *Id*

## ARGUMENT

## I.     The Legal Standards Applicable To This Application

### A.  The Standard For Granting A Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy . . . ."). To be granted such relief the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter* at 7. As demonstrated below, the Committee fails to satisfy any of these requirements, and its Application should be denied.

### B.  The Law Governing Plaintiff's Claims Under NEPA, The APA, The DC EPA, And The DC EPA.

"NEPA is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision." *New York v. Nuclear Regulatory Com'n,* 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558 (1978)). It serves the dual purposes of "place[ing] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983), and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.*

To enforce its obligations, "NEPA does not authorize a private right of action, but judicial review is granted through the APA." *Friends of Tims Ford v. Tennessee Valley Authority,* 585 F.3d 955, 967 n. 3 (6th Cir.2009) (citations omitted)).[3] Similarly whether any final decision by the District affecting Plaintiff's rights is arbitrary and capricious is determined under the DC APA, *see Kingman Park Civic Assoc'n, v. Gray,* --- F.Supp.2d ---, 2014 WL 4810189 *3 (D.D.C. Sept. 29, 2014) (citing D.C. Official Code § 2–510(a)(3)(A); *Kegley v. District of Columbia,* 440 A.2d 1013, 1019 (D.C. 1982)). "Under the APA, the court will set aside a final agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Latin Americans for Social and Economic Development v. Administrator of Federal Highway Admin.*, 756 F.3d 447, 464 (6th Cir. 2014) (quoting *Sierra Club v. Slater,* 120 F.3d 623, 632 (6th Cir.1997)).

"[A]n agency may violate NEPA, and consequently the APA when it predetermines the result of an environmental analysis." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010). However, a plaintiff seeking to invalidate an agency determination as "predetermined" must satisfy a stringent standard." *Wyoming v. U.S. Dep't of Agriculture*, 61 F.3d 1209, 1264 (10th Cir. 2011). "In analyzing the environmental impacts of a proposed action under NEPA, agency officials are not required to be 'subjectively impartial.'" *Wyoming v. U.S. Dept. of Agriculture*, 661 F.3d 1209, 1263 (10th Cir. 2011) (citations omitted). Rather, "predetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome." *Forest Guardians v. U.S. Fish and Wildlife Serv.,* 611 F.3d 692, 714 (10th Cir.2010) (emphasis in original).

---

[3]  At the outset it should be noted that the District Defendants cannot have violated NEPA or the APA because these statutes do not apply to District government actions.

In addition to its claims under NEPA and the APA, Plaintiff is also understood to assert that construction of a new, two-track Tunnel should be enjoined because the District did not prepare an EIS under the DC EPA and issued a Public Right of Way Occupancy Permit to CSXT in violation of D.C. Official Code provisions. As explained below, at 42-43, the District is not mandated or even authorized to require an EIS for the Virginia Avenue Tunnel Project. Nor have the District Defendants violated District laws by issuing the Occupancy Permit. *Id.*

## II.     The Committee's Motion Must Be Denied Because It Fails To Clearly Show That It Is Likely To Suffer Irreparable Harm In The Absence Of A Preliminary Injunction.

To prevail on a preliminary injunction motion, the movant must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter,* 129 S.Ct. at 375 (citing *Los Angeles v. Lyons,* 461 U.S. 95, 103 (1983)). "Indeed, if a party fails to make a sufficient showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." *Appalachian Voices v. Chu*, 725 F. Supp.2d 101, 104 (D.D.C. 2010) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995).

"[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual-not theoretical-and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *National Tobacco Company, L.P., v. District of Columbia*, 2011 WL 4442771 *6 (Sept. 14, 2011, D.D.C.) (quoting *Power Mobility Coal. v. Leavitt,* 404 F.Supp.2d 190, 204 (D.D.C. 2005) (internal citations and quotation marks omitted). "[I]t is bedrock law that injunctions 'will not issue to prevent injuries neither extant nor presently threatened, but only merely feared.'" *Sierra Club v. U.S. Corps of Engineers*, 990 F. Supp.2d 9, 24 (D.D.C. 2013) (quoting *Comm. in Solidarity With People of El Salvador (CISPES) v. Sessions,* 929 F.2d 742, 745–46 (D.C. Cir.1991) (internal quotation marks and citations omitted).

Plaintiff has failed to make any such showing. The Committee implicitly acknowledges the meagerness of its claim of irreparable harm by arguing that the Court may justify an injunction based on a weak showing of irreparable harm coupled with a strong showing of success on the merits.  Pl Memo at 39-40 (quoting *CityFed*, at 747). Thus, to buttress its claim of injury, the Committee contends that it is "important" that "once defendants issue their approvals and permits, they will lose their ability to control CSXT's operations, both with respect to the construction and the actual operation of the newly expanded tunnel."  Pl. Memo at 40 (without citation to any authority).

This, however, is not irreparable harm. Nor is this true. "A stop work order, which does what its name implies, may issue if 'work on any building, structure or premises is being performed contrary to the provisions of the Construction Codes, or the Zoning Regulations *or in an unsafe or dangerous manner*.'" *Elkins v. District of Columbia*, 690 F.3d 554, 559 n.2 (D.C. Cir. 2012) (citing D.C. MUN. REGS. tit. 12A, § 114.1). "Work beyond the scope of a permit violates the Construction Codes." *Id.* Further, the Terms and Conditions governing the Occupancy Permit expressly provide DDOT "the right to terminate and revoke the Permit in the event of a major casualty" damaging the Tunnel Reconstruction Improvements "and materially and adversely impact[ing] . . . the immediate health, safety, or welfare of the public using Virginia Avenue, SE." *See* DCX-6  at 118, 122-23. The Committee also overlooks the federal government's authority to achieve railway safety. *See, e.g., Association of American Railroads v. Department Of Transportation*, 198 F.3d 194, 198 (D.C. Cir. 1999) (citing 49 U.S.C. § 20103(a))[4] (Secretary of Transportation is empowered to "prescribe regulations and issue orders

---

[4]  49 U.S.C. §20103 (a) now provides that "[t]he Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970. When prescribing a security regulation or issuing a security order that affects the safety of railroad operations, the Secretary of Homeland Security shall consult with the Secretary."

for every area of railroad safety."); *see also* 49 U.S.C. §20101 ("The purpose of this chapter is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.").

Further, the Committee does not assert that it or any of its members currently suffers or is threatened with irreparable injury that is certain, great, actual, and imminent. *See* Pl Memo at 41. The Committee anticipates or predicts that one of its members, Maureen Cohen Harrington, will suffer from construction noise, vibrations, air pollutants, and other environmental impacts, not to mention traffic and parking problems and utility disruptions." *Id*. However, the record in support of the Application does not clearly show that these anticipated inconveniences, which are truly common in some degree in a thriving city such as Washington, DC, will somehow rise to the level of irreparable injury. *Id*.; *see also* PX-16, Declaration of Maureen Cohen Harrington, at ¶¶ 5-8. Rather, the Harrington Declaration does not provide any descriptive information about these anticipated effects of the construction, which Ms. Harrington correctly consistently labels "'inconveniences.'"

Rather, the Committee stakes its attempted showing of irreparable harm on Ms. Harrington's "fears" that she will suffer injury from "the operation of the newly expanded Virginia Avenue Tunnels," PX-16 at ¶ 7, and the supposed risks of a rail disaster or terrorist attack on trains carrying hazardous materials, *id*. at ¶ 8. That the Committee relies on fears regarding possible events well off in the future to support its irreparable harm claim defeats the Application, as a matter of law.

