## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**COMMITTEE OF 100 ON THE**
**FEDERAL CITY,**

　　　　　　Plaintiff,

　　　　v.

**ANTHONY FOXX, et al.,**

　　　　　　Defendants.

Case No. 1:14-cv-01903 (CRC)

### MEMORANDUM OPINION

The nation's transportation infrastructure, especially in its cities, is rapidly deteriorating. But making the necessary improvements can be disruptive and harmful to the environment if not done properly.  It thus falls to government to shepherd the modernization of our roads, bridges, and tunnels without unduly diminishing the quality of life and well-being of affected residents. The tension between these often competing aims is what animates this case.

At issue is the Virginia Avenue Tunnel ("VAT"), a 111-year-old rail tunnel that runs for approximately nine blocks under the Capitol Hill neighborhood in the center of Washington, D.C.  The tunnel is an integral link in a rail network that serves the mid-Atlantic and mid-western United States.  Yet due to its age, the tunnel is ill-equipped to accommodate 21st century freight traffic:  It is too narrow for two parallel tracks; it is not high enough for trains carrying modern, double-stacked shipping containers; it floods often and requires frequent repairs; and its earthen foundation requires trains to travel well below their normal speeds.  These deficiencies have combined to make the tunnel, in the opinion of a coalition of Washington-area government leaders, "one of the most significant freight bottlenecks on the East Coast."  Metropolitan Washington Council of Governments, Transportation Improvement Program for the Metropolitan

Washington Region: FY 2013-2018, at D-1 (2012).  And because passenger trains pass just to the west of the tunnel to access Washington's Union Station, the bottleneck causes passenger rail delays as well.

CSX Transportation, Inc. ("CSXT"), which owns the Virginia Avenue Tunnel and much of the associated rail network, would like to renovate and expand the capacity of the tunnel as part of a regional railway improvement program.  The tunnel renovation project has been almost five years in the making, and CSXT estimates that construction will take 30 to 42 months to complete.  The federal government, the District of Columbia government, AMTRAK, and a range of regional government representatives support reconstruction of the tunnel.

The same cannot be said of the Committee of 100 on the Federal City (the "Committee"), a non-profit organization dedicated to urban planning and historic preservation in the Washington, D.C. area.  Part of the Committee's opposition to the reconstruction undoubtedly stems from broader concerns over CSXT's movement of hazardous materials through Washington, D.C., so close to our halls of government and national monuments, which has been a topic of much public debate and litigation in recent years.  In 2005, the District of Columbia City Council passed an act that would have forbidden the rail shipment of "explosives, flammable gases, poisonous gases and other poisonous materials" within 2.2 miles of the United States Capitol Building.  CSX Transp. v. Williams, 406 F.3d 667, 669 (D.C. Cir. 2005).  CSXT successfully challenged the act on the ground that it was pre-empted by federal law.  Id. at 673.  CSXT did, however, voluntarily agree not to ship certain hazardous materials through the District.  While relevant to this case in certain respects, neither the wisdom nor legality of that practice is before the Court.

The focus of the Committee's suit here is more limited.  It contends the District of

Columbia Department of Transportation ("DDOT") and the United States Department of

Transportation, through the Federal Highway Administration ("FHWA"), violated the National

Environmental Policy Act in numerous respects by failing adequately to assess the potential

environmental harms of the proposed reconstruction.  The agencies' environmental review and

resulting final Environmental Impact Statement were deficient, the Committee alleges, because

they improperly committed themselves to the project before completing the review, understated

or ignored potential environment risks, and failed to consider in detail alternatives to the chosen

project that called for rerouting trains around the city.

Before the Court is an application by the Committee for a preliminary injunction

prohibiting DDOT from issuing the necessary permits for reconstruction of the tunnel to begin.

The bar for obtaining a preliminary injunction pending resolution of a suit on the merits is high,

and the Court concludes that it has not been cleared here.  On the record before the Court, the

Committee has not established that its suit is likely to succeed on the merits.  Nor has it shown

that the potential environmental harm of reconstruction outweighs the public benefit from

modernizing the tunnel.  The Court will, accordingly, deny the Committee's application.

## I.        Background[1]

### A.        The Virginia Avenue Tunnel

Completed in 1904, the Virginia Avenue Tunnel passes under the Capitol Hill

neighborhood of Washington, D.C., from 2nd Street to 11th Street Southeast.  Final

---

[1]  The record currently before the Court consists of the draft and final environmental impact statements and their various appendices and exhibits, FHWA's Record of Decision, and other material submitted with the parties' briefs.  The following background facts are drawn from those materials. The entire administrative record has yet to be filed.

Environmental Impact Statement ("FEIS") at S-1.  It runs beneath Virginia Avenue Southeast and parallel to, and just south of, Interstate 695 (formerly I-295).  Its western portal emerges four blocks from the U.S. Capitol Building.  Id. at 1-2.  The tunnel is constructed of masonry and its rails sit atop crushed stone on a dirt floor.  Id at 2-3, 2-4.  Although the tunnel is functional, it requires frequent inspection and repair.  Id. at 2-3.  Its walls are flaking, its mortar is deteriorating, and the dirt floor floods frequently due to poor drainage.  Id. at 2-4.  The recurrent repairs cause significant backups in rail traffic.  Id. at 2-3.  The soft foundation of the tunnel also limits the speeds of passing trains.  Id. at 2-4, 2-5.

The VAT and the rail tracks that pass through it are owned by CSXT and comprise part of a CXST freight rail corridor that runs between the East Coast and West Virginia, Pennsylvania, Ohio, Indiana, and Illinois.  Even when it is performing at top capacity, the VAT is a choke point in the CSXT system.  Id. at S-3.  Although the VAT used to contain two railroad tracks, with changes in modern railway technology it now has room for just one.  Id. at 2-1.  Freight on much of the rest of the network travels on two tracks, including both before and after the VAT.  Id. at 1-4.  Due to the single track, trains often must idle outside the tunnel, waiting for oncoming trains to clear the tunnel so they can pass single-file.  Id. at 2-2.  Passenger trains traveling to and from Washington's Union Station share the tracks just west of the VAT with freight trains.  A tunnel shutdown or backup in idling trains therefore causes cascading delays for passenger travel as well.  Id. at 1-5.  The VAT also lacks sufficient vertical clearance to accommodate "double-stacking" of intermodal freight containers—a relatively recent practice that doubles the capacity of each train.  Id. at S-3.

B.    The National Gateway Initiative

In 2010, CSXT launched the $842 million National Gateway Initiative with the central purpose of ensuring dual tracks and enabling double-stacking of containers throughout its rail system.  Appl. Prelim. Inj. Ex. 3, at 2.  The proposed expansion of the VAT, discussed in more detail below, accounts for approximately $160 million of the total cost of the initiative.  Id. Ex. 5.  These investments were spurred by projections that the nation's rail freight volume will increase by up to 50 percent by 2040.  77 Fed. Reg. 25,781, 25,782.  Much of this increase is expected to result from the anticipated expansion of the Panama Canal, which would enable larger intermodal container ships that previously docked at West Coast ports to reach the East Coast and the Gulf of Mexico.  FEIS at 2-6.

Due to its potential to increase rail freight capacity, reduce the need for shipping freight by truck, and limit passenger rail delays, expansion of the VAT is supported by a wide range of transportation authorities, as reflected by its inclusion in the Northeast Corridor Infrastructure Master Plan, a set of recommendations for regional transportation improvements issued by AMTRAK, the Federal Railroad Administration, and the twelve states in the Northeast Corridor.  NEC Master Plan Working Group, Northeast Corridor Infrastructure Master Plan (2010), available at http://bit.ly/1sZRYWE.  Reconstruction is also supported by some neighborhood groups, including the Capitol Hill Southeast Advisory Neighborhood Commission.  ROD App. C-14, C-16.

In furtherance of the National Gateway Initiative, CSXT and the DDOT entered into a series of agreements, which are described in further detail below.  See infra, III.B.1.b.  In an August 2010 agreement, DDOT agreed to support the initiative and to redesign ongoing reconstruction of the 11th Street Bridge—which sits near the eastern portal of the tunnel—so as

not to preclude expanding the VAT.  Appl. Prelim. Inj. Ex. 13 at 2–4.  In exchange, CSXT

agreed to relocate a communication tower near the 11th Street Bridge and pay DDOT (subject to

a credit) $4,171,044 to offset the cost of the bridge redesign.  Id.; Appl. Prelim. Inj. Ex. 13 at 2.

In a December 2012 agreement, DDOT promised to issue permits for the VAT reconstruction,

conditioned on the project receiving NEPA approval, and to "provide oversight of the EIS

process."  Appl. Prelim. Inj. Ex. 19 at 1–2.  DDOT later issued CSXT public right-of-way

occupancy permits to enable construction activities to begin in the event of NEPA approval.  Id.

Exs. 15, 17.  And in October 2013, DDOT received an option to make an offer to purchase a

five-mile tract of unused railway line owned by CSXT elsewhere in the city.  Id. Ex. 14 at 1–2.

The option was conditioned on CSXT obtaining the necessary permits to undertake the VAT

reconstruction.  Id. at 3.

