## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COMMITTEE OF 100 ON THE FEDERAL CITY,** | |
| Plaintiff, | |
| v. | Case No. 1:14-cv-01903  (CRC) |
| **ANTHONY FOXX, et al.,** | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

The Committee of 100 on the Federal City has moved for reconsideration of the Court's April 7, 2015 decision to deny its request for an injunction barring CSX Transportation from reconstructing the Virginia Avenue Tunnel in Washington, D.C. The Committee contends that new information gleaned from the recently-produced administrative record demonstrates that the federal and local agencies involved in the environmental review of the reconstruction project unlawfully predetermined its outcome. The Court concludes, however, that the Committee's new evidence does not satisfy its burden to demonstrate that the agencies failed objectively to consider the environmental impacts of the reconstruction. Accordingly, it will deny the motion.

### I.      Background

Plaintiff Committee of 100 on the Federal City filed an application for a preliminary injunction to prevent construction on the Virginia Avenue Tunnel in the Capitol Hill neighborhood of Washington, D.C. The Court denied the application in a 46-page Opinion after conducting a hearing. Comm. of 100 on the Fed. City v. Fox, No. 14-cv-1903, 2015 WL 1567902 (D.D.C. Apr. 7, 2015). The Court assumes familiarity with the facts and law outlined in its prior opinion, and will only briefly recount the salient facts. CSX Transportation

("CSXT") seeks to renovate the 111-year-old Virginia Avenue tunnel by adding a second track, improving the track ballast, and raising the ceiling to permit double-stacked trains. Id. at *1. The Federal Highway Administration ("FHWA"), along with the District of Columbia Department of Transportation ("DDOT") as co-lead agency, published an Environmental Impact Statement ("EIS") and Record of Decision ("ROD") under the National Environmental Protection Act ("NEPA") allowing CSXT to proceed with the reconstruction, and the Committee has brought suit to challenge that decision. Id. at *2.

Among other issues, the Committee contended in its preliminary injunction application that DDOT unlawfully predetermined the outcome of the NEPA review by entering into a series of agreements with CSXT. DDOT agreed, among other things, to provide letters of support for the project; manage the EIS process; issue permits and provide easements in the event of NEPA approval; and redesign, at CSXT's expense, an ongoing project near the tunnel to permit reconstruction. Id. at *11. Those agreements also provided benefits to the District of Columbia and DDOT, including an option enabling DDOT to make an offer to CSXT to purchase a right-of-way in Southeast D.C. to be used as a walking and biking trail. Id. at *11–12. The Committee argued further that the alleged NEPA predetermination reflected in these agreements should be attributed to FHWA because the federal agency failed to independently consider the data and analysis underpinning the EIS. Id. at *12–13. The Court, however, found that the agreements did not reflect predetermination of the environmental review process because they neither irreversibly committed resources to the project nor bound DDOT to arrive at a specific NEPA outcome. Id. at *10–12. And relying on FHWA's representations in the EIS and ROD that the federal agency had independently reviewed the facts and analysis underlying the EIS, the

Court concluded that, even if DDOT had prejudged the NEPA result, the Committee had failed to satisfy its burden to attribute that predetermination to FHWA. Id. at *13.

After the Court denied the Committee's preliminary injunction application, the Committee filed an appeal with the D.C. Circuit and sought an emergency stay of the reconstruction from this Court, which the Court denied. The Committee then requested that the Circuit stay the project. Meanwhile, the parties filed the certified list of the contents of the administrative record. Pointing to a series of emails and agreements contained in this record that it argues shed new light on its claims of predetermination, the Committee on May 5, 2015 filed a motion under Federal Rule of Civil Procedure 59(e) to set aside the Court's denial of its preliminary injunction application. On May 11, 2015, The Court of Appeals issued an order staying the Committee's appeal and directing this Court to consider the Committee's new evidence in the first instance. The Court held a telephonic scheduling conference with the parties the next day and issued an order expediting the remaining briefing schedule on the Committee's Rule 59(e) motion. Briefing was completed on May 21, 2015.