Any potential for these concerns to become more than speculative requires the completion of the tunnels. The completion is estimated to be 30 to 42 months away. FEIS at 3-37. There is no reason to assume that this matter will not be decided on its merits long before

then.  Accordingly, these fears related to a temporally distant future cannot support a preliminary injunction. *Chu*, 725 F. Supp.2d at 106 (denying preliminary injunction motion solely on basis of plaintiffs' failure to show likelihood of irreparable harm, where anticipated harm was to be in forms of environmental and aesthetic injury to occur when plant to be reconfigured to use "clean coal" went into operation in two years from time of motion).

Further, Ms. Harrrington claims that her fears of an environmental disaster are supported by findings of the 2007 Railroad Feasibility Study ("RRFS").  According to the RRFS, the location of the rail line makes hazardous materials moving through the District a "tempting target for attack."  PX-16 at ¶ 9.  That no such attack has taken place in the past seven years, while trains have had to idle while awaiting the tunnel to clear suggests that this fear is far too speculative to support preliminary injunctive relief.  See *Sierra Club v. U.S. Corps of Engineers*, 990 F. Supp.2d 9, 24 (D.D.C. 2013) (denying preliminary injunctive relief because "the harms that an oil spill might potentially someday cause—however fearsome—are not certain, and therefore are not sufficient to satisfy the 'irreparable harm' standard.")

Finally, the Committee seeks to distinguish its claimed potential harms from aesthetic injuries sometimes considered by courts in conjunction with a NEPA procedural violation to satisfy the irreparable harm requirement. *See* Pl Memo at 40-41. It should be noted that in cases in which courts have relied on claims of aesthetic injury to find irreparable harm, those injuries were irreparable in nature. *See Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F.Supp.2d 1, 24–25 (D.D.C.2009) (agency final rule that authorized possession of firearms in national parks and wildlife refuges, which had gone into effect approximately two months earlier, caused plaintiffs ongoing, irreparable environmental and aesthetic injuries in addition to their NEPA procedural injuries); *Fund for Animals v. Clark,* 27 F.Supp.2d 8, 14 (D.D.C.1998)

(plaintiffs challenging organized bison hunt planned by Park Service, Fish and Wildlife Service and National Forest Service, had shown they would suffer "other, concrete injuries" to their aesthetic interests in addition to procedural violations if defendants proceeded with the hunt); *Fund for Animals v. Norton,* 281 F.Supp.2d 209, 219-20 (D.D.C. 2003) (plaintiffs challenging permit authorizing killing of mute swans that Fish and Wildlife Service had issued approximately one month earlier had demonstrated irreparable injury through combination of procedural harm and harm to their environmental and aesthetic interests in "their ability to view, interact with, study, and appreciate mute swans." *Id.*

Accordingly, the Court should deny the Application regardless of its assessment of the other three "factors of the injunctive relief analysis; for even if the plaintiffs [had made] a strong showing on those factors, they still would not be entitled to interim injunctive relief." *Chu*, 725 F. Supp.2d at 106 (citing *Winter,* 129 S.Ct. at 375 *and CityFed,* 58 F.3d at 747.

## III.   The Committee Is Not Likely To Succeed On The Merits Of Its Claims

Plaintiff contends that the FEIS is arbitrary and capricious for eight reasons: (1) the Alternatives analysis was unlawfully pre-determined, (2) the FEIS unlawfully segments the VAT from other regional projects, (3) the FEIS fails to take a hard look at the cumulative impacts of the Tunnel expansion project, (4) the FEIS impact analysis disregards reasonably foreseeable effects of the Tunnel project, (5) the EIS fails to adequately assess Alternatives to expanding the Tunnel, (6) the FEIS relies on flawed information, (7) the District violated the D.C. Environmental Policy Act, and (8) the District violated D.C. Official Code §§10-801 and/or 9-202.01. The District Defendants address these contentions in sequence.

### A.  Neither The ROD, The FEIS, Nor Any Assessment Of Alternatives Was Pre-determined

The Committee contends that the FEIS and/or ROD are arbitrary and capricious because the selection of a "Build" Alternative was unlawfully pre-determined. Pl Memo at 6 - 12. Plaintiff supports this contention by characterizing in self-serving but inaccurate ways selected portions of a several agreements between the District and CSXT. Plaintiff's ostensible objective in characterizing the agreements as it does, is to persuade the Court that they reflect an "irreversible and irretrievable commitment of resources" to the Selected Alternative, or at the very least, an alternative involving expansion of the existing VAT.

### 1.  The August 23, 2010 Memorandum of Agreement

Plaintiff first attacks an August 23, 2010 Memorandum of Agreement ("MOA") between CSXT and DDOT. PX-13, DX-1. Plaintiff points out that in this agreement, "DDOT agreed that the Virginia Avenue Tunnel Expansion Project was "critical" to rail transportation and agreed to "work together" with CSXT to effectuate the project, including submitting grant applications for the project."  Pl Memo at 15. While the August 23, 2010 MOA certainly contains various statements consistent with the fact that DDOT and CSXT have a common interest in the efficient movement of rail transport through the District and in having infrastructure in the District to achieve this objective, this MOA does not reflect any irretrievable or irreversible commitment of District resources to any Alternative subject to the EIS process.

### 2.  The Change Order

The Committee contends that CSXT agreed to pay the District $4,171,044 for actions that the District agreed to through the August 23, 2010 MOA. It observes that this amount corresponds to the cost of a contract modification or Change Order the District entered into regarding work to be performed on the 11th Street Bridge. *See* Pl Memo at 17, PX-18. This

Change Order reflects that "the basis of the Scope of Services outlined in this document is to modify the design of proposed Bridge S-19 to accommodate the proposed construction along the current CSX Rail line adjacent to I-695 (Southeast/Southwest Freeway) in Southeast Washington DC." PX-18 at 3. "This structure shall be redesigned in such a way *as not to preclude* the construction of a CSX shoo-fly track (included as Attachment B) and the widening of the CSX Virginia Avenue Tunnel (included in the Request for Proposal documents supplied prior to award)". *Id.* (emphasis added).

It is important to note that PX-18 is a materially incomplete copy of Change Order Modification of Contract No. 8 ("Change Order No. 8"). As reflected on the first page of PX-18, the Change Order consists of 31 pages, while PX-18 is only 5 pages long. Accordingly, the Court is respectfully referred to  DCX-7, for  a complete copy of Change Order No. 8.

Change Order No. 8 reflects a commitment by the District simply to preserve its option to permit an Alternative requiring expansion of the existing VAT. It does not, however, reflect an irretrievable commitment of District resources to do so. This is because the cost of the Change Order No. 8 was to be absorbed *by CSXT*, not the District, as reflected in Change Order ¶ 4.6 ("CSXT's Share of Project Cost). DCX-7 at 8. The Committee makes inconsistent assertions regarding the costs of this Change Order. First the Committee states that "[t]he change order cost the District of Columbia $4,171,044," Pl Memo at 17 (citing PX-18).  This is simply wrong. *See* DCX-7, at 7, ¶ 4.7(b) ("CSXT shall pay to [DDOT] $4,174,044 for design and construction costs associated with adjustments to the Project required by CSXT ("Redesign Costs")). On the next page of its memorandum, the Committee acknowledges that CSXT took on the cost of the Change Order asserts, "[i]t is important to note that CSXT's agreed payment of $4,171,044 . . . . Pl Memo at 18.