### C.      Preparation of the Environmental Impact Statement

Because reconstruction of the VAT would require the temporary closure of ramps to

Interstate 695, which is federal property, the project requires federal approval.  Record of

Decision ("ROD") at 1.  FWHA, which oversaw the approval process, decided a full

environmental impact statement ("EIS") was needed in order to assess the environmental impacts

of construction before it could grant approval.  Compl. ¶ 40, 77 Fed. Reg. 25,781.  FHWA, as the

lead agency, and DDOT, as joint lead agency, oversaw an extensive environmental review

process beginning in the summer of 2011.  Compl. ¶¶ 39–40.  DDOT consulted and met with

elected officials and various local and federal agencies responsible for historic preservation,

housing and community development, and environmental protection, including the

Environmental Protection Agency ("EPA"), the Fish and Wildlife Service, the D.C. Department

of Housing and Community Development, and the State Historic Preservation Office.  FEIS at 7-

1 to 7-4.  Before issuing the draft EIS, the agencies hosted four public meetings, made

information available online, and solicited written comments.  Id. at 7-9 to 7-11.  They

considered twelve possible design concepts—a no-action scenario, seven "build options," and

four options that would have rerouted trains around the city.

The draft EIS was issued on July 12, 2013.  DDOT presented the draft at a public

meeting, which a FHWA representative attended, and extended the public comment period by 30

days.  Id. at 7-12 to 7-13; Transcript, July 31, 2013, available at

http://www.virginiaavenuetunnel.com/sites/default/files/VAT_Public_Meeting_Transcript_Reda

cted_102513_1.pdf.  Over one hundred individuals and organizations—including the

Committee—provided written comments on the draft EIS.  FEIS at 7-13; Compl. ¶ 43; Appl.

Prelim. Inj. Ex. 10.

The final EIS was approved almost a year later, on June 5, 2014.  The document outlined

the purpose and need of the project, the alternatives considered, the affected environment, the

potential environmental consequences of the various alternatives, and the historic properties

affected by the project.  It also incorporated a detailed study of the historical uses of the land (in

order to understand what hazardous industrial substances might be disturbed by excavation), and

various engineering specifications.  The EIS attached 700 pages of public comments and agency

responses.  FEIS App. L.  Altogether, the EIS spanned six volumes, 13 appendices, and over

2,500 pages.  It analyzed four alternative scenarios in detail: a no-action scenario and three

alternative design concepts that maintained freight traffic through downtown Washington, D.C.

The EIS discussed and eliminated eight options: four other options for rebuilding the tunnel and

four options that involved rerouting most or all freight around the city entirely.  FEIS at 3-44.

All of the "reroute" options required the construction of either a new, longer tunnel under the

city or a new bridge crossing the Potomac River well south of Washington, D.C. <u>Id.</u> at 3-45, 3-58, 3-60. The agencies and CSXT held two more public meetings in July 2014 and solicited further comments. ROD at 3.

> D.     The Preferred Alternative

The EIS ultimately endorsed what it called "Alternative 3" or the "Preferred Alternative," one of the build options. FEIS at 3-2. FWHA's Record of Decision, issued November 4, 2014, responded to comments to the EIS and affirmed the selection of the Preferred Alternative. ROD at 45 & App. C. In the Preferred Alternative, a new parallel tunnel will be built on the south side of the existing tunnel. ROD at 3. When that tunnel is complete, trains will switch to the new tunnel while the existing tunnel is demolished and rebuilt. <u>Id.</u> The result will be two adjacent tunnels separated by a center wall in a slightly larger footprint. <u>Id.</u> The tunnels will be built on a concrete base and include security enhancements. <u>Id.</u> at 8. Theoretically, the double track will reduce delays, and the increased clearance will permit fewer double-stacked trains to carry projected freight volumes of the next twenty-five years. FEIS at S-4.

The Preferred Alternative will take approximately 30 to 42 months to finish. <u>Id.</u> at S-32. During that time, residents can expect to experience noise, dust, and vibration from the construction activity. Crews will be excavating, demolishing, and rebuilding the tunnel using jack hammers, pile drivers, and other heavy equipment. <u>Id.</u> at 5-20. Heavy trucks will be bringing material in and debris out, and concrete mixers and generators will be employed on site. <u>Id.</u> at 5-20, 5-27. The EIS predicts that construction noise intermittently will exceed current ambient noise levels by up to 18 decibels. <u>Id.</u> at 5-27, 5-30. Just above that level—90 decibels—the Occupational Safety and Health Administration mandates hearing protection for workers. 29 C.F.R. § 1926.52. "Front row" residents living directly adjacent to the construction

8

activity—including some seniors in an apartment complex facing the tunnel—will be most affected.  Id. at 5-11 to 5-14.  One of the Committee's members, Ms. Maureen Cohen Harrington, is one of these "Front Row" residents.  Appl. Prelim. Inj. Ex. 16.  To mitigate impacts from construction, CSXT has committed to installing fencing, watering down roads and materials to reduce dust, installing vibration and noise monitors, and choosing equipment and construction techniques that cause relatively less vibration and noise.  Id. at 5-25, 5-35, 5-36, 5-46.  The EIS predicts that vibrations from construction will not cause damage to any nearby buildings, and that particulate matter and ozone gas emissions should be *de minimis*.  Id. at 5-20, 5-39.  As for the unavoidable noise, CSXT will limit construction to daylight hours and weekdays to minimize the impact on residents.  Id. at 5-28.  Although construction activities will be impossible to ignore, the EIS predicts that, with these mitigation measures, they should be no more than an "annoyance" or "inconvenience" for nearby residents.

On November 12, 2014, the Committee filed suit and applied for a preliminary injunction to halt construction on the VAT.  As explained in further detail below, the Committee alleges various procedural violations of the National Environmental Policy Act, the Administrative Procedure Act, and District of Columbia law.  The Court heard argument on the application on February 20, 2015.

## II.     Legal Standard

### A.     National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., requires a federal agency to take a "hard look" at the environmental consequences of proposed federal actions.  Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 75 (D.C. Cir. 2011).  Congress passed NEPA to accomplish two goals:  To oblige the agency "to consider every

significant aspect of the environmental impact of a proposed action" and to ensure that the agency informs the public "that it has indeed considered environmental concerns in its decisionmaking process." Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983) (quotation marks and citation omitted).  Before it undertakes an action or irretrievably commits resources to a project, the federal agency must therefore make public its consideration of the foreseeable environmental consequences.

NEPA is essentially a procedural statute.  Vt Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).  It does not mandate any particular substantive environmental result, and is designed to ensure well-informed and well-considered decisions, not necessarily the best decisions.  Theodore Roosevelt Conservation P'ship, 661 F.3d at 68; accord Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989) ("NEPA merely prohibits uninformed—rather than unwise—agency action.").  When a federal action significantly affects the quality of the human environment, the federal agency must prepare a detailed EIS.  Found. Econ. Trends v. Heckler, 756 F.2d 143, 146 (D.C. Cir. 1985).  The EIS must describe in detail "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented."  42 U.S.C. §§ 4332(2)(C)(i), (ii). The EIS must also explain alternatives to the proposed action and any resources that would have to be committed if the project were to go forward.  Id. §§ 4332(2)(C)(iii), (v).  Preparing an EIS is a significant undertaking; the agency must not only publish its analysis for public review and comment, but must also consult with other federal agencies that offer specific expertise.  Id. § 4332(2)(C); 40 C.F.R. §§ 1502.9, 1506.6; accord Sierra Club v. Army Corps of Eng'rs, 990 F. Supp. 2d 9, 18 n.5 (D.D.C. 2013).  And an EIS must be completed before the agency irretrievably commits resources to the federal action, otherwise the NEPA review would not

serve its purpose of ensuring that the environment is considered during the early stages of planning.  Andrus v. Sierra Club, 442 U.S. 347, 351 (1979).

> B.      Administrative Procedures Act

NEPA does not provide an independent right of action.  Plaintiffs therefore typically bring NEPA claims under the general review provision of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702, 706.  Sierra Club, 990 F. Supp. 2d at 22.  The APA requires that an agency's NEPA decision "comply with 'principles of reasoned decisionmaking, NEPA's policy of public scrutiny, and the Council on Environmental Quality's ["CEQ"] regulations.'"  Del. Riverkeeper Network v. Fed FERC, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (quoting Found. Econ. Trends, 756 F.2d at 154).  The NEPA decision must be upheld if the federal agency has "'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'"  Hammond v. Norton, 370 F. Supp. 2d 226, 238 (D.D.C. 2005) (quoting Balt. Gas & Elec. Co., 462 U.S. at 105).  A court may only set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Much like in other APA challenges, a NEPA decision is improper "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Del. Riverkeeper, 753 F.3d at 1313 (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)) (internal quotation marks and citations omitted).

Courts reviewing an agency's environmental analysis generally defer to the informed discretion of the agency on an issue that requires a high degree of technical expertise.  Id.  But no

deference is owed to agency interpretations of NEPA or CEQ regulations because NEPA is addressed to all federal agencies.  Grand Canyon Trust v. Fed. Aviation Admin., 290 F.3d 339, 342 (D.C. Cir. 2002).  A reviewing court must therefore "undertake a 'thorough, probing, in-depth review' of the agency's decision and then decide whether it was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  Hammond, 370 F. Supp. 2d at 238 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971)).

### C.    Preliminary Injunction

A preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter v. NRDC, 555 U.S. 7, 24 (2008).  In order to block work on the VAT before the Court reaches a decision on the merits of its claims, the Committee must establish (1) likelihood of success on the merits; (2) likelihood that it will "suffer irreparable harm in the absence of preliminary relief;" (3) that the balance of equities tips in its favor; and (4) that the injunction is in the public interest.  Id. at 20.  If the Committee has not established a likely injury, however, the Court need not analyze the other preliminary injunction factors.  Id. at 23–24.  The Court therefore will first examine the injuries alleged by the Committee.