## II.     Standard of Review

Reconsideration of an order or amendment of a judgment "is an extraordinary measure" that a court does not approach lightly. Fresh Kist Produce, LLC v. Choi Corp., 251 F. Supp. 2d 138, 140 (D.D.C. 2003). Relief under Rule 59(e) may be appropriate in circumstances where there has been an intervening change in law, new evidence is available, or the court needs to "correct a clear error or prevent manifest injustice." Ciralsky v. C.I.A., 355 F.3d 661, 671 (D.C. Cir. 2004). The Committee primarily argues that newly available documents from the administrative record provide grounds for reconsideration. As new evidence is a fair ground to bring a Rule 59(e) motion, the Court will examine the merits of the Committee's contention

below.  The Committee also seeks reconsideration of the standard the Court applied to its predetermination claim.  A Rule 59(e) motion, however, "is not simply an opportunity to reargue facts and theories upon which a court has already ruled." Fresh Kist Produce, 251 F. Supp. 2d at 140 (internal quotations removed). The Committee does not discuss any change in controlling law or, in the Court's view, identify clear error. It simply reiterates its prior contention that expressing support for a project, negotiating for concessions in exchange for that support, and agreeing to permit the project in the event of successful NEPA review predetermine the environmental analysis.  This is insufficient to merit Rule 59(e) relief.

###    III.    Analysis

As the Court explained in greater detail in its April 7, 2015 Opinion, NEPA requires agencies to consider potential environmental effects objectively and in good faith, but they need not be "subjectively impartial." Carolina Envtl. Study Grp. v. United States, 510 F.2d 796, 801 (D.C. Cir. 1975) (citing Envtl. Def. Fund, Inc. v. Army Corps of Eng'rs, 470 F.2d 289, 295 (8th Cir. 1972)).  Indeed, Council on Environmental Quality regulations contemplate that agencies will announce any "preferred alternative" at the draft EIS stage. 40 C.F.R. § 1502.14(e).  And the standards governing NEPA review remain the same regardless of whether the federal agency is reviewing a proposal from a private entity or itself seeks to take action. See, e.g., Coal. to Protect Cowles Bog Area v. Salazar, No. 12-cv-515, 2013 WL 3338491 (N.D. Ind. July 2, 2013) (analyzing whether National Park Service predetermined NEPA review of its own program to restore area to wetland); Los Alamos Study Grp. v. U.S. Dep't of Energy, 794 F. Supp. 2d 1216, 1219 (D.N.M. 2011), aff'd, 692 F.3d 1057 (10th Cir. 2012) (reviewing argument that the Department of Energy predetermined its plan to build a research facility before completing NEPA review).

Wyoming Outdoor Council v. Forest Service, 165 F.3d 43, 50 (D.C. Cir. 1999), and Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983), establish the point in time when government action in support of a project triggers an obligation to first complete NEPA review: An agency is not required to prepare a final EIS and ROD until the critical stage at which it makes an irretrievable commitment of resources towards a project. E.g., Wyo. Outdoor Council, 165 F.3d at 49 (issuing leases such that the agency loses authority to preclude the project); Thomas v. Peterson, 753 F.2d 754, 760–61 (9th Cir. 1985) (funding activity having no purpose other than furthering a program under NEPA review). An agency can also predetermine the outcome of its review if it agrees to reach a certain decision regarding the environmental effects of a project before completing the substantive analysis of those effects. Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002) (agreeing to reach a Finding of No Significant Impact by a date certain).

The Committee presents a substantial number of documents culled from the administrative record, which it contends constitute new evidence revealing DDOT's predetermination of the NEPA result and FHWA's failure to independently review DDOT's analysis. The Court will address the Committee's new evidence on a categorical basis.