However, Plaintiff asserts then that the payment "was not intended to benefit the District or to actually offset the District's obligations. Instead, the District was required to issue a credit to CSXT for the exact same amount with respect to CSXT's liabilities associated with the expansion of the Virginia Avenue Tunnel." *Id* at 16 (citing PX-13, Art. III (B)).  This, however, assertion assumes too much. The August 23, 2010 MOA Art. III(B) states that "DDOT shall obtain the CSXT Credit Amount of funds through traditional federal appropriations and obligations for resurfacing of Federal-Aid facilities" – not District resources. PX-13. This term most certainly does not commit District funds to an Alternative involving expansion of the existing VAT. Nor does it provide CSXT any assurance that it will obtain recovery of any of, much less the entire $4,171,044 cost. On its face, the MOA provides for offset only to the extent that an Alternative involving expansion of the existing VAT is ultimately permitted. If such an Alternative is not permitted, the District gets the benefit of CSXT paying for the Change Order without incurring any cost for resurfacing Virginia Avenue. Even if such an alternative is permitted, but the cost of restoring and/or resurfacing Virginia Avenue is less than $4,171,044, the District enjoys the benefit of the difference in CSX receives no offsetting benefit.

Nevertheless, Plaintiff continues that "[u]nder the agreement DDOT was required to make up for the shortfall that resulted from granting CSXT this credit from federal funds." *Id.* (citing PX-13, Art. III(B)).  At best, Plaintiff misreads this agreement. The August 23, 2010 MOA requires CSXT to pay any cost of resurfacing and or restoring Virginia Avenue in excess of $4,171,044; it expressly states that, "[t]o the extent that the total cost for the restoration and/or resurfacing of Virginia Avenue exceeds the remaining credit balance of the CSXT Credit Amount to be applied by DDOT, *such costs shall be paid by CSXT*." *Id.* (emphasis added).  Like the other August 23, 2010 MOA language quoted by the Committee, this language makes *any*

commitment of District resources contingent upon the uncertain permitting of an alternative involving expansion of the VAT and places *all* the financial risk on CSXT. CSXT invested its resources simply to preserve the possibility that an alternative involving expansion of the VAT *could* be permitted. This, however, does not render the FEIS or the alternative selection arbitrary and capricious under *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 229 (D.D.C. 2003), *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000), or *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010), cited in Pl Mem at 14.

### 3.   December 21, 2012 Term Sheet Agreement

Next, the Committee suggests that the December 21, 2012 Term Sheet Agreement between DDOT and CSXT (PX-19) reflects Defendants' predetermination that a tunnel expansion alternative would be selected. Pl Memo at 17. Plaintiff points to three aspects of this agreement to support its theory. In the first, DDOT agreed to issue a Public Right of Way Occupancy Permit that CSX to would require if the FHWA ROD endorsed one of the "build" alternatives. *Id.*  The Committee ignores that DDOT's "commitment" is entirely contingent upon the issuance by FHWA of a ROD that "selects one of three build alternatives currently described in that Draft Environmental Impact Statement dated September 12, 2012." PX-19, ¶ 4.b. Because this "commitment" is contingent on a determination to be made by the FHWA, not the District, it is not "irreversible and irretrievable." *See Public Utilities v. Commission v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990) (holding agency did not violate NEPA by granting a conditional certificate of use to power company where "non-environmental approval was expressly not to be effective until the environmental hearing was completed.")

Further, the Committee asserts that the District's agreement to "continue to provide oversight of the EIS process for the VAT as co-lead agency with FHWA" and to "partner" with

CSXT to "manage the EIS process" reflects unlawful pre-determination. Pl Memo at 17. First, Plaintiff's partial quotation is misleading. This agreed-upon cooperation was to be provided explicitly "under FHW's *Every Day Counts* initiative and federal law, which is designed to shorten project delivery, enhance project safety, and protect the environment." PX-19 at 2, Term Sheet ¶5 ("environmental Impact Statement ('EIS') Process")).Thus, it is clear from the actual language of the agreement that the District has merely agreed to continue to perform its role as lead local agency for the EIS in accordance with federal law designed to facilitate project safety and "protect the environment." The Committee has cited no cases and the District cannot locate any in which a court has held that agreeing to conduct an EIS in accordance with federal law amounts to unlawful predetermination.

Plaintiff's third point is more convoluted. The Committee states, "[i]n a December 21, 2012 Term Sheet Agreement between DDOT and CSXT (Exhibit 19), the DDOT agreed to: . . . 3. DDOT granted CSXT a permanent right of way for the space occupied by the expanded Virginia Avenue Tunnel (Exhibit 15, Art. I(A) and Art. IV(A))." Pl Memo at 17. Plaintiff's Exhibit 19 is the Public Right of Way Occupancy Permit identified in Plaintiff's Exhibit 15 at ¶ 3. In Art. I(B) of PX-15, this Public Right of Way Occupancy Permit sets forth a series of conditions upon its application, which determine that as of the date it was issued, December 21, 2012, it did not, in fact, irretrievably and irreversibly confer "a permanent right of way for the space occupied by the expanded Virginia Avenue Tunnel." Rather, the Public Space Right of Way Occupancy Permit (PX-15) issued by DDOT only provides CSXT occupancy rights that are coextensive with the footprint of such "build" alternative, if any, to be ultimately granted by the FHWA through the ROD.  PX-15.  Specifically, the Occupancy Permit states that FHWA and DDOT were preparing an EIS "to determine which, if any of three (3) build alternatives currently

described in that [DEIS].will be an acceptable alternative for the Virginia Avenue Tunnel Reconstruction Improvements, *if any*[.]" PX-15 at 2 (3rd "Whereas Clause") (emphasis added). Thus, as of December 21, 2012, no determination had had been reached as to whether *any* "build" alternative would be selected. Therefore, the Occupancy Permit **did not**, as of December 21, 2012, commit the District to "a permanent right of way for the space occupied by the expanded Virginia Avenue Tunnel," contrary to Plaintiff's  assertion on Pl Memo at 17.

Rather, the Terms and Conditions for the Public Right of Way Occupancy Permit, PX-15 at 2-7, expressly stated that "the NEPA process will conclude with the issuance of a record of decision ("Record of Decision") which **may** select one of the build alternatives, **if any**, pursuant to which Permittee may construct the Virginia Avenue Tunnel Reconstruction Improvements **or adopt the "No Build alternative" identified in the DEIS**." *Id.*, 4th "Whereas Clause" (emphasis added). Then, "**if** the Record of Decision identifies a build alternative for the construction of the Virginia Avenue Tunnel Reconstruction Improvements, [CSXT] **shall** have the right to construct the Virginia Avenue Tunnel Reconstruction Improvements . . . in a manner set forth in the Record of Decision[.]" *Id.*, 6th "Whereas Clause." Again, the objectively clear language of the agreement, stating that DDOT "shall" do "if" certain conditions come into being demonstrates that the District had not irretrievably and irreversibly committed to a "build" alternative.

The Terms and Conditions governing the Public Right of Way Occupancy Permit, PX-15, further provide that "CSXT shall only be allowed to construct the Virginia Avenue Tunnel Reconstruction Improvements in the location identified in the Record of Decision, if any. Therefore, upon completion of the Virginia Avenue Tunnel Reconstruction Improvements in accordance with the Record of Decision, this Permit shall be automatically and without further action amended to reduce the Virginia Avenue Tunnel Right of Way ("ROW") shown on Exhibit

A to reflect the as-built location of the Virginia Avenue Tunnel Reconstruction Improvements."

*Id*. at Art. I(B)

And "*if the Record of Decision (defined above) selects the "no build alternative" for the Virginia Avenue Tunnel Reconstruction Improvements, this Permit shall terminate and be of no further force and effect*."  PX-15 Art. IV ¶ B.