### III.    Analysis

### A.    Irreparable Harm

An injunction is appropriate only if the applicant has demonstrated irreparable harm and the inadequacy of legal remedies.  Sierra Club, 990 F. Supp. 2d at 38.  "The party seeking injunctive relief must demonstrate that the claimed injury is 'both certain and great.'"  Id. at 38–39 (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The alleged harm must be likely, not just possible.  Winter, 555 U.S. at 22.  In the NEPA context, irreparable harm may

be found when a procedural harm is combined with an aesthetic or other concrete injury.  <u>Fund for Animals v. Clark</u>, 27 F. Supp. 2d 8, 14 (D.D.C. 1998).

The Committee identifies five distinct harms that it contends will occur if construction is allowed to proceed.  First, it alleges that "once the Defendants issue their approvals and permits, they will lose their ability to control CSXT's operations, both with respect to the construction and actual operation of the newly expanded tunnel."  Appl. Prelim. Inj. at 40.  Second, it claims that its member Maureen Cohen Harrington, who lives next to the planned construction site, "will suffer from noise, vibrations, air pollutants, and other environmental impacts."  <u>Id.</u> at 41.  Third, it claims that Ms. Harrington will suffer a loss in the value of her home.  Fourth, the Committee asserts that "in the event of a rail spill, Ms. Harrington's life and property would be at risk."  <u>Id.</u>  And finally, in an argument raised for the first time in its reply brief, the Committee contends that construction will result in the removal of trees and the closure of parks and other recreation areas in the neighborhood.

## 1.   Control of the Site

The Committee's first claimed harm—that the issuance of permits would prevent the District and federal governments from controlling what CSXT does on the site—lacks factual support in the record.  As the defendants point out, the District of Columbia will retain authority over all local construction activities and the federal government will retain authority over the operation of rail services during the construction period.  Opp'n of District Defs. at 14.  In addition, CSXT will be bound by the mitigation measures and other commitments reflected in the EIS and Record of Decision, as well as the terms and conditions of its permits.  The Committee thus fails to establish how any "loss of control" resulting from the issuance of permits would occur, let alone cause it irreparable harm.

2.   <u>Disruption and Property Damage</u>

The Committee next contends that Ms. Harrington and other nearby residents will be irreparably harmed by construction-related noise, dust, and vibration.  The EIS analyzed all of these potential effects.  It concluded that construction noise will be "a nuisance or an annoyance, especially if unmitigated, to those living and working adjacent to" the construction area, but noted that construction generally will be limited to weekdays and daylight hours and that noise will be mitigated through the use of sound barriers and other construction techniques.  FEIS at 5-28.  As for vibration, the EIS concluded that no vibration damage will occur to homes or other buildings as a result of construction but that "certain major vibration producing construction activities are predicted to cause human annoyance" for nearby residents.  <u>Id.</u> at 5-39.  And with respect to dust and other air pollutants, the EIS predicted that emissions would be below applicable EPA <i>de minimis</i> thresholds and thus concluded that "the impacts of criteria pollutants from construction activities are not considered to be a concern."  <u>Id.</u> at 5-22.

While the Court appreciates that Ms. Harrington and other nearby residents might regard the effects of the VAT reconstruction project as more than mere "nuisances" or "annoyances," the effects noted in the EIS do not rise to the level of irreparable injuries upon which a preliminary injunction may be based.  Most importantly, the Committee offers no evidence to rebut the EIS's conclusion that the incremental effects on the environment will be relatively modest given the urban setting of the construction site and the mitigation measures assumed in the EIS.  The cases cited by the Committee in which courts have found irreparable harm from construction projects involved far more severe disruptions and environmental hazards than those predicted by the EIS.  <u>San Luis Valley Ecosystem Council v. Fish & Wildlife Serv.</u>, 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009) (preliminarily enjoining a drilling project because rigs would

have operated 24 hours a day, under bright lights, in a sensitive wildlife refuge); New York v.

Shinnecock Indian Nation, 280 F. Supp. 2d 1, 4–5 (E.D.N.Y. 2003) (finding irreparable harm

from "incredible traffic congestion" and "drastically heighten[ed] air pollution" that would likely

be caused by the construction of a casino in a "fragile natural environment").  The Committee

therefore has not demonstrated that the anticipated construction impacts are likely to cause

irreparable environmental harm.

### 3.   Potential Rail Accidents

The Committee next contends that residents will be irreparably harmed by the increased

risk of a rail accident due to trains moving at higher speeds through the new tunnel.  As will be

discussed further below, see infra Section III.B.4, the EIS considered this issue and concluded

that despite the higher speeds, train derailments will be less likely to occur in the new tunnels

due to upgrades to the tunnel floor and track ballast.  FEIS at 5-11.  The Committee offers no

evidence to rebut the EIS's conclusion in that regard.  Absent contrary evidence, the

Committee's claimed harm is largely speculative and therefore insufficient to establish

irreparable harm.  See Sierra Club, 990 F. Supp. 2d at 41 ("[I]njunctions will not issue to prevent

injuries neither extant nor presently threatened, but only merely feared.") (internal citations

omitted).

### 4.   Loss of Property Value

The Committee also contends that Ms. Harrington "will suffer diminution in the value of

her home" if construction is not enjoined.  Appl. Prelim. Inj. at 41.  It points to the unique

features of Ms. Harrington's no-interest mortgage, which she claims would require her

immediately to pay off the full balance of the loan were she to move out temporarily or sell her

home.  Reply Ex. 48, ¶¶ 9, 13, 14.  The Committee contends this economic loss would be

irreparable notwithstanding the general rule that economic losses do not constitute irreparable harm because they can be compensated with money damages.  See Wis. Gas, 758 F.2d at 674. The Court disagrees.  While it may be reasonable to assume that Ms. Harrington would have difficulty selling her home at market values during the construction period, the Committee has not established that any reduction in value would be significant or permanent, or that it could be not be compensated monetarily at a later date were the Committee to prevail on the merits.   The Committee has therefore not established that this economic loss is likely to cause irreparable harm.

### 5.   Loss of Trees and Public Recreation Space

Finally, the Committee alleges that it would be irreparably harmed absent an injunction because the proposed project will require clearing trees and closing parks and other recreation spaces enjoyed by Ms. Harrington.  As for access to parks, the Committee appears to acknowledge that several local parks will be closed only during the construction period.  See Reply at 63 ("The project will 'also require construction-period occupancy of Virginia Avenue Park'") (citing FEIS at 6-19); id. ("Access to Bridge Spot Park, a popular skate park, will also be blocked during construction"); id. ("[A]ccess to Garfield Park will be closed during construction.").  According to the EIS, access to all of the parks will be restored following construction.  FEIS at 5-5, 5-60, 5-62, 5-64.  The Committee has not cited any case, and the Court is aware of none, where a temporary closure of a park or recreation area was held to constitute irreparable harm for purposes of a preliminary injunction.  The Court declines to reach that holding here.  While undoubtedly an inconvenience to Ms. Harrington, not being able to walk or skate in nearby parks during the estimated construction period is not the type of severe and irreversible injury that is required to establish irreparable harm.

The question of harm from removal of trees is not as clear cut.  The EIS indicates that the construction will require the removal of approximately 200 trees, most of which are on public property—168 line Virginia Avenue—and are considered healthy and mature under local forestry regulations.  Id. at 5-54.  The EIS indicates that mitigation fees will be paid (presumably by CSXT) to compensate for the removal of mature trees, but it does not say whether the trees will be replaced.  And even if the mature trees were replaced with saplings, it would take years for them to grow to the size of the current ones.  Other courts have found that the clearing of mature trees to accommodate construction projects constitutes, or at least contributes to, irreparable harm.  See Lichterman v. Pickwick Pines Marina, Inc., 2007 WL 4287586, at *6 (N.D. Miss. Dec. 6, 2007), aff'd, 308 F. App'x 828 (5th Cir. 2009) (finding that clearing trees in a shoreline buffer zone mandated by the government to conceal a marina and hotel construction project constituted irreparable harm to residents with views of the shore); Merritt Parkway Conservancy v. Mineta, 424 F. Supp. 2d 396, 425 (D. Conn. 2006) (holding the "felling of mature trees" together with other effects to the aesthetic and historic features of a Connecticut parkway to be irreparable harm); Saunders v. Wash. Metro. Area Transit Auth., 359 F. Supp. 457, 462 (D.D.C. 1973) (enjoining subway construction because, in addition to procedural harms, "[p]laintiffs would suffer irreparable harm in the removal of trees from their neighborhood").  While the Court considers it somewhat of a close question on the facts presented, it concludes that the tree removal here would inflict a sufficiently severe and irreversible injury to Ms. Harrington and other residents to clear the bar of irreparable harm.  The Court therefore will proceed to the other prongs of the preliminary injunction analysis.

## B.        Likelihood of Success on the Merits

The Committee must establish a likelihood of success on the merits of its claims in order to enjoin construction on the tunnel.  It alleges that DDOT and FHWA violated NEPA in six ways: they predetermined the selection of the Preferred Alternative prior to completing the NEPA review; they improperly segmented the project in order to minimize its environmental effects; they failed to examine the cumulative effects of the project; they disregarded foreseeable impacts of the project; they failed to consider reasonable alternatives; and they relied on inaccurate information.  The Committee also alleges violations of District of Columbia law.  The Court will address each argument in turn.