## A.   Negotiation Documents

The first category of documents consists of internal DDOT emails and other correspondence concerning the negotiations between DDOT and CSXT regarding the agreements noted above. As explained in the Court's prior Opinion, the agreements do not establish predetermination by DDOT because they do not reflect an irreversible commitment of resources. Comm. of 100 on the Fed. City, 2015 WL 1567902, at *10–12. It follows, then, that correspondence within DDOT regarding negotiation of those agreements—such as asking "what

leverage [DDOT has] with the Virginia Avenue tunnel," ARDDOT0000565, or whether "DDOT need[s] anything from CSXT," Pl. App. 121—likewise does not establish that the municipal agency was pre-committed to ensuring that the environmental review of the tunnel reconstruction arrived at a specific outcome.  NEPA does not preclude a municipal agency that participates in the environmental review process from negotiating with a project proponent to determine under what terms it will provide an easement or permit.  To require a completed environmental review at such an early stage would be contrary to the principle that agencies need not perform an EIS at the preliminary stages of a project "'concerning events which may never occur.'"  Wyo. Outdoor Council, 165 F.3d at 49 (quoting Mobil Oil Corp. v. FTC, 562 F.2d 170, 173 (2d Cir. 1977)) (alterations in original).

For similar reasons, the Committee reads too much into the suggestion in some of the documents that DDOT, the Mayor's Office, and the City Administrator downplayed their public support for the project and negotiated with CSXT without each other's knowledge.  None of these documents—for example an email from the Mayor's office that there is no need to make a public announcement about the project, Pl. App. 127, and an email from DDOT recommending "against having another town hall meeting . . . because we will be essentially repeating the same information that has been communicated on numerous occasions," Pl. App. 595—show that DDOT had agreed to reach a specific NEPA outcome.

## B.   Discussion of the NEPA Outcome

The Committee points to a second category of new documents that it contends express DDOT's agreement, not only to support the project more generally, but to arrive at a certain NEPA outcome.  Unlike agreements reflecting support for a project generally, which cannot constitute predetermination unless there has been an irreversible commitment by the agency, e.g.,

Flaherty v. Bryson, 850 F. Supp. 2d 38, 70 (D.D.C. 2012), an agreement to arrive at a certain

NEPA outcome necessarily predetermines the review process, Davis, 302 F.3d at 1112.  The

Committee provides, for example, emails in which a CSXT contractor noted that "the anticipated

role of DDOT . . . is to facilitate the process of review and approval of the NEPA

documentation," Pl. App. 76, and a DDOT official communicated to CSXT that "DDOT is open

to acting on CSX's behalf for the environmental work associated with the Virginia Avenue

Tunnel project," Pl. App. 124.  While these documents come a step closer to providing evidence

of predetermination than those discussed above, they still do not meet the Committee's burden.

These documents perhaps could be read as indicating a willingness to arrive at a favorable NEPA

outcome, but they are not a promise to do so.  Moreover, the Court reads the emails as being

equally if not more consistent with DDOT simply agreeing to perform work as a participant in

the NEPA review process.  And any predetermination concerns raised by these comments are

reduced when they are viewed in context: DDOT later agreed, in the Term Sheet Agreement, "to

provide oversight of the EIS process . . . as co-lead agency with FHWA.  DDOT will partner

with FHWA and CSXT to manage the EIS process under FHWA's *Every Day Counts* initiative

and applicable federal law, which is designed to shorten project delivery, enhance project safety,

and protect the environment."  Appl. Prelim. Inj. Ex. 19.  As explained in the Court's prior

opinion, this agreement does not commit DDOT to reach any specific NEPA outcome.

Other documents highlighted by the Committee, meanwhile, appear to contradict its

assertion that DDOT agreed to reach a certain outcome in the environmental review or

committed resources to the project before NEPA review was complete.  Instead, they show

DDOT duly recognizing its responsibility not to enter into binding commitments prior to the

completions of the NEPA process.  For example, the Committee provides a DDOT email

explaining that it could not to enter into First Source and Certified Business Enterprise agreements with CSXT before a ROD had been issued. Pl. App. 594. Similarly, another email shows a DDOT official reviewing a draft joint cooperation agreement and identifying issues that must be resolved so as to be "consistent with the NEPA process." Pl. Supp. Ex. 6. While the Court agrees with the Committee that this particular draft of the proposed joint cooperation agreement could be read to unconditionally require the city to issue all necessary permits, Pl. App. 508, the final agreements that DDOT and CSXT ultimately signed explicitly conditioned permits on NEPA approval, Appl. Prelim. Inj. Exs. 15, 19. These supplemental documents therefore fail to establish that DDOT unlawfully predetermined the NEPA outcome.