Quite clearly and expressly, the Occupancy Permit does *not* provide CSXT with "a permanent right of way for the space occupied by the *expanded* Virginia Avenue Tunnel." Instead, the Occupancy Permit only provides CSXT with occupancy rights for a "build" alternative if the ROD approves a build alternative. *Id.* The Occupancy Permit fully recognizes the possibility that the FHWA may select the "No Build Alternative." *Id.* The Occupancy Permit also expressly provides that it will automatically terminate and become a legal nullity if and when FHWA approves the "No Build Alternative."  *Id.* Thus, the Occupancy Permit does not reflect an irretrievable and irreversible commitment by the District in advance of the ROD. It only provides occupancy rights as determined by the FHWA, not the District, through the ROD. Accordingly, it is no evidence of unlawful predetermination. *See Fund For Animals v. Norton*, 281 F. Supp.2d at 229.

### 4.  Shepherd's Branch Agreement

The Committee also contends that an October 29, 2013, Amendment to the December 12, 2012 Term Sheet Agreement shows that the District unlawfully predetermined the outcome of the EIS. Pl Memo at 17. However, the Court may readily determine from the Amendment language quoted at Memo p.17, that the District has not made any irretrievable or irreversible commitment of resources to any of the "Build Alternatives." All that the Amendment provides is that any closing on any potential sale by CSXT of the Shepherd's Branch right-of-way is to be

proceeded by the District's issuance of the permits and approvals by District agencies to proceed with the Project "in accordance with the build alternative, if any, determined to be the acceptable alternative pursuant to the [FWHA's] Record of Decision . . ." *Id.* Once again, the Committee points to a document that (1) recognizes that the FWHA may select the "No Build Alternative", and (2) does not require the District to afford anyone anything that the ROD does not, when issued, expressly provide for. The Amendment does not expose the District to any liability for denying permits or approvals relating to a Build Alternative where the ROD has not explicitly authorized such construction. Once again, Plaintiff argues that the District has irretrievably and irreversibly committed its resources to a Build Alternative-favorable decision, when in fact, any obligation on the part of the District is contingent upon its authorization through the FHWA' s ROD.

Further, in seeking to establish predetermination based on these contingencies, the Committee fails even to suggest on what basis the District could withhold the various permits and approvals for an alternative selected by the FHWA through the ROD.

In addition, Plaintiff cites no case in which actions by a state or local agency were held to have predetermined a joint Federal – state/local EIS, much less a Federal Record of Decision. This is entirely understandable because NEPA places the responsibility for preparing an EIS only on Federal agencies. Moreover, Plaintiff's Memo does not mention, much less discuss, that the Record of Decision that governs which alternative CSXT may pursue, is solely the determination of the FHWA, as to which the Committee has offered no showing of predetermination. *See* Record of Decision, PX-12 at 45.

**B. The Scope Of The Analysis Of The Virginia Avenue, Tunnel, Which Has Independent Utility, Is Proper And Not Unlawfully Segmented**

The Committee further challenges the validity of FHWA's EIS and ROD by claiming that the agency has acted unlawfully by limiting the scope of its NEPA analysis to the proposal actually before it - the Virginia Avenue Tunnel Project. Pl Memo at 19-23. Plaintiff argues that the FHWA should assess a nonexistent proposal "including other Projects Associated *with* CSXT's National Gateway Initiative." *Id.*; *cf. Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987). In doing so, the Committee completely ignores the independent utility of a double track tunnel in allowing freight and passenger trains to pass through the District simultaneously in opposite directions.  Plaintiff also ignores that no greater project has been proposed. Further, the Committee does not attempt to define for this Court another project on which the FHWA should have based it analysis.

**1. The Rule Against Segmentation**

The D.C. Circuit has explained  that  the danger to NEPA efficacy posed by "[s]egmentation" [is that it] allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) (citing *West Chicago, Ill. v. U.S. Nuclear Regulatory Comm'n,* 701 F.2d at 650). "The rule against segmentation was developed to insure that interrelated projects, the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions." *Id*. (citing *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430 (5th Cir.1981); *Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976) (*en banc* )); *see also Jackson Cnty. N. Carolina v. FERC*, 589 F.3d 1284, 1290 (D.C. Cir. 2009) ("[a]gencies may not evade their responsibilities under

NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact.") (citations and internal quotes omitted).

"*The rule against segmentation, however, is not required to be applied in every situation*." *Jackson Cnty*, 589 F.3d at 1290 (emphasis added). "To determine the appropriate scope for an EIS, courts have considered such factors as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." *Id*. (quoting *Taxpayers Watchdog, Inc.,* 819 F.2d at 298). On the facts of this case the rule against segmentation is not implicated. *See Taxpayers Watchdog, Inc.,* 819 F.2d at 298-300.

### 2.   Applying the Rule Against Segmentation

Two D.C. Circuit decisions cited by the Committee addressing segmentation claims demonstrate that the Virginia Avenue Tunnel Project has not been improperly segmented: *Taxpayers Watchdog*, and *Macht v. Skinner*, 715 F. Supp.1131 (D.D.C. 1989), *aff'd*, 889 F.2d 281 (D.C. Cir. 1989).

#### a.   *Taxpayers Watchdog*

*Taxpayers Watchdog* presented a challenge to a proposed rail project that was only a part of an earlier proposed, much larger urban rail transit plan. *Id*.  In 1978, Southern California Rapid Transit District ("SCRTD") presented a "Draft Alternatives Analysis/Environmental Impact Statement/Environmental Impact Report" ("TWDEIS") to the Urban Mass Transit Administration ("UMTA"). The TWDEIS presented 11 alternative mass transit plans intended to improve public transportation in and around Los Angeles.  In May, 1979, UMTA approved the TWDEIS and made it available for review and public comment in June.  In September 1979, the SCRTD chose a plan for an 18.6 mile subway line between the Los Angeles central business

district and North Hollywood as its "preferred alternative." Following completion of a number of tasks and procedures required in the UMTA review process, an underground 18.6 mile plan became the selected alternative, and UMTA approved the TWFEIS.

However, a 1984 federal government cutback of funding for local transit projects forced SCRTD to develop a new alternative that consisted of only the first four miles of the selected alternative 18.6 mile system ("Minimum Operable Segment" or "MOS-1"). SCRTD determined that MOS-1would make a "'viable contribution to the greater Los Angeles urban transportation infrastructure" and would ease congestion in the city's central business district. *Id.* at 297. Thereafter, in response to a methane gas explosion in Los Angeles, Congress imposed additional eligibility restrictions for federal funding of rail plans in that city. This precluded SCRTD, again, from proceeding with a proposed 18.6 mile route and forced it to develop a new extended rail system plan. Thus, in June 1986, SCRTD proposed four potential alternative routes, with each utilizing MOS–1. On August 27, UMTA contracted with SCRTD to release funding to construct MOS–1, even as SCRTD attempted to design a more extensive system.  UMTA concluded that the short MOS-1 "was preferable to no rail system at all," and "would be 'worth the investment when weighed against the benefits ... increased accessibility and decreased total number of vehicle miles traveled in the [central business district] area.'" *Id.* UMTA completed its environmental review for MOS–1 in November, 1984, and issued a Finding of No Significant Impact. *Id.*

Taxpayers Watchdog sued to enjoin UMTA from releasing the funds, contending the agency had not complied with NEPA. Taxpayers Watchdog asserted that NEPA required that "the entire, as yet undetermined, subway system must be considered and a 'determination ... made whether the small part of the larger project has been improperly segmented from the

whole.'" *Id.* at 298. Taxpayers Watchdog maintained that MOS–1 was merely the first leg of a rail line contemplated to extend well beyond the MOS-1 termini, from which MOS-1had been improperly segmented, and that MOS-1 was not an independent project.

However, the trial court had found MOS-1 to be "an independent project that would make a much needed contribution to Los Angeles' transit system," based on SCRTD's evidence "that MOS–1 would provide a much needed service to the central business district ("CBD") of a city that will shortly face 'debilitating daily gridlock.'" *Id.* at 299.