### 1.        Predetermination

The Committee contends that DDOT improperly predetermined the outcome of the NEPA process prior to the completion of the EIS by entering into a series of agreements with CSXT that, in its view, committed DDOT to the selection of the Preferred Alternative.  Because NEPA only governs the actions of federal agencies, however, the Committee further argues that DDOT's alleged predetermination should be attributed to FHWA because it was aware of the bias created by the agreements and failed to conduct an independent review of the EIS before adopting it in the Record of Decision.  The Committee's predetermination claim thus presents two questions: (1) do the agreements in question reflect improper predetermination by DDOT? and (2) if so, should any improper conduct by DDOT be attributed to FHWA?  Before answering those questions, the Court will discuss the standards guiding the predetermination inquiry.

#### a.        Standards for Assessing Predetermination

By requiring agencies to conduct environmental review prior to taking certain actions, NEPA seeks to strike a careful balance.  The Act requires agencies to consider potential

environmental effects objectively and in good faith, Carolina Envtl. Study Grp. v. United States, 510 F.2d 796, 801 (D.C. Cir. 1975), yet agencies are generally driven by policy objectives and frequently prefer one course of action over another from the beginning of a project, see 40 C.F.R. § 1502.14(e) (agency may have a "preferred" alternative prior to initiating NEPA review).  These policy objectives are equally present when an agency reviews a project sponsored by a private entity as when it seeks to take action itself, as an agency's policy aims are often furthered through the private-sector projects that it approves or denies.  Thus, while NEPA requires that agencies take a hard look at the environmental effects of an action, an agency need not be "subjectively impartial" in doing so.  Carolina Envtl. Study Grp., 510 F.2d at 801 (citing Envtl. Def. Fund, Inc. v. Army Corps of Eng'rs, 470 F.2d 289, 295 (8th Cir. 1972)).  Bias towards a preferred outcome does not violate NEPA so long as it does not prevent full and frank consideration of environmental concerns.  NRDC v. Nuclear Regulatory Comm'n, 547 F.2d 633, 659 n.5 (D.C. Cir. 1976) (Tamm, J., concurring), rev'd sub nom. on other grounds, Vt Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978) ("'NEPA assumes as inevitable an institutional bias within an agency.'" (quoting Envtl. Def. Fund, 470 F.2d at 295)).

In striking this balance, NEPA seeks to ensure that agencies conduct environmental analyses in a timely and objective fashion by prohibiting them from predetermining the outcome of their review.  See 40 C.F.R. § 1502.2(g) (an EIS must "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made"); id. § 1506.1(a) ("Until an agency issues a record of decision . . . no action concerning the proposal shall be taken which would . . . [l]imit the choice of reasonable alternatives.").  But an agency may take ancillary steps towards a project before completing environmental review so long as NEPA review is complete before the agency makes an "irreversible and irretrievable

commitment of resources." <u>Wyo. Outdoor Council v. Forest Serv.</u>, 165 F.3d 43, 50 (D.C. Cir.

1999); <u>accord</u> <u>State of Idaho by & through Idaho Pub. Utils. Comm'n v. ICC</u>, 35 F.3d 585, 598

(D.C. Cir. 1994). Issuing permits, leases, or approvals that enable the project to begin can

constitute an irreversible commitment of resources by an agency. <u>See</u> <u>Wyo. Outdoor Council</u>,

165 F.3d at 49 (issuing leases such that agency no longer retains "'the authority to preclude all

surface disturbing activities'" constitutes an irretrievable commitment of resources (quoting

<u>Sierra Club v. Peterson</u>, 717 F.2d 1409, 1415 (D.C. Cir. 1983)); <u>Fund for Animals</u>, 281 F. Supp.

2d at 229–30 (same). Likewise, an agency must complete its environmental analysis before

authorizing or funding activity that is solely designed to support the project under NEPA review.

<u>See</u> <u>Thomas v. Peterson</u>, 753 F.2d 754, 760–61(9th Cir. 1985) (Forest Service could not issue

permits for a service road with no other purpose than to aid a proposed logging program before

completing its environmental review).

b.      <u>Predetermination by DDOT</u>

The Committee asserts that a series of agreements between DDOT and CSXT reflect an

irreversible commitment of resources by DDOT towards the VAT reconstruction project before

the EIS was completed. The agreements generally show that DDOT supported the National

Gateway Initiative and the reconstruction of the tunnel; sought certain concessions from CSXT

in exchange for that support; and took steps to facilitate the tunnel reconstruction in the event of

NEPA approval.

To support its argument that these agreements show improper predetermination, the

Committee relies heavily on the Ninth Circuit's decision in <u>Metcalf v. Daley</u>, 214 F.3d 1135 (9th

Cir. 2000). In <u>Metcalf</u>, various federal agencies agreed to support the efforts of the Makah

Indian Tribe to renew its historic practice of whale hunting. <u>Id.</u> at 1138–39. Prior to undertaking

20

NEPA review, the agencies entered into agreements with the Makah to seek formal approval for the hunts from the International Whaling Commission as well as to monitor and study the hunts. Id.  The Ninth Circuit found that these agreements constituted an irretrievable commitment of resources by the agencies prior to the completion of their environmental review.  The court reasoned that "[i]t is highly likely that because of the [agencies'] prior written commitment to the Makah and concrete efforts on their behalf, the [environmental assessment] was slanted" in favor of the hunt.  Id. at 1144.

The Committee urges the Court to apply Metcalf and find that DDOT's support of the VAT reconstruction similarly reflected improper predetermination.  But Metcalf's applicability in this Circuit is limited.  As Judge Kelinfeld's dissent in Metcalf observes, the panel majority imposed a subjective standard on federal agencies by asking whether the environmental review was "slanted" in favor of the hunt as a result of agency bias.  Id. at 1147–48.  This standard runs counter to the Court's reading of the D.C. Circuit's approach to the predetermination inquiry. Although the Circuit appears not to have addressed the precise factual circumstances presented here, it has generally adopted a more objective approach to determining whether an agency has irreversibly committed resources towards a particular project.  In Sierra Club, for example, the Circuit held that an agency must prepare an EIS at the point it will no longer "retain the authority to preclude" the activity under NEPA review.  717 F.2d at 1415.  And in Wyoming Outdoor Council, it rejected a NEPA challenge to the Forest Service's alleged failure to complete NEPA review prior to authorizing oil and gas leases in a national forest.  165 F.3d at 47.  The Court reasoned that deciding to permit exploration in the forest did not trigger the obligation to complete an environmental review because the Forest Service had not yet issued permits to specific companies and thus no drilling could commence.  Id. at 50.  Only when the agency had

issued every permit necessary to begin the project was there an irretrievable commitment of resources. Id.

These cases establish that the test in this Circuit for determining when an agency's commitment is "irreversible" looks to the practical effects of agency's conduct rather than whether the conduct suggests subjective agency bias in favor of the project. The agreements cited by the Committee fall short of establishing predetermination when judged against that standard. The Court discusses each of the agreements below.

i.        General Pledges of Support

In an August 2010 Memorandum of Agreement, DDOT pledged generally to support CSXT's National Gateway Initiative and to submit a "TIGER II" grant application for federal funds to defray the costs of planning, but not the actual construction of, the VAT reconstruction project. Appl. Prelim. Inj. Ex. 13. It further promised, in a December 2012 Term Sheet Agreement, to provide oversight of the EIS process as co-lead agency with FHWA and to "manage the EIS process under FHWA's *Every Day Counts* initiative," a streamlined process for performing environmental review of the transit projects. Id. Ex. 19. DDOT's general expressions of support for CSXT's National Gateway Initiative and its submission of a federal planning grant application on the company's behalf merely reflect its subjective preference for the project. See Carolina Envtl. Study Grp., 510 F.2d at 801. Because neither agreement precluded DDOT from later determining that the project should not go forward, these actions do not constitute an irreversible commitment of resources prior to completion of environmental review.

ii.      Conditional Permits

The same is true for DDOT's agreement to issue CSXT public space and right-of-way

permits in the event of a favorable NEPA result.  See Appl. Prelim. Inj. Ex. 19 (agreement by

DDOT to issue public space permit and right-of-way required for the VAT reconstruction in the

event that the project received NEPA approval); id. Ex. 15 (December 2012 D.C. Public Right-

of-Way Occupancy Permit conditioned on NEPA approval).  An agency's promise to issue a

permit for a project in the future, but only on the condition that the project receives NEPA

approval, is not an irreversible commitment of resources.  See Pub. Utilities Comm'n of State of

Cal. v. FERC, 900 F.2d 269, 282 (D.C. Cir. 1990) (finding no predetermination because

agency's "non-environmental approval was expressly not to be effective until the environmental

hearing was completed.").  For this reason, the Committee's reliance on Fund for Animals v.

Norton, 281 F. Supp. 2d 209 (D.D.C. 2003) is misplaced.  The relevant agency in Fund for

Animals had issued all permits required to allow hunting of mute swans before it reviewed the

environmental effects of the hunt.  Id. at 214–15.  Because the permits allowed the hunt to begin,

and in fact hunting likely had taken place before the agency had completed NEPA review, the

district court determined that the agency had predetermined the NEPA outcome.  Id. at 229.