### C.   FHWA's Involvement

In a third category, the Committee offers documents that it claims establish FHWA's failure to independently review the evidence and analysis underlying the EIS and ROD. According to the Committee, because FHWA did not conduct an independent review, DDOT's alleged predetermination is attributable to the federal agency. See Davis, 302 F.3d at 1113 (attributing contractor's predetermination to agency because it "failed to conduct a sufficient independent review").

First, the Committee provides an October 2010 email from Michael Hicks, the FHWA official charged with overseeing the environmental review of the tunnel reconstruction, stating he is "not sure how to handle this one, [DDOT has] an announced preferred alternative so it's already pre-decisional." Pl. App. 210. The Committee contends that this email establishes that Hicks believed DDOT had predetermined the outcome of the NEPA review. While it is unclear to the Court precisely what Hicks meant, the Committee's interpretation of the email is strained. Agencies must announce any preferred alternative before issuing the draft EIS. 40 C.F.R. §

1502.14(e).  Therefore, arriving at a preferred alternative during the review process could not constitute improper predetermination.  Moreover, the most natural reading of Hicks' comment "it's already pre-decisional" is not, as the Committee suggests, that he believed a decision had already been made: pre-decisional, after all, means *before* the decision.

Second, the Committee points to instances in the review process which, it contends, demonstrate that Hicks' comments were ignored or that he did not review pertinent materials. Generally, however, the record before the Court shows that Hicks was extensively involved throughout the review process. See generally Def. Supp. App. 81–244 (reflecting emails, memoranda, graphs, and drafts demonstrating FHWA's questions and comments throughout the environmental review process and the follow-up responses by DDOT and contractors). Importantly, Hicks rejected a contractor's proposal to conduct a more limited environmental assessment and issue a Finding of No Significant Impact; he instead required a full EIS—a much more involved and lengthy process, compare 40 C.F.R. § 1508.13 (a "[f]inding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment"); with id. § 1508.11 (an "[e]nvironmental impact statement means a detailed written statement as required by section 102(2)(C) of NEPA"). Def. Supp. App. 93–94.

The specific instances highlighted by the Committee, moreover, actually reflect the consequences of FHWA's oversight.  For example, the Committee points to comments by Hicks on a draft of the EIS demanding additional discussion of (1) the risk of Arsenic and Chromium 6; (2) the risk of asbestos removal; and (3) the unique effects of construction on residents of the Capper Senior Apartments, including the discrepancy between their anecdotal reports of vibrations caused by trains and the results of vibration tests at the location.  Pl. App. 681–83, 98.

Contrary to the Committee's contention that these comments were ignored, the final EIS reflects further analysis regarding each concern. See Final EIS at 4-52 (adding further discussion of potential consequences of uncovering Arsenic and Chromium 6); 5-49 (discussing mitigation measures regarding asbestos); 4-47 (discussing results of vibration tests at Capper Senior Apartments). In another instance, the Committee points to an email from a DDOT official stating that "based on additional information . . . and further internal discussions and FHWA direction, DDOT would like to drop [one of the temporary re-route options that had been contemplated.]" Pl. App. 213. FHWA's involvement in this decision, then, is clearly reflected in the email.

In short, the portions of the administrative record provided by the Committee do not support its position that DDOT unlawfully predetermined the NEPA outcome or that FHWA failed to independently consider the environmental effects of the tunnel reconstruction. Because the Court concludes that the Committee has failed to establish a likelihood of success on the merits of its predetermination claim, it need not address the Committee's further contentions regarding the balance of harms or the public interest. Accordingly, Court will deny the Committee's motion to alter its prior denial of the Committee's request for a preliminary injunction.

### IV.     Conclusion

For the above reasons, it is hereby

**ORDERED** that [69] Plaintiff's Motion to Alter Judgment is DENIED.

**SO ORDERED.**

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:      May 26, 2015