The district court also found that MOS-1's "central location connecting downtown Los Angeles with outlying residential areas" made it "particularly well suited for future expansion." *Id.* Thus, MOS-1 neither foreclosed alternative expansion routes nor dictated a particular future choice. Finally, the trial court found that funding MOS–1 "would not irretrievably commit federal funds for the construction of any proposed extension." As the D.C. Circuit observed, in summarily affirming, neither the California statute that mandated the subway construction nor the UMTA-SCRTD funding contract could require UMTA to fund any future construction without first complying with NEPA. *Id.*

### b.  *Macht v. Skinner*

The *Taxpayer Watchdog* analysis is buttressed by that of this United States District Court in *Macht v. Skinner*, 715 F. Supp.1131 (D.D.C. 1989), *aff'd*, 889 F.2d 281 (D.C. Cir. 1989). The Committee quotes part of a sentence from *Skinner* out of context for the proposition that "the issue is easier to resolve (against segmentation) when the project is, for example, a highway *between* two cities, so that any segments shorter than the full length of the highway have no independent  purpose." Pl Memo at 20 (quoting *Skinner* at 1136) (emphasis in original).  The unquoted remainder of that sentence is, "*but that is not the case here.*" *Id.* (emphasis added).

Nor is it the case in this matter. Thus, it is understandable that the Committee does not discuss the facts or holding of *Skinner*. *Skinner* is not at all concerned with segmentation of a highway. Rather, in *Skinner* the trial court upheld the State of Maryland's segmentation of an urban rail project where the segmentation was done **specifically** to avoid NEPA requirements. *Id*. at 1135 (holding that segmentation by States of their projects "to insulate [them] from federal environmental law" . . . to "enable it to proceed without the delays and expenses associated with compliance with federal environmental law" was "a legitimate choice for the State to make.").

Moreover, the trial court gave a clear explication of how the segmentation satisfied all four prongs of the *Taxpayers Watchdog* analysis, specifically explaining how the proposed segmentation had logical termini. *Id*. at 1135-36. The Court observed that "the termini of the proposed segment [were] logical in terms of local access and parking" and consistent with Maryland's population and usage forecasts, and "that they end just before an extension at one end would have the adverse environmental effect of destroying an existing bicycle path." *Id*. at 1136. Particularly pertinent to this case, the Court stated:

> Plaintiffs would have the Court evaluate the issue of logical termini by looking at the purported lack of autonomy in the other segments which may, possibly, be constructed in the future. However, the Court understands the test of *Taxpayers Watchdog* to imply that the logical terminus criterion is meant to be applied to the segment under consideration at the moment, not to segments which might be constructed at some unspecified date in the future, and which may or may not ever be built.

*Id*.

The same reasoning dictates that the CSXT Project, as reviewed, has logical termini. The termini of the CSXT project are its connections with double sets of tracks to the north and south of the existing tunnel. These connections will enable freight and passenger train to safely simultaneously pass the expanded Tunnel, thereby eliminating delays of rail traffic up and down

the East Coast.  This is true even if other obstacles to intermodal/stacked container transport are not resolved. Accordingly, this Project has substantial independent utility. *See Skinner*, at 1136 (proposed segment having stations located near downtown on more waivers, highway taxes, bus lines" . . . "compels the conclusion that lines had independent utility.").

In addition, the Project is not foreclosing the opportunity to consider alternatives. The Committee does not suggest otherwise. Moreover, the Project does not irretrievably commit federal, or for that matter, District funds committed to projects closely related to this. In fact, Plaintiff does not even address this prong in its Application memorandum.

Finally, the Committee's asserted failure to locate any case in which a court has determined that a tunnel or bridge - standing alone - has independent utility is of absolutely no consequence.  *See* Pl Memo at 22.  Even the Committee must acknowledge that replacement, for safety purposes, of a bridge that has reached the end of its useful life, has independent utility. *Id*. (citing *Defenders of Wildlife v. N. Carolina Dep't of Transp*., 971 F. Supp.2d 510, 525 (E.D.N.C. 2013, *aff'd in part, rev'd in part*, 762 F.3d 374 (4th Cir. 2014)).  The bottleneck the tunnel poses to commuter transportation to and from the nation's capital, and to passenger and freight transportation through Washington, DC, is well recognized,  ROD at 5, 6, 18; FEIS at 1-3(citing *District of Columbia Freight Forum*, Volume 1, Issue 1 [January 2012])., 2-1 – 2-2, 2-5, 3-5, 3-62. This reflects that the VAT has reached the end of its useful life as a single track passageway. Accordingly, the rehabilitation and expansion of the VAT, standing alone, has substantial independent utility. Accordingly, it has not been unlawfully segmented.

## C.  The FEIS Reasonably Evaluated Alternatives

The Committee asserts that the FEIS fails to adequately assess alternatives to expanding the Tunnel. Pl Memo at 28 – 33.  Upon scrutiny, the Committee does not establish that the FEIS

failed to adequately examine the alternatives, but merely complains that the FEIS did not accord its various analysis factors the same respective priorities the Committee would.  In essence, the Committee calls on the Court to substitute Plaintiff's judgment for that of the FHWA.  However, decisional authority, the EIS, and the ROD all demonstrate that the Committee's argument lacks merit.

NEPA's implementing regulations require the proposing agency to, *inter alia* "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which are eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). "An alternative is 'reasonable' if it is objectively feasible as well as 'reasonable in light of [applicant's] objectives.'" *Theodore Roosevelt Conservation P'ship v. Salazar,* 661 F.3d 66, 72 (D.C. Cir. 2011) (quoting *City of Alexandria v. Slater,* 198 F.3d 862, 867 (D.C.Cir.1999)).  "Reasonable alternatives" are those "that are technically and economically practical or feasible and meet the purpose and need of the proposed action." *See* 43 C.F.R. § 46.420(b).

NEPA's mandate "that agencies consider the environmental impacts of 'all reasonable alternatives' does not substantively constrain an agency's choice of objectives; to the contrary, it is those very objectives that provide the point of reference for a determination whether an alternative is 'reasonable' in the first place." *City of Alexandria*, 198 F.3d at 867 (reversing district court which had held that FHWA had "violated NEPA because it did not sufficiently prioritize environmental goals" on the basis that the trial court had "subtly—and impermissibly—transformed a procedural statute into a substantive one.")  Two legal truths foreclose Plaintiff's effort to have this Court substitute Plaintiff's priorities in assessing alternatives for those dictated by the FHWA's statement of the purpose of the proposal.  First,

"Congress in enacting NEPA ... did not require agencies to elevate environmental concerns over other appropriate considerations." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97 (1983). Second, "[a] court reviewing the NEPA adequacy of an EIS may not substitute its own policy judgments for those of the agency." *Tongass Conservation Soc. v. Cheney*, 924 F.2d 1137, 1141 (D.C. Cir. 1991); *see also Potomac Alliance v. U. S. Nuclear Regulatory Comm'n*, 682 F.2d 1030 (D.C. Cir. 1982) (Court may not substitute its judgment for that of agency); *Lemon v. McHugh*, 668 F.Supp.2d 133, 138 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971) ("Even if this Court disagrees with the [agency's] decisions and conclusions, it may not substitute the agency's judgment with its own.").