Similarly, in Save the Yaak Committee v. Block, 840 F.2d 714 (9th Cir. 1988), to which the

Committee also cites, the Ninth Circuit held that an agency had made an irreversible

commitment of resources because it had issued contracts and "construction had already begun"

prior to completing NEPA review.  Id. at 718 (emphasis added).  By contrast, the Tenth Circuit

in Forest Guardians v. Fish and Wildlife Service, 611 F.3d 692 (10th Cir. 2010), rejected the

plaintiff's predetermination argument where the issuance of an agency grant to the project

proponent was conditioned on successful NEPA review.  Id. at 718–19.  Here, the permits

23

DDOT issued did not enable CSXT to begin construction prior to the completion of the NEPA review. Because permitting construction to begin is the point at which DDOT would have irreversibly committed resources to the project, see Wyoming Outdoor Council, 165 F.3d at 50, its conditional permits do not demonstrate an unlawful predetermination of the NEPA outcome.

### iii.     11th Street Bridge Redesign

The 11th Street Bridge crosses CSXT's tracks near the eastern entrance of the VAT. In the August 2010 Memorandum of Agreement, DDOT agreed to redesign an existing plan to reconstruct the bridge so that its onramp would be compatible with the VAT reconstruction. Appl. Prelim. Inj. Ex. 13. CSXT agreed to repay to DDOT the entire $4.2 million cost of the redesign, which amount DDOT agreed to credit CSXT in the event the VAT reconstruction received NEPA approval. Id.[2] Thus, CSXT would have borne the entire cost of the modifications had the project not received NEPA approval. Nevertheless, the Committee argues that by committing its funds toward the redesign for the short period of time until CSXT repaid the redesign costs, DDOT irretrievably committed resources to the VAT reconstruction prior to completion of NEPA review. The Court disagrees.

The agreement to redesign the 11th Street Bridge was not an irretrievable commitment of resources to the VAT project because the bridge reconstruction had utility regardless of whether the VAT construction was approved. This is not a circumstance where an agency takes action with no purpose other than to further the project under NEPA review. Cf. Thomas, 753 F.2d at

---

[2] Originally, DDOT agreed to credit the amount towards the costs of repaving Virginia Avenue after the construction was complete—and only if DDOT received federal funding for the repaving. Id. The parties modified that agreement, however, in an April 2014 amendment to the Memorandum of Agreement. Appl. Prelim. Inj. Ex. 20. Under the modified agreement, DDOT can only credit the payment towards another construction project involving CSXT that will require repaving, if one is identified. Id. The Committee does not identify how this change to the contract would alter the Court's analysis of the predetermination inquiry.

760–61 (Forest Service allowed project proponent to construct a forest road with no other purpose than to aid a logging program before determining whether it could issue logging permits under NEPA). DDOT was already in the process of reconstructing the 11th Street Bridge, which is part of a $390 million project to modernize freeway bridges connecting the Southeast-Southwest Freeway and I-295, create a pedestrian and bicycle path across the river, and connect a proposed streetcar network. DDOT, 11th Street Bridge Project, http://ddot.dc.gov/page/11th-street-bridge-project (last checked April 7, 2015). Moreover, the redesign of the onramp served the independent purpose of preserving flexibility while the VAT reconstruction was under consideration. That flexibility was equally compatible with the EIS's no-build alternative as the scenario that ultimately received NEPA approval.

The redesign also was not an irreversible commitment of agency resources towards the VAT reconstruction because DDOT was not required to pay for the redesign unless a VAT "build" option received NEPA approval. As a practical matter, before NEPA review was complete, the agreement obligated CSXT to repay DDOT's costs. Then, if the Record of Decision had selected the "no build" alternative, DDOT would not have been required to provide the credit to CSXT and the entire cost of the redesign would have remained with CSXT.

iv.    Shepherds Branch Right-of-Way

In an October 2013 amendment to the December 2012 Term Sheet Agreement noted above, CSXT gave DDOT a one-time option to acquire the Shepherds Branch right-of-way—a five-mile tract of unused CSXT railway line south of the Anacostia neighborhood in the District of Columbia—for use as a walking and biking trail. Appl. Prelim. Inj. Ex. 14. The agreement entitles DDOT to submit an offer to purchase the right-of-way at a price based on an appraisal of the property and obligates the parties "to use commercially responsible efforts and negotiate in

25

good faith to reach mutually agreeable terms" for the purchase. Id.  The agreement does not, however, obligate CSXT to agree to DDOT's proposed purchase price.  It also provides that DDOT cannot close on the option unless CSXT obtains the permits and approvals required to construct the VAT under the "build alternative, if any, [that is] determined to be the acceptable alternative" after NEPA review.  Id.

The Committee asserts that the Shepherds Branch option was a "powerful inducement" for DDOT to favor the Preferred Alternative during NEPA review because DDOT could not close on the option unless one of the build alternatives was selected.  Reply at 11.  At the hearing on the Committee's application, counsel for both CSXT and the District countered that the agreement did not in fact condition closing on selection of a build alternative.  They contend that the closing condition requiring DDOT to issue permits under the "build alternative, if any" would have been triggered *only if* a build alternative was selected.  If no build alternative had been selected, they suggest, the condition would simply not apply and DDOT still could close on the option.  The Court finds the agreement ambiguous.  While it could be read as the District and CSXT suggest, one could also fairly infer from the circumstances that the parties intended that DDOT would be unable to exercise the option unless CSXT received authorization to pursue one of the build alternatives.  But even if DDOT stood to benefit financially from the selection of the Preferred Alternative, how much so is debatable.  The option merely gave DDOT an opportunity to make CSXT an offer to purchase the right-of-way and to enter into good faith negotiations; it did not obligate CSXT to sell, no matter the offer.

Regardless of any potential inducement, DDOT's acquisition of the option still does not represent an irretrievable commitment of resources towards the VAT.   While the agreement might have caused DDOT to *favor* the selection of the Preferred Alternative, it does not bind

DDOT to issue any permits or require it to invest any resources towards the project.  Nor would

DDOT have been in breach of the agreement, as the Committee suggests, if none of the build

alternatives had been selected; it merely would have been unable to close on the option.

Accordingly, acquiring the Shepherds Branch option does not constitute improper

predetermination of the NEPA review by DDOT.[3]

> c.   Attribution of DDOT's Alleged Predetermination to
> FHWA

As discussed above, the Committee alleges that DDOT's contractual arrangements with

CSXT constituted unlawful bias in favor of a build alternative prior to the completion of NEPA

review.  NEPA, however, as a federal statute, does not apply to DDOT's conduct.  See 42 U.S.C.

§ 4332(2) (requiring "all agencies of the *Federal* Government" to perform environmental review

(emphasis added)).  So even if DDOT did somehow predetermine the NEPA outcome, DDOT's

bias must be attributed to FHWA in order for there to be a NEPA violation.  The Committee

contends that DDOT's bias can be attributed to FHWA because it was aware of DDOT's

advance agreements with CSXT yet nonetheless issued the EIS without independently reviewing

its analysis and underlying data.

The Committee rests its attribution argument principally on the Tenth Circuit's decision

in Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).  In Davis, the Utah Department of

Transportation and three municipalities sought to build a new highway project.  Id. at 1109–10.

FHWA assumed responsibility for approving the project and issuing the environmental analysis

---

[3]  The Committee also argues that CSXT induced DDOT to grant NEPA approval by agreeing to
remove a communications tower that interfered with the proposed 11th Street Bridge ramp, to
negotiate for easements to enable DDOT to construct pedestrian and bicycle trails, and to extend
the VAT tunnel entrance from 10th Street to 12th Street.  Appl. Prelim. Inj. Exs. 13, 19.  But
none of these agreements is conditioned on NEPA approval.  They therefore put DDOT in no
worse condition if the VAT reconstruction was not approved.

required by NEPA.  Id. at 1110.  The actual preparation of the environmental analysis, however, was undertaken by a consultant retained by one of the municipalities.  Id.  The consultant ultimately prepared, and FHWA approved and issued, a finding of no environmental impact, or FONSI.  Id.  Opponents of the highway sued to enjoin construction, arguing that FHWA and other defendants violated NEPA by prejudging the outcome of the environmental analysis.  Id. The Tenth Circuit reversed the district court's denial of the requested injunction.  It first determined that the consultant had predetermined the environmental findings because its contract with the municipality *obligated* it to prepare a FONSI by a date certain, prior to the completion of the environmental analysis.  Id. at 1112.  The Court then attributed the contractor's prejudgment to FHWA in two ways.  First, it found that FHWA was directly implicated in the consultant's "'rush to judgment' on the environmental issues" because it was aware that a FONSI had been prepared prior to the completion of the analysis and had ordered it removed from the record prior to a public meeting to discuss a draft of the analysis.  Id. at 1112–13. Second, the court found that "FHWA failed to conduct a sufficient independent review of the [the consultant's] work to insulate itself from the [consultant's] biases towards a FONSI[.]"  Id. at 1113.