Without discussing the specifics of any of the "re-routing" alternatives, Plaintiff argues that "[r]e- routing would have accommodated the first seven [purpose] criteria better than expanding the tunnel[.]"  Pl Memo at 29. For the Court to accept the Committee's assertions, it would have to (1) ignore the DEIS' detailed analysis of each of the rerouting alternatives, DEIS at 3-25 – 3-27, (2) disregard its obligation to accord deference to the FHWA, *see City of Alexandria*, 198 F.3d at 867 (citation omitted), (3) virtually exclude Criterion 8 in evaluating the reasonableness of the DEIS, EIS, and ROD, and (4) give greater credence to the Committee's assessment of alternatives than that of the FHWA, even though Plaintiff (a) fails to actually discuss any of the rerouting alternatives in particular, (b) declines to support the assertions underlying its assessments with any sort of evidence, and (c) glosses over important considerations, such as the expense, difficulty, and delay implicit in pursuing any of the

rerouting alternatives. *See* PlMemo at 29 – 30.[5]

_____

[5]  Although the Committee does not appear concerned with elimination of any of the non-rerouting alternatives, the DEIS explains why four more of the initial 12 alternatives were not excluded in the FEIS:

> Concepts 3, 3A and 7 were also eliminated from further consideration. Concepts 3 and 3A failed to meet one of the criteria based on the Project's Purpose and Need. Concept 7 failed to meet Criteria 5 and 6. In summary, the major reasons for eliminating these concepts include:

> Concept 3, Rebuild, Temporary North Side Runaround, would result in major impacts to I-695 during construction.

> Concept 3A, Rebuild, Permanent Two Tunnels (New Tunnel on North Side of Existing Virginia Avenue Tunnel), would also result in major impacts to I-695 during construction.

> Concept 4, Rebuild, Combination Runaround, would require two major disruptions to freight rail operations, causing stoppages of freight train movements for several weeks for each disruption.

> Concept 7, Rebuild, Temporary Reroute, would result in a substantial degradation of freight rail service to growing customer demands in the I-95 corridor.

DEIS at 3-27.

Re-routing alternatives were eliminated for the following reasons:

> Concept 8, Reroute, Deep Bore Tunnel, which failed three of the evaluation criteria, would require acquisition of 14 to 16 acres at portal locations and the construction of ventilation shafts in urban areas. It would have an extremely high cost (estimated to cost approximately $2 billion) and require extensive planning efforts across multiple jurisdictions.

> Concept 9, Reroute, NCPC Indian Head Alignment, which failed three of the evaluation criteria, would require a new bridge over the Potomac River and 31 miles of new rail line. It would traverse several communities, would affect diverse natural resources, would have an extremely high cost (NCPC estimated to cost between $3.2 and $4.2 billion), and would require extensive planning efforts across multiple jurisdictions.

> Concept 10, Reroute, NCPC Dahlgren Alignment, which failed three of the evaluation criteria, would require a new bridge over the Potomac River and 38 miles of new rail line. Like Concept 9, it would traverse several communities, would affect diverse natural resources, would have an extremely high cost (NCPC estimated to cost between $3.5 and $4.7 billion), and would require extensive planning efforts across multiple jurisdictions.

> Concept 11, Permanent Reroute, which failed four of the evaluation criteria, would include substantial diversion of freight traffic to trucks or other modes of transportation, with associated impacts to interstate highway congestion, higher fuel consumption, and

Plaintiff lists eight criteria employed in the EIS to assess the reasonable alternatives for achieving CSXT's goals. Memo at 28 – 29. Plaintiff expresses its view that rerouting rail lines outside the District of Columbia "would have accommodated the first seven criteria better than expanding Tunnel." *Id*. at 29. This assertion tacitly concedes that rerouting ignores – indeed, would not have satisfied Criterion 8: "The concept has a comparatively low cost." This concession, without more, should be fatal to Plaintiff's Application. The FEIS explained that the costs of the various re-routing alternatives each ran into the billions of dollars, DEIS at 3-37, which made them prohibitively expensive. *See also* ROD at 22-23 ("Each [re-routing] alternative would involve costs of extraordinary magnitude."). The D.C. Circuit "ha[s] recognized that a 'rule of reason' applies both to an agency's identification of the available alternatives and to its examination of their relative merits." *Nevada v. Department of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006). Accordingly, on these facts, the Committee's insistence that the FEIS is fatally flawed is irreconcilable with D.C. Circuit precedent.

### D.  The FEIS Properly Considers Cumulative Impact

The Committee asserts that the FEIS fails to properly consider the cumulative impact of the use and operation of an expanded VAT, as required by 40 C.F.R. Section 1508, *et seq.* Pl Memo at 24-25.  In this argument, the Committee appears to have failed to connect the FEIS' discussion of "Post-Construction Impacts," analyzing the operational impacts of the expanded Tunnel[6], with the corresponding "Cumulative Impacts" analyses of a dozen environmental aspects, at FEIS §§ 5.18, 5-100 – 5-105.

---

increased pollution.

DEIS at 3-27.

[6] *See* FEIS §§ 5.1.2 (land use); 5.2.2 (farmland); 5.3.2 (social and community conditions); 5.4.2 (economic conditions); 5.5.3 (air quality); 5.6.3 (noise); 5.7.3 (vibration); 5.8.2 (soil contamination); 5.9.2

Further, as the Committee acknowledges, the FEIS commences its analysis of Project's cumulative effects by observing that "[t]he vast majority of impacts of the Preferred Alternative for the other two Built Alternatives will occur during construction." (FEIS Ch. 5, Environmental Consequences, annexed as DCX-14, at 5-100 (emphasis in original).) The FEIS then reasonably explains that, "[t]herefore, the cumulative impacts herein provided focused primarily on the construction period of the project, and how it and other construction projects in the vicinity of the LOD [limits of disturbance] could cumulatively affect the surrounding community." (*Id.*) Nevertheless, the FEIS' analysis of cumulative impacts was not limited to the construction period. (*See, e.g.*, DCX at 5-101-02 ("Transportation" ("Upon completion of the new tunnel, freight rail transportation in and around the District will operate more efficiently, meaning no bottleneck and the flexibility in the same amount of freight nurturing. Passenger train service using CSX rail lines will benefit in Virginia and District because of the increased network capacity.")); 5-102 ("Land Use" (expected to continue unaffected); *id.* ("Socio-Economic Conditions" (no evidence of adverse effect); *id.* ("Air Quality" ("As described in Section 5.5, the Project will not trigger the GC Rule by day now *de minimis* emission thresholds in either construction or post-construction conditions."). Nothing in these analyses reflects FEIS fails to take into account the anticipated cumulative impacts of the expanded Tunnel's intended use.

### E.  The FEIS Considered Reasonably Foreseeable Project Impacts

The Committee asserts that the FEIS fails to meet the requirements of 40 C.F.R § 1502.22 by not analyzing reasonably foreseeable, post-construction impacts of an expanded, modernized VAT. Pl Memo at 25. In particular, Plaintiff asserts that the FEIS does not address

---

(water ); 5.10.2 (vegetation and wildlife); 5.11.3 (historical and archaeological resources); 5.12.2 (parks and recreation); 5.13.2 (visual and aesthetic); 5.14.2 (utilities); 5.15.1.2 (freight transportation); 5.15.2.2 (roadways); 5.15.3.2 (traffic); 5.15.4.2 (parking); 5.15.5.2 (pedestrians and bicyclists); 5.15.6.2 (transit).

reasonably foreseeable rail accidents involving spills of toxic materials, negative impacts on land values, and possible terrorist attacks. *Id.* at 26-27. However, the Committee's argument assumes obligations upon the FHWA and the District that do not exist with regard to this project and ignores analyses contained in the FEIS.