Davis differs from this case in several respects.  First, unlike the consultant contract in Davis, DDOT's agreements with CSXT did not obligate DDOT to reach any particular NEPA outcome.  As a result, the agreements here did not put FHWA on notice of improper bias, regardless of when the federal agency learned of them.  Second, the current record in this case lacks any suggestion that FHWA sought to manipulate the NEPA process—by, for example, removing evidence of a contractor's prejudgment from public view—as was the case in Davis. Finally, the record here also does not reflect, as it did in Davis, that FHWA failed to conduct an

independent review of the EIS.  In fact, FHWA affirmed at least twice in the Record of Decision

that it had independently considered the data underlying the EIS and the potential environmental

effects of the project.  ROD at 2 ("FHWA considered the impacts of the Project and alternate

courses of action under NEPA"), id. at 44 (FHWA arrived at its decision "after its own

independent review and consideration of the referenced information" in the EIS).  The only

record evidence cited by the Committee to contradict these statements is a passage in a DDOT

environmental manual indicating that DDOT would exclusively prepare a Federal Register

notice announcing the beginning of the environmental review.  That alone is plainly insufficient

to rebut the presumption of regularity accorded to agencies in performing their duties.  See, e.g.,

Sierra Club v. Costle, 657 F.2d 298, 334 (D.C. Cir. 1981) (agencies receive "the benefit of the

presumption of good faith and regularity in agency action").

Accordingly, even if DDOT predetermined the NEPA outcome, the Committee has failed

to identify sufficient evidence in the current record to attribute that predetermination to FHWA.

#### d.      Contractor Bias

Taking a somewhat similar tack, the Committee asserts that FHWA impermissibly relied

on reports generated by a contractor with a financial interest in the VAT construction project.

The EIS indicates that it considered three engineering reports prepared by Clark-Parsons Joint

Venture.  FEIS Chs. 8, 10.  The same company has contracted with CSXT to be the lead

construction contractor on the VAT project.  Appl. Prelim. Inj. Ex. 9.  The Committee contends

that because Clark-Parsons has a financial interest in the reconstruction of the VAT, its reports

may be biased, and FHWA was therefore obligated to disclose the alleged conflict and

independently verify the accuracy of the reports.

29

The D.C. Circuit considered a very similar argument in <u>National Wildlife Federation v.</u> <u>FERC</u>, 912 F.2d 1471 (D.C. Cir. 1990), where a plaintiff argued that the agency had impermissibly relied on biased reports generated by a contractor with a financial interest in the project. <u>Id.</u> at 1485. The Circuit held that the agency properly used the reports because it was aware of the consultant's bias and independently confirmed the validity of the data underlying the reports, and the petitioner had "not pointed to any inaccuracies in the disputed data, but . . . merely speculated that the data [was] unreliable due to the interests of the proponents of the evidence." <u>Id.</u> The Circuit found that "[s]uch a speculation, without more, is insufficient to undermine the Commission's independent determination that the data were reliable." <u>Id.</u> at 1485–86.

The Committee's argument fails here for the same reasons. It has not demonstrated that Parsons-Clark's connections to CSXT were hidden from FHWA. Indeed, NEPA regulations permit a project proponent and its contractors to provide information on which an EIS is based. Guidance Regarding NEPA Regulations 48 FR 34263-01, 34266.[4] As discussed above, moreover, FHWA's statement that it performed an independent review of the EIS is afforded a presumption of validity, which the Committee has not rebutted. The Committee also has failed to assert any substantive errors in Clark-Parsons' reports, which do not appear to analyze the environmental effects of the project in any event, but are rather engineering reports describing the effects of construction on traffic and vibration. FEIS at 10-1. Accordingly, the Committee has not demonstrated that FHWA has violated NEPA by relying on reports prepared by the Clark-Parsons Joint Venture.

---

[4] A contractor who *prepares* the EIS, however, must "have no financial or other interest in the outcome of the project." 40 C.F.R. § 1506.5(c). Here, there is no evidence in the present record before the Court that Clark-Parsons played a role in drafting the EIS.

2. <u>Segmentation</u>

The Committee next alleges that the EIS improperly segmented the VAT proposal from the larger National Gateway Initiative in order to reduce the scope of analysis. A project subject to NEPA may not be segmented in such a way as to reduce the environmental impact assessed or mask its true scope. That is so because "[a]gencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact." <u>Coal. on Sensible Transp., Inc. v. Dole</u>, 826 F.2d 60, 68 (D.C. Cir. 1987).

CEQ regulations specify that actions are "connected," and therefore should be analyzed in the same EIS, if they: "(i) [a]utomatically trigger other actions which may require environmental impact statements[;] (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously[; or] (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). In contrast, each action evaluated in its own EIS shall:

> (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
> (2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and
> (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f). A short project may have logical endpoints if it connects with a broader network in a useful fashion. <u>Taxpayers Watchdog, Inc. v. Stanley</u>, 819 F.2d 294, 299 (D.C. Cir. 1987) (finding that the district court properly approved a four-mile rail system that connected to other bus and rail links). When the project runs through a city, however, "the 'logical terminus' criterion is unusually elusive," and the more useful question is "whether one project will serve a significant purpose even if a second related project is not built." <u>Coal. on Sensible Transp.</u>, 826

F.2d at 69 (citing <u>Taxpayers Watchdog</u>, 819 F.2d at 299). "The commercial and financial viability of a project" on its own is an important indication that it has substantial independent utility. <u>Del. Riverkeeper Network v. FERC</u>, 753 F.3d 1304, 1316 (D.C. Cir. 2014) (finding that a pipeline project had been improperly segmented because it was financially interdependent with other segments and offered no realistic customer benefit on its own).

The EIS identifies the termini of the VAT as the ends of the tunnel itself, under Virginia Avenue from 2nd Street SE to 11th Street SE. FEIS at 2-8. The Committee, however, contends that the proposed VAT improvements are useless without similar modifications throughout the rail network. Noting the EIS's emphasis on CSXT's contemporaneous National Gateway Initiative, it argues that increasing clearance in the VAT will serve no purpose unless the 60 other impediments to double-stacking in the network are also removed. Appl. Prelim. Inj. at 21–22; <u>id.</u> Ex. 3, at 2. And the Committee characterizes the Defendants' reliance on the benefits of double-tracking (which the VAT project would accomplish on its own) to justify the project as an improper *post hoc* rationalization that the Court should ignore. Reply at 21–23. The Committee's segmentation argument fails for two primary reasons.

First, the conclusion that the VAT project has a logical scope and independent utility apart from the wider network finds support in the current record. The EIS itself identifies three drawbacks of the current tunnel, two of which—the limits of the single track and ever-increasing maintenance needs and safety risks of the aging tunnel—would be immediately eliminated by the Preferred Alternative. FEIS at 2-1. The Record of Decision also highlights the enhanced safety that would result from the Preferred Alternative. ROD at 8. The speed and flexibility gained by modernizing and expanding the VAT provides a clear benefit to customers and the railway alike.

32

Second, the Committee has not identified another project currently pending before a federal agency from which the VAT project could have been divided.  At the hearing on the application, counsel for the Committee noted that the Department of Transportation had just awarded $2.8 million to conduct a NEPA evaluation of possible improvements to the Long Bridge, the only rail crossing of the Potomac between Washington, D.C. and Harpers Ferry, West Virginia, 50 miles to the northwest.  Luz Lazo, Long Bridge project gets $2.8 million from federal government, Wash. Post (Sept. 18, 2014); FEIS at 2-7.  But this project is in the early planning stages, while construction on the VAT is ready to begin.  Even assuming the Long Bridge construction could be a "connected" action, it is entirely speculative whether it will take place, and it would not undermine the independent utility of the VAT discussed above.  The agency's conclusion that the VAT improvements form a logical segment is reasonable under the circumstances.

### 3.  Cumulative Effects

The Committee alleges that FHWA failed to evaluate the cumulative effects of the VAT construction.  Cumulative effects "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," regardless of who or what is responsible for the other actions.  40 C.F.R. § 1508.7.  The purpose of studying cumulative effects is similar to that of the segmentation requirement: "to prevent agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."  NRDC v. Hodel, 865 F.2d 288, 297 (D.C. Cir. 1988) (internal citations removed) (remanding for further consideration of the effects on migratory species of simultaneous development in multiple planning areas).  A cumulative effects analysis must identify the area of study; expected impacts from the proposed

project; other expected actions in the same area and their impacts; and the overall cumulative

impact that can be expected if the individual effects are allowed to accumulate. Del.

Riverkeeper, 753 F.3d at 1319 (citing Grand Canyon Trust v. Fed. Aviation Admin., 290 F.3d

339, 345 (D.C. Cir. 2002)).  In evaluating cumulative effects, courts assume a "worst case"

scenario in which reasonably foreseeable projects that could lead to incremental impacts but are

not currently under review would take place.  Coal. on Sensible Transp., 826 F.2d at 71

(incorporating the effects of other highway projects that had been previously approved by

assuming they would be completed).

 The Committee contends that the EIS ignored the cumulative effects of the VAT project

by examining only the effects of construction, not ongoing tunnel operations.  Appl. Prelim. Inj.

at 24 (quoting FEIS at 5-100).  It argues that it was arbitrary and capricious for FHWA to

"ignore the environmental impact of transporting up to four times the volume of freight rail,

including hazardous materials, at increased speeds through the heart of the capitol."  Id. at 25.

The Committee also points to a supposed inconsistency in positions advanced by the project's

proponents regarding the volume of freight that will move through the new tunnel:  Defendants

assert both that CSXT will move "the same amount of freight with fewer trains," Opp'n of Fed.

Defs. at 24 (quoting FEIS at 5-82), and that the VAT will accommodate increased freight

volumes, FEIS at 5-82.