A proposed project may foreseeably have adverse environmental impacts that are not subject to NEPA analysis. *See, e.g. Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1092 (D.C. Cir. 1984). "NEPA is meant to supplement federal agencies' other nonenvironmental objectives, not to transplant specific regulatory burdens from those expert agencies otherwise authorized to redress specific nonenvironmental problems and pointlessly to reimpose those objectives on other unqualified agencies." *Id.* The Federal Railroad Administration is the "responsible expert agency" regarding railway safety, including transportation of hazardous materials. *See Louisville & N.R. Co. v. Sullivan*, 617 F.2d 793, 804 (D.C. Cir. 1980) (Wilkey, J., dissenting); *see also Canadian Pacific Ry. Co. v. Surface Transp. Bd.*, 1197 F.3d 1163, 1166 (D.C. Cir. 1999) (Federal Railroad Administration is responsible for railroad safety). Accordingly, even to the extent that the proposed improvements to the tunnel could foreseeably result in spills of hazardous materials, NEPA and its regulations do not require the FEIS or ROD to address them.

Nor must an EIS or ROD address potential environmental impacts of sabotage or terrorism under 40 C.F.R § 1502.22 as the Committee would require. *See City of New York v. Dep't of Transp.*, 715 F.2d 732, 750 (2d Cir. 1983) (citing *Natural Resources Defense Council, Inc. v. NRC,* 685 F.2d 459, 516, 540–45 (D.C.Cir.1982) (Wilkey, J., dissenting), *rev'd,* 462 U.S. 87 (1983), for proposition that "[w]ith respect to environmental consequences that are only remote possibilities, an agency must be given some latitude to decide what sorts of risks it will assess). *See also Mid States Coalition for Progress v. Surface Transp. Bd.,* 345 F.3d 520, 544

(8th Cir.2003) (holding agency did not err in declining to reopen record for construction of new rail lines in light of terrorist attacks of September 11, 2001); *Limerick Ecology Action v. Nuclear Regulatory Commission,* 869 F.2d 719, 743-44 (3d Cir.1989) (upholding agency decision not to analyze sabotage risks under NEPA where petitioner did not propose a meaningful way to do so).

This limitation on agencies' NEPA responsibilities is provided for by *Metro. Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 774 (1983).   In *Metro Edison*, the U.S. Supreme Court held that NEPA applies only when there is a "reasonably close causal relationship between a change in the physical environment and the effect at issue," such as that addressed by "the familiar doctrine of proximate cause from tort law." *Id.* at 774. In *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 767 (2004), the Supreme Court further discussed the relationship between an agency's action and a possible environmental impact that is required to trigger NEPA responsibility.  The Court stated that "'but for' causation, where an agency's action is considered a cause of an environmental effect even when the agency has no authority to prevent the effect" is "insufficient to make an agency responsible for a particular effect under NEPA." *Id.*   The *Public Citizen* Court further instructed courts to "draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not" so that agencies would not be required to prepare an EIS when doing so would serve "no purpose" under NEPA. *Id.*

In *New Jersey Department of Environmental Protection v. United States Nuclear Regulatory Commission*, (*NJDEP*), the Third Circuit applied this standard. It held that the Nuclear Regulatory Commission ("NRC") could not be required to issue an EIS regarding possible effects of potential airborne terrorist attacks when reviewing a relicensing application for a nuclear generation facility. 561 F.3d 132 (3rd Cir. 2009).  The Court reasoned that the

"NRC's lack of control over airspace supports our holding that a terrorist aircraft attack lengthens the causal chain beyond the 'reasonably close causal relationship' required by [*Metro. Edison* and *Public Citizen*]." *Id*. at 140. Consistent with the reasoning of *Glass Packaging*, the Third Circuit observed that "[a] terrorist attack on an NRC-licensed facility would require, at a minimum, a failure by the FAA and the Department of Defense to protect and defend the facility." 561 F.3d at 141. As with all the above-cited cases, the FHWA's mission lacks the "reasonably close causal relationship between a change in the physical environment and the effect at issue," to require its EIS to analyze potential environmental effects of terrorist attacks. *See Metro. Edison* at 774. This is especially true because the ROD merely provides for enhancements to an already existing facility. *See NJDEP* at 142.

In addition, the FEIS does, in fact, analyze both the risk of hazardous material spills and terrorist actions. Even if an analysis of derailment risk were required, the FEIS addresses this very issue. As a matter of fact, the FEIS concludes that train derailments will be less likely in the improved tunnel as compared to existing tunnel even at the higher contemplated speeds because "[t]he new tunnel will have a more reliable concrete tunnel floor and track ballast." FEIS 5-11 ("Post Construction Impacts: Public Facilities, Services and Safety); *see also id*. at App. L-81 (explaining that "modern infrastructure and new technologies that will be applied inside the tunnel, including state of the art roadbed, will provide a greater level of safety for freight rail traffic than the existing tunnel"); *id*. at S-4 (the new tunnel "also enhances the safety of the tunnel and railroad operations by providing a center wall in the new tunnel separating the two sets of tracks, which will provide the benefit of isolating any derailment within the tunnel"); *id*. at 5-15 (discussing coordination with local first responders regarding train derailment protocols).

And contrary to the Committee's concerns, the FEIS concludes that the risk of a terrorist attack will be reduced by the Project because with the removal of the existing bottleneck trains will not have need to idle out in the open waiting to the Tunnel.  ES-2; FEIS 10-7 (citing Railroad Realignment Study).

### F.  The FEIS And ROD Do Not Rely On Flawed Information In Violation of NEPA

The Committee next asserts that the FEIS fails to comply with NEPA requirements because it relies on two statements that the Committee contends are not accurate. Pl Memo at 34. In fact, it is the Committee's contention that suffers from two fatal flaws. The first of these is that the challenge statements are accurate. The second is that the Committee's argument misapplies the pertinent legal standard.

The two statements with which the Committee takes issue appear in FEIS Chapter 2,"Purpose and Need." FEIS at 2-1 – 2-8.  Section 2.1 of this chapter, "Virginia Avenue Tunnel Deficiencies," states that "[t]he Virginia Avenue Tunnel is deficient for the following [three] reasons:

- With a horizontal clearance (i.e., width distance between interior tunnel walls) that only allows a single railroad track, the tunnel is *a* major bottleneck freight rail not only within the District, but also on the eastern seaboard generally;

- The tunnel has insufficient clearance (i.e., height distance between the tunnel floor and ceiling) to operate double-stack intermodal container freight trains; and

- At over 100 years old, the tunnel is nearing the end of its life and is subject to an increasing level of maintenance and repairs higher risks of structural failure."

(FEIS Ch. 2, Purpose and Need, annexed as DCX-15, at 2-1 (emphasis added).)

The Committee takes issue with the FEIS' statement that "[t]he single railroad track within Virginia Avenue Tunnel represents the single greatest constraint on rail headway (the frequency of passing trains in a given time) on CSX's mainline freight rail network. It is a

bottleneck to the eastern seaboard freight rail corridor because only a single freight train can pass through the tunnel at any one time." *See* Pl Memo at 34 (displacing the underscored language with an ellipsis). This statement appears in FEIS § 2.1.1, "Tunnel Width."

Plaintiff also disputes the accuracy of a sentence in FEIS § 2.1.2, "Tunnel Height." The Committee accurately quotes the FEIS as stating "this inadequate clearance of Virginia Avenue Tunnel effectively prevents CSX from operating double-stack intermodal container freight trains along its eastern seaboard freight rail corridor." Pl Memo at 34 (quoting FEIS at 2-3). The Committee, however, neglects the immediately following two sentences: "as a result, the inadequate vertical clearance of the tunnel represents both a major deficiency of the tunnel and the ability to provide efficient service in the rail corridor. *Although there are other locations District with inadequate vertical clearances*, addressing them would require only minor modifications to the rail line." (DCX-15, FEIS Ch. 2, at 2-3 (emphasis added).)