 The Committee's argument misses the mark.  The EIS does in fact analyze cumulative

effects, both in its summary of post-construction effects, see id. at S-10 to S-25, and in a separate

section on cumulative impacts, see id. at 5-100 to 5-105.  For example, the EIS discusses post-

construction air quality impacts from train operations under the Preferred Alternative.  Id. at S-

13.  The EIS and Record of Decision also analyze the incremental effects of the projected 50

34

percent increase in freight transportation in the project area.  In contrast, the Committee has not

provided any evidence to support its contention that four times the current amount of freight will

actually move through the VAT.  As a result, the Committee has not at this point demonstrated

that the agency failed to consider post-construction cumulative effects.

4.    Foreseeable Impacts

In addition to cumulative effects, NEPA requires the agency to consider direct and

indirect foreseeable future effects of the project under review.  40 C.F.R. § 1508.25(c).  An

agency may not unreasonably disregard foreseeable environmental consequences that are

supported by the record.  Brady Campaign to Prevent Gun Violence v. Salazar, 612 F. Supp. 2d

1, 23 (D.D.C. 2009).  On the other hand, an agency is not required to assess an environmental

harm that is only a remote possibility, Robertson v. Methow Valley Citizens Council, 490 U.S.

332, 356 (1989), or examine a risk that is merely conceivable, but not reasonably foreseeable,

Theodore Roosevelt Conservation P'ship v. Salazar, 605 F. Supp. 2d 263, 274 (D.D.C. 2009),

aff'd, 616 F.3d 497 (D.C. Cir. 2010).  Nor does NEPA require consideration of foreseeable

effects that are not potentially subject to the control of the federal agency doing the evaluation.

N.J. Dep't of Envtl. Prot. v. Nuclear Regulatory Comm'n, 561 F.3d 132, 139 (3d Cir. 2009).

This is because NEPA is not meant to "transplant specific regulatory burdens from those expert

agencies otherwise authorized to redress specific nonenvironmental problems and pointlessly to

reimpose those objectives on other unqualified agencies."  Glass Packaging Inst. v. Regan, 737

F.2d 1083, 1092 (D.C. Cir. 1984).

The Committee asserts that DDOT and FHWA failed to consider what it believes are two

reasonably foreseeable impacts of the VAT project: rail accidents and terrorist attacks.  As to the

former, the Committee argues that greater freight traffic and trains traveling at higher speeds

through the tunnels will increase the risk of accidents.  It adds that, if CSXT were to rescind its voluntary agreement not to transport certain hazardous materials through the District, the consequences of any accident could be more serious.

Citing CSXT accident statistics, the Committee argues that the risk of a train derailment in the tunnels is reasonably foreseeable.  See Reply Ex. 36 (CSXT incident reports since 2005); id. Ex. 35 (discussing a 2007 CSXT coal spill into the Anacostia River).  But the risk of an accident exists today.  For the Committee's argument to prevail, then, it must demonstrate that the newly-constructed tunnels will foreseeably *increase* the risk of an accident as compared to current operations.  It has not made that showing.  First of all, the EIS makes clear that the number of trains passing through the tunnels will not "vastly" increase, as the Committee argues.  The "worst-case" 50 percent increase in freight volume is anticipated to occur gradually over the next 30 years.  And with the increased height of the tunnels, double-stacked trains would be able to carry as much freight on half as many cars.  The Committee is correct that trains would be able to move faster through the new tunnels—40 miles per hour rather than the current 15.  But it is also true that trains now have to brake from their normal speed before entering the VAT and then accelerate when they exit.  Which scenario presents a higher risk of derailment is not self-evident.

The Committee's contention that higher speeds will make accidents more likely also overlooks the modernization of the tunnel.  Stressing this point, the EIS concludes that "[t]rain derailments will be less likely to occur in the new tunnel compared to the existing tunnel, despite a higher operating speed than current conditions[, because t]he new tunnel will have a more reliable floor and track ballast."  FEIS at 5-11.  It also notes the new center wall would isolate

any derailment.  Id. at S-4.  Thus, not only is an increased marginal risk of accidents not reasonably foreseeable, it was also considered, and rejected, in the EIS.

The Committee also contends that the EIS ignored the risk of terrorist attacks.  But as with potential derailments, the Committee fails to demonstrate how the risk of an attack would be any greater than it is now.  Indeed, one might think trains idling outside the tunnel, as they do now, would present more inviting terrorist targets.  Assessing the marginal risk of an attack would be speculative in any event.  As a result, courts generally have not required agencies to assess the potential for terrorist attacks in a NEPA analysis.  See Mid States Coal. for Progress v. Surface Transp. Bd., 345 F.3d 520, 544 (8th Cir. 2003) (holding that the agency need not supplement its safety analysis with a specific assessment of the risk due to terrorist attacks); City of New York v. Dep't of Transp., 715 F.2d 732, 750 (2d Cir. 1983) (same).  The Court declines to do so here.

## 5.    Consideration of Alternatives

Consideration of alternatives is at the core of NEPA's procedural mandate.  City of Alexandria v. Slater, 198 F.3d 862, 866 (D.C. Cir. 1999).  The Committee asserts that the EIS is inadequate because it failed to consider in detail four alternative project concepts that involved rerouting freight around (or under) the District of Columbia.  It argues that FHWA unreasonably applied its screening criteria to these four options and improperly rejected them without conducting a monetary cost-benefit analysis.

CEQ regulations require the EIS to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1; accord id. § 1508.25(b).  An agency therefore must:

 (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

. . .

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

Id. § 1502.14.  An agency is not required, however, to conduct a monetary cost-benefit analysis.

Id. § 1502.23 ("For purposes of complying with the Act, the weighing of the merits and

drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis

and should not be when there are important qualitative considerations.").

The problem remains that a "reasonable alternative" is not self-defining; it must be

compared to something.  City of Alexandria, 198 F.3d at 867 (citing Vt Yankee Nuclear Power

Corp. v. NRDC, 435 U.S. 519, 551 (1978)).  The universe of reasonable alternatives is therefore

limited by reference to the objectives of the federal action.  Citizens Against Burlington, Inc. v.

Busey, 938 F.2d 190, 195–96 (D.C. Cir. 1991).  The agency must define the objective of the

federal action, or in other words, the "purpose and need to which the agency is responding."  40

C.F.R. § 1502.13.  A reasonable alternative must meet this purpose and need, and also be

"technically and economically practical or feasible."  43 C.F.R. § 46.420(b).  A court's review of

an agency's consideration of alternatives follows a "rule of reason" analysis:  it must be upheld

"so long as the objectives that the agency chooses are reasonable" and its discussion of "the

alternatives are reasonable and the agency discusses them in reasonable detail."  Busey, 938 F.2d

at 196.

FHWA defined the purpose and need of the VAT project as to "preserve, over the long-

term, the continued ability to provide efficient freight transportation services in the District of

Columbia, the Washington Metropolitan Area and the eastern seaboard." ROD at 2. The agency

first considered eleven design concepts (along with a no-action option) to meet this purpose and

need. Seven of the alternatives involved rebuilding or reconfiguring the VAT. FEIS at 3-43.

Four others involved rerouting the bulk of freight traffic outside (or under) Washington, D.C.

altogether. Id. These are the four options the Committee argues were not given due

consideration.

 After the application of eight screening criteria, the four reroute options were eliminated

because they had an "extremely high cost" (ranging from $2 to $4.7 billion); would require

planning across multiple jurisdictions; would require the construction of either a "deep bore"

tunnel under the city or a new bridge across the Potomac river south of Washington; would

adversely affect diverse natural resources; or would include substantial diversion of freight

volume to trucks with associated effects on highway congestion, fuel consumption, and

pollution. Id. at 3-65. The three designs that had passed all of the criteria were then evaluated in

detail in the EIS against the no-build alternative. Id. at 3-65 to 3-66.

 The Committee disputes the elimination of the reroute options. It argues that screening

criterion six—that "[t]he concept will be implemented in a time frame that accommodates the

near term anticipated increase in freight traffic," id. at 3-63—was unachievable, and designed to

make the reroute options fail. It notes the Preferred Alternative itself will take 30 to 42 months

to complete. Id. at S-32. As for cost, the Committee argues that the EIS does not explain

whether criterion eight—"[t]he concept has a comparatively low cost," id. at 3-63—measures

merely financial investments, or reflects a cost-benefit analysis. It asserts that failure to weigh

the benefits to CSXT and others against the cost of rerouting indicates the agency "entirely failed

to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n of the U.S., Inc.,

463 U.S. at 43.  Finally, because DDOT managed a 2007 Railroad Realignment Feasibility Study ("RRF study") that concluded that the benefits of rerouting most freight traffic around Washington's downtown core would outweigh the costs, Appl. Prelim. Inj. Ex. 25 at 94, the Committee alleges that the District may not now take the opposite position on the balance of costs and benefits without some reasoned explanation.