The Committee asserts that these two "statements were inaccurate and misleading, because they exaggerate the importance of the Virginia Avenue Tunnel." Pl Memo at 35. Plaintiff argues that other CSXT documents reveal that "the Virginia Avenue Tunnel was just one bottleneck among numerous other bottlenecks involving inadequate clearance or single tracking along eastern seaboard." Pl Memo at 35. Yet, the Committee invites this Court to find that the FEIS is inaccurate and misleading and based on flawed information by using representations that are themselves misleadingly incomplete.

The language quoted above that the Committee fails to call to this Court's attention makes clear that the Tunnel's height deficiency is only one such height obstacle to double-stacking, intermodal freight transport within the District, let alone the entire eastern seaboard. Similarly, the list of "Virginia Avenue Tunnel Deficiencies" that precedes the quoted sentences

reflects that the Tunnel is "*a* major bottleneck for freight rail movement" - not the only one. The statements *actually* made in the FEIS, on which its conclusions, and those of the ROD, are based, are entirely accurate.

Moreover, the FEIS chapter from which the Committee cherry-picks these incomplete quotations clearly states that the need for the Project that is the subject of the FEIS analysis is caused by *three* structural and operational deficiencies, including the deteriorating condition of the aging Tunnel.  Thus, the Committee's characterization of the FEIS as inaccurately and misleadingly based on flawed information is without merit.

### G.  The District Has Not Violated Local Law

The Committee asserts that the District has failed to comply with the DC EPA because the FHWA-District FEIS allegedly does not satisfy the requirements NEPA or the DC EPA, Pl Mem at 37-38, and, because the District issued CSXT a Right of Way Occupancy Permit before completing an EIS in accordance with the DC EPA, *id*. at 38. In addition, Plaintiff argues that the District violated D.C. Official Code§§ 10-801 and or 9-202.01 by granting the  Public Right Way Occupancy Permit without approval of the District Columbia Council and without  providing notice to the Historic Preservation Review Board, the Advisory Neighborhood Commission, or abutting landowners. Pl Memo at 39.

Examination of the facts proves the Committee wrong and shows that the District complied with District law in all aspects. First of all, the District was without authority to require an EIS for the Project under the DC EPA.  The entirety of the proposed work area is within the District's Central Employment Area. *See* DCX  6, June 26, 2009 letter from Lennox Douglas to Troy Neisz; *see also* 11 DCMR 199 (defining "Central Employment Area"); 10 DCMR A304.9, 304.10; see also DCX- 7, Map of Central Employment Area. *See* D.C. Official Code § 8-

109.06(a)(7) (providing that "No EIS shall be required by this subchapter with respect to an action . . . (7) Within the Central Employment Area as defined in the Zoning Regulations of the District of Columbia."). Even if this were not the case, no DC EIS would be required because an EIS has been prepared pursuant to NEPA. D.C. Official Code §8-109.06(a)(1). And, contrary to the Committee's assertions, at Pl Memo p. 38, the FEIS does satisfy NEPA and its regulations, as demonstrated *infra*, at 17-43.

Nor has the District violated its own laws by granting CSXT a Public Right of Way Occupancy Permit, as the Committee contends. *See* Pl Memo at 39. D.C. Official Code § 10-801 is the first statute set forth in Title 10, Ch. 8 of the D.C. Official Code, entitled "Sale of Public Lands." Section 10-801 applies to the sale, conveyance, lease for a period greater than 20 years, exchange or other disposal of real property owned in fee simple by the District. The Public Right of Way Occupancy Permit effectuates none of these transactions. By its very Terms and Conditions, it merely affords CSXT the right to occupy certain public space.

Similarly, D.C. Official Code §§ 9-202.01 and 9-202.02 apply where a street or alley is to be permanently closed to public use. *See Techworld Dev. Corp. v. D.C. Preservation League*, 648 F. Supp. 106 (D.D.C. 1986), *rev'd on other grounds*, 1987 WL 1367570 (D.C. Cir. June 2, 1987). These statutes certainly are not implicated here – and there is nothing to indicate to the contrary. Accordingly, there is no basis in local law on which the FEIS or ROD may be deemed arbitrary and capricious.

IV. **The District Will Be Harmed If The Preliminary Injunction Is Granted**

The U.S. Supreme Court has recognized that the "concern for the safety and indeed the lives of its citizens" is a "primary concern of every government." *United States* v. *Salerno*, 481 U. S. 739, 755 (1987). Contrary to Plaintiff's assertions, the Project will result in a safer Tunnel

and a reduction in pollution.  The modernized railbed is expected to permit freight trains to travel

through the Tunnel more safely than they currently do. In addition, the floor of the expanded

Tunnel is to be impermeable. This will reduce or eliminate the existing risk of groundwater

pollution that arises when water, from heavy rains, collects in the Tunnel and may seep through

the existing dirt floor beneath the Tunnel. Further, the new tunnel will eliminate backlogs

causing trains to idle in the open where they present a more inviting target for terrorists in the

Nation's capital.  Thus, granting the requested injunction would injure the District Defendants

impairing their ability to perform their responsibilities in serving people of the District of

Columbia in a matter affecting public health and safety.

Moreover, as reflected in in the August 31, 2011 letter from City Administrator Neil

Albert and DDOT Director Gabe Klein to Secretary of Transportation Ray H. LaHood in support

of National Gateway Initiative, DCX- 8, the Project is anticipated to create 1,800 jobs, many of

which would be likely to go to District residents.  Imposition of a preliminary injunction would

delay this economic benefit to District residents and to the District through tax revenues.

## V.    Public Interest Weighs Against Injunction

In determining whether injunctive relief is appropriate, the Court must balance the

equities and hardships on both sides, and "must pay particular regard to whether such relief

would further the public interest*," Cobell v. Kempthorne*,455 F.3d 301, 315  (D.C. Cir. 2006)

(citations omitted). As a preliminary injunction would deny the District Defendants the

opportunity to serve District residents and visitors by facilitating construction of a newVAT, and

correspondingly deny the public the obvious benefits of a new tunnel.  These interests far

outweigh the concern expressed by Ms. Harrington regarding anticipated inconvenience arising

from construction activities near her home.  While the District Defendants do not brush aside

lightly "inconvenience factors" to those living near major construction projects, this is a fact of life in a thriving City, such as the District of Columbia.  But the ability to move forward with projects for the greater good of the City as a whole cannot give way to complaints attendant to the obvious effects arising from such construction projects.  This result is not what any of the federal or District laws on which Plaintiff relies were intended to prevent.

## CONCLUSION

As demonstrated above, Plaintiff does not even come close to clearly establishing that it is likely to ultimately prevail on the merits of its case or suffer irreparable harm in the absence of a preliminary injunction.  Further, the balance of equities clearly favors denial of the requested extraordinary relief, as does the public interest.  Accordingly, the Plaintiff's Application for a preliminary injunction should be denied.

Date: December 15, 2014                           Respectfully submitted,

                                                  EUGENE A. ADAMS
                                                  Interim Attorney General for the District of
                                                  Columbia

                                                  ELLEN A. EFROS
                                                  Deputy Attorney General
                                                  Public Interest Division

                                                  GRACE GRAHAM, D.C. Bar No. 472878
                                                  Chief, Equity Section

                                                   /s/ Thomas L. Koger
                                                  THOMAS L. KOGER, D.C. Bar No. 427921
                                                  Senior Assistant Attorney General
                                                  Office of the Attorney General, DC
                                                  441 Fourth Street, NW
                                                  Washington, DC 20001
                                                  Telephone:  (202) 727-4170
                                                  Email:  thomas.koger@dc.gov

                                                  *Counsel for Defendant Mayor Vincent Gray,*

*and Acting Director Matthew Brown, sued solely in their respective  official capacities*