Courts evaluate whether an alternative meets an objective "with considerable deference to the agency's expertise and policy-making role." City of Alexandria, 198 F.3d at 867.  The closest any case cited by the Committee comes to rejecting a consideration of alternatives is New Mexico ex rel. Richardson v. Bureau of Land Management, 565 F.3d 683 (10th Cir. 2009).  In that case, the Tenth Circuit reversed a district court finding that the Bureau of Land Management complied with NEPA where the agency did not examine one alternative at all.  Id. at 707.  Here, by contrast, the agency set forth twelve design options, articulated reasonable criteria against which to judge the scenarios, and applied those criteria to all of the options.  FEIS at 3-62 to 3-63.  It also adequately explained why it rejected the four reroute options without more detailed consideration.  Id. at 3-64 to 3-65.  This is all "the thoroughness required by law."  Busey, 938 F.2d at 198.  NEPA does not prevent an "unwise" consideration of alternatives; merely an uninformed one.  Id. at 199.  Nor does it require a monetary cost-benefit analysis before rejecting an alternative scenario based on cost.  40 C.F.R. § 1502.23.  Given the deference due to the agency under the rule of reason and the steps of review outlined in the EIS, the Committee has not demonstrated that the consideration of alternatives reflected in the EIS was unreasonable.

### 6.   Accurate Information

A NEPA evaluation must rely on "high quality" information and accurate scientific analysis.  40 C.F.R. § 1500.1(b).  "Agencies shall insure the professional integrity, including

scientific integrity, of the discussions and analyses in environmental impact statements." Id. §

1502.24.  An agency need not, however, "employ the best, most cutting-edge methodologies."

Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 511 (D.C. Cir. 2010)

(upholding a NEPA analysis based on a scientific method that was acceptable at the time, but

had been replaced by newer models).  Factual determinations survive review as long as there is a

"rational connection between the facts found and the decision made."  New Mexico ex rel.

Richardson, 565 F.3d at 713.

      The Committee asserts that the EIS contains inaccurate information in two respects.  It

contends that it exaggerates the extent to which the existing tunnel, standing alone, contributes to

freight bottlenecks.  And it faults the EIS's reliance on cost data from the 2007 RRF study to

justify the elimination of the four reroute alternatives.  Neither of these alleged deficiencies in

the EIS violates the agency's obligation to rely on quality information and accurate analysis.

      The role of the tunnel in delaying freight and passenger rail traffic is widely documented

in the EIS.  FEIS at 2-2 ("The single railroad track within Virginia Avenue Tunnel represents the

single greatest constraint on rail headway (the frequency of passing trains within a given time

period) on CSX's mainline freight rail network . . . .  Ordinarily, just freight trains are affected

by this delay.  However, if an eastbound train is delayed, the queue could extend beyond the

junction at 1st Street SW, which is located just one-half-mile from the Virginia Avenue Tunnel

portal at 2nd Street SE, or less than the length of a typical freight train.  Trains queued beyond

that point will continue to cause delays to passenger rail service traveling between Virginia and

Union Station."); accord id. at S-3, 2-1, 2-5.  Just because it may not be the *only* bottleneck in the

CSXT network does not mean that it does not create, or significantly contribute to, the delays

and inefficiencies described in the EIS.  Moreover, as explained in the discussion of the

Committee's segmentation claim, the EIS adequately explains why the tunnel modernization has independent utility even without improvements to the rest of the CSXT network.  See supra, III.B.2.

Moving to the Committee's second objection, the EIS cites the 2007 RRF study to explain why it eliminated the reroute options based on cost, among other reasons.  As noted above, the RRF study indicated that the cost of the four options—which would involve constructing either a nine-mile long "deep bore" tunnel running under the city center or a new Potomac River bridge south of Washington—would range from $2 to $4.7 billion.  The Preferred Alternative, on the other hand, is estimated to cost substantially less, at about $160 million.  While the Committee faults the "dated nature" of the study, Reply at 51, it nowhere suggests how the cost of those options could possibly have *decreased* in the last eight years.  Its more serious objection is that the agencies failed to weigh those costs against the potential economic benefits of rerouting freight around the city.  As previously noted, however, NEPA does not require agencies to conduct monetary cost-benefit analysis when considering alternatives.  See supra, III.B.5; 40 C.F.R. § 1502.23.

The Committee therefore has not established at this stage that the EIS rests on inaccurate information.

### 7.    District of Columbia Law

The Committee's final contention on the merits is that DDOT and the District of Columbia violated a series of local laws by issuing the permits required for the VAT reconstruction.  The Committee first asserts that DDOT failed to promulgate an EIS in conformity with the District of Columbia Environmental Policy Act ("DCEPA"), D.C. Code § 8-109.01, et seq.—which imposes environmental review requirements on the city similar to those

required by NEPA—by entering into the agreements with CSXT described in Section III.B.1

above.  The DCEPA, however, provides that the city and its agencies need not issue an EIS if

"an EIS has been prepared in accordance with [NEPA]" or if the project's "impact on the

environment has been considered in the functional equivalent of an EIS."  D.C. Code § 8-

109.06(a)(1), (3).  Because DDOT and FHWA issued an EIS under NEPA that, for the reasons

stated above, appears adequate on this record, DCEPA did not require DDOT to issue another

EIS.

The Committee next maintains that DDOT violated D.C. Code § 10-801 by failing to

obtain D.C. City Council approval before issuing the right-of-way permits for the VAT.  D.C.

Code § 10-801 requires City Council approval prior to selling, conveying, leasing for more than

20 years, or otherwise disposing of real property owned by the District.  That provision,

however, does not address the issuance of right-of-way permits.  Instead, D.C. Code § 10-

1141.03 allows the mayor to "issue permits to occupy or otherwise use public rights of way,

public space, and public structures pursuant to this subchapter for any purpose" and does require

prior City Council approval.  The Committee argues that the right-of-way permit issued to CSXT

does not comport with D.C. Code § 10-1141.03 because that provision allows the mayor to

revoke a right-of-way permit at any time, whereas the permit issued to CSXT will terminate only

with the consent of both DDOT and CSXT.  Appl. Prelim. Inj. Ex. 15 at 4.  But this incongruity

does not transform the right-of-way permit into a disposition of real property.  The conditions of

the permit more accurately reflect an easement than a lease or other transfer because CSXT may

only use the land to operate the VAT.  Compare Easement, Black's Law Dictionary (10th ed.

2014) ("An interest in land owned by another person, consisting in the right to use or control the

land, or an area above or below it, *for a specific limited purpose*" (emphasis added)); with Lease,

43

Black's Law Dictionary (10th ed. 2014) ("A contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration").  The permit itself, moreover, provides that it will remain in effect if any provision is deemed invalid.  Appl. Prelim. Inj. Ex. 15 at 3.  Thus, even if this clause is incompatible with D.C. Code § 10-1141.03, the more appropriate remedy would be to strike it from the agreement.  Furthermore, the Committee would not appear to have standing to challenge the permit on the basis that it waives the mayor's right to revocation.

Finally, the Committee contends that DDOT violated D.C. Code § 9-202.01, which allows for the permanent closure of "all or part of any street or alley . . . upon approval of a proposed resolution submitted by the Mayor to the Council for its review."  The VAT reconstruction, however, will not require the city to permanently close any street or alley, merely land adjacent to or under streets.  See Appl. Prelim. Inj. Exs. 15, 17 (delineating above- and below-ground locations of right-of-way permits).  The provision is therefore inapplicable.

For all of the reasons discussed above, the Committee has not established a likelihood of success on the merits of its claims.

### C.   Balance of Equities and Public Interest

The final two factors the Court must consider in deciding whether to grant a preliminary injunction are the balance of harms and the public interest.  When balancing competing claims of injury, the Court must "consider the effect on each party of the granting or withholding of the requested relief."  Winter v. NRDC, 555 U.S. 7, 9 (2008).  And it must pay "particular regard to public consequences in employing the extraordinary remedy of injunction."  Id.

The Committee's claimed injuries are cataloged above: the noise, dust, vibration, and loss of flora and public space that would be caused by the construction project and any increased risk

of a rail accident or terrorist attack after the project has been completed.  On the other side of the

scale, CSXT claims that it will suffer economically if the project is further delayed due the

continuing cost of maintaining and repairing the aging tunnel and the lost revenue associated

with operating an inefficient freight rail system.  Opp'n of CSXT at 23.  The injuries identified

by the federal defendants are mainly public harms from keeping the tunnel in its current state.

Opp'n Fed. Defs. at 40–41.  They reiterate that reconstruction of the VAT will improve the

safety and security of the tunnel and the efficiency of both the freight and passenger rail system

in the Washington, D.C. area.

The Court concludes the balance of the equities tips decidedly in the Defendants' favor,

and particularly towards the public interest.  As discussed above, the Committee's contentions

that a new tunnel will lead to more accidents and a greater risk of terrorist attack are speculative

at best.  And with the exception of the removal of some 200 trees, the Committee has not

established that any environmental effects of the construction activity will be severe or

irreparable.  Moreover, although the construction inevitably will be disruptive and unsightly, the

Committee has identified only one of its members who will be directly affected.  This is not to

minimize Ms. Harrington's understandable misgivings over the prospect of a large-scale

construction project outside her front window in the coming years.  But her concerns do not

outweigh the broader public's substantial interest in modernizing this deteriorating and

outmoded tunnel.  Winter, 555 U.S. at 22 (denying a preliminary injunction even though

plaintiffs had made a showing of "near certainty" of irreparable harm); Weinberger v. Romero-

Barcelo, 456 U.S. 305, 312–13 (1982) ("[T]he court may in the public interest withhold relief

until a final determination of the rights of the parties, though the postponement may be

burdensome to the plaintiff.").  A balancing of the harms and the public interest thus weighs against enjoining the project.

**IV.       Conclusion**

For the foregoing reasons, the Committee has failed to carry its burden to establish grounds for a preliminary injunction.  The Court therefore will deny the Committee's application.  A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   April 7, 